<pre>
1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF TEXAS
2                         HOUSTON DIVISION

3
     SHERRY SHELBY              *   4:16-CV-01549
4                               *
     V.                         *   9:17 A.M. to 5:06 P.M.
5                               *
     BOXER PROPERTY             *
6    MANAGEMENT CORPORATION     *   APRIL 8, 2019

7                         BENCH TRIAL
              BEFORE THE HONORABLE KEITH P. ELLISON
8                        Day 1 of 8 Days

9    APPEARANCES

10   FOR THE PLAINTIFFS:
     Ms. Rhonda Hunter Wills
11   Mr. Patrick Raspino
     Wills Law Firm PLLC
12   1776 Yorktown
     Suite 570
13   Houston, Texas 77056
     (713) 528-2047
14
     FOR THE DEFENDANT:
15   Ms. Teresa S. Valderrama
     Mr. Mauro Ramirez, Jr.
16   Fisher & Phillips LLP
     910 Louisiana Street
17   Suite 4000
     Houston, Texas 77002
18   (713) 292-0150

19   ALSO IN ATTENDANCE:
     Ms. Sherry Shelby
20   Ms. Barbara Michaelis
     Ms. Lauren Hafner
21   Mr. Rodney Hale
     Mr. Alex Kakhnovets
22   Ms. Samantha Galindo

23

24

25
                          Laura Wells, CRR, RDR
</pre>

1    **APPEARANCES (continued):**

2    Court Reporter:
     Laura Wells, RPR, RMR, CRR
3    515 Rusk Street, Suite 8004
     Houston, Texas 77002

4
     Proceedings recorded by mechanical stenography.
5    Transcript produced by computer-assisted transcription.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DAY 1**
**(Bench Trial)**

                                                          Page
April 8, 2019

Announcements..................................      4
Hearing on Motion..............................      4
Ruling of Court................................     13
Opening Statement by Ms. Wills.................     14
Opening Statement by Ms. Valderrama............     41
Rule Invoked...................................     65
Reporter's Certificate.........................    272

**ALPHABETICAL**

WITNESSES                                          Page
**SHERRY SHELBY**
     Direct Examination By Ms. Wills                68
     Cross-Examination By Ms. Valderrama           154

1                          **PROCEEDINGS**

2              THE COURT:  Keep your seats.  Good morning.

3    Please be seated.  Good morning and welcome.  We will

4    begin by taking appearances of counsel, starting with the

09:16:56  5    plaintiffs.

6              MS. WILLS:  Good morning, Your Honor.  Rhonda

7    Wills on behalf of the plaintiffs.  I have with me my

8    co-counsel, Patrick Raspino.

9              THE COURT:  Welcome.

09:17:08  10              MS. VALDERRAMA:  Teresa Valderrama on behalf of

11    Boxer Property Management Corporation.

12              MR. RAMIREZ:  Mauro Ramirez, Boxer Property

13    Management Corporation.

14              THE COURT:  We received the pleading yesterday

09:17:22  15    concerning damages and attorneys' fees.  Do you want to

16    say anything further?

17              MR. RAMIREZ:  Your Honor, we would like to

18    present our arguments on that motion.

19              THE COURT:  Okay.  Please be seated.

09:17:33  20              MR. RAMIREZ:  Thank you, Your Honor.  The

21    defendant is moving to dismiss all evidence of damages and

22    the damages computation presented by defendants under

23    Rule 37.  The short of it is that it was not until six

24    months after the close of discovery that the plaintiff

09:17:49  25    disclosed the full extent and nature of their claims in

5 - 5

1   this lawsuit.

2        The plaintiffs' claim, as has been articulated at that

3   point and has been included in their proposed pretrial

4   findings and what they are asking this Court to decide, is

09:18:05   5   that Ms. Shelby worked 70 hours every single week over a

6   91-week period and that she has evidence to represent and

7   establish that the opt-in plaintiffs, the other ten people

8   in this lawsuit, worked 60 weeks every single week.

9        THE COURT:  60 hours a week.

09:18:25   10        MR. RAMIREZ:  60 hours a week every single week

11   of their respective time periods.  So that is their claim,

12   but that information was not provided to us or articulated

13   to us until a month before this Court setting.  The

14   plaintiffs provided their initial disclosures --

09:18:41   15        THE COURT:  A month?  Say that again.  Did you

16   say you got it a month before?

17        MR. RAMIREZ:  Yeah.  We received that information

18   on March 8th of this year.

19        THE COURT:  Well, couldn't you have asked for a

09:18:49   20   continuance at that point if you needed more time?

21        MR. RAMIREZ:  Your Honor, so let me go back a

22   bit.  They --

23        THE COURT:  I understand they filed it out of

24   time.  I understand that.

09:19:00   25        MR. RAMIREZ:  Right.  Your Honor, at that point

1   in time, this became an issue for pretrial issues, as we

2   are here.  A continuance is both inappropriate and, at

3   this point, would not prevent the harm that has already

4   been committed in this case.

09:19:16  5   This case has been pending for three years, just about

6   three years.  The discovery period has closed.  And there

7   is no explanation that has been provided by the plaintiffs

8   for this late disclosure.

9   Under the Rule 37 analysis and the factors that the

09:19:34  10  Court would consider, it's really up to the plaintiffs to

11  explain why they felt it appropriate to withhold that

12  information from us until six months after discovery had

13  been closed.  They did not provide us the computations

14  that were necessary.  They did not articulate their claim

09:19:52  15  in the manner that they are trying to present it to the

16  Court today until that point in time.

17  That prejudices the defendant.  It prevented us from

18  receiving information that is critical to the defense of

19  this case.  And we are not moving for a continuance.  We

09:20:05  20  are moving that their claims be dismissed today.

21  THE COURT:  Well, but you see this on March 8th.

22  Why couldn't you have at least let us know that you had

23  this issue?  I mean, we've blocked out the whole week for

24  a trial.

09:20:19  25  MR. RAMIREZ:  Well, Your Honor, we wanted to be

*Laura Wells, CRR, RDR*

1  sure that we were prepared in order to present this to the

2  Court.  We received the information from the plaintiffs at

3  that point in time.

4      And then last week on Monday -- we produced over

09:20:30  5  650,000 pages in this case, and it wasn't until the

6  plaintiffs presented their exhibit list last Monday that

7  they identified the particular documents that they argue

8  support the computations that they provided to us.  So at

9  that point we felt that everything had come together and

09:20:47  10  was in a place where we were prepared with our information

11  to present this to the Court and ask for this dismissal.

12          THE COURT:  Thank you.  Ms. Wills.

13          MS. WILLS:  Yes, Your Honor.  First of all, I

14  take issue with the misrepresentations that have just been

09:21:05  15  made to the Court.  There has been a pattern, frankly, of

16  misrepresentations to the Court in this case.  I won't go

17  into all of them.  But there has been a real pattern in

18  this case of misrepresentations.  I mean, frankly, just

19  flat out fraudulent statements to the Court.  The cameras

09:21:24  20  weren't recording my clients until we showed an e-mail

21  that indeed they were recording them.  This is along the

22  same pattern.

23      We provided disclosures back in November of 2018.  So

24  I don't -- I don't know why it is that counsel whom, to be

09:21:39  25  honest, I have never met before today, didn't appear at

1    any of the depositions.  So we provided disclosures in

2    November of 2018 with the damages prior to that.  They had

3    an opportunity to take the deposition of Ms. Shelby and of

4    multiple other plaintiffs in this lawsuit, pursuant to the

09:21:59    5    Court's order that they be allowed to take those

6    depositions.  So they have had more than ample

7    opportunity.

8         And when they took those depositions, Ms. Shelby

9    testified as to how many hours per week she was working on

09:22:10    10    average, as did the other plaintiffs who they deposed.

11    They took multiple depositions in this case.

12              THE COURT:  When were these depositions?

13              MS. WILLS:  Early last year, Your Honor, before

14    April, I believe, around April of last year.

09:22:25    15         Furthermore, Your Honor, the disclosures were simply

16    amended to address Your Honor's findings in your summary

17    judgment order.  In your summary judgment order you made

18    two critical findings that impacted our damage

19    calculation, frankly.

09:22:41    20         One was you limited us to a two-year statute of

21    limitations.  And as Your Honor knows, we anticipated

22    going back three years.  Your Honor ruled we got two

23    years.  So we had to shave a year off of that.  And

24    frankly, that caused a lot of plaintiffs to have to drop

09:22:58    25    out of the case because they were limited out by statute

1  of limitations.

2      Secondly, Your Honor ruled in their favor on the

3  fluctuating workweek.  We had calculated damages at time

4  and a half, which typically the Fair Labor Standards Act

09:23:13   5  allows.  But in this instance, Your Honor ruled in their

6  favor and allowed them to have halftime.

7      So we simply amended our disclosures to reflect Your

8  Honor's rulings on those critical legal issues that

9  halftime be applied rather than time and a half and that

09:23:29   10  we be limited to a two-year statute of limitations rather

11  than a three-year statute of limitations.

12      And those disclosures were made to them shortly after

13  Your Honor made Your Honor's ruling in your motion for

14  summary -- in your ruling on motions for summary judgment.

09:23:44   15  So they have had this information for a very long time.

16      We also had a lengthy telephone conference with Your

17  Honor where we talked about scheduling this trial; and at

18  that time, they could have raised this issue with Your

19  Honor.  No mention was ever made of this at all.

09:24:05   20      THE COURT:  What is it you provided on March 8th

21  that they didn't have before?

22      MS. WILLS:  This is where we reflected halftime,

23  and we cut the statute of limitations back to two years.

24      And might I add, Your Honor, that they are talking

09:24:19   25  about, you know, records.  We relied on their pay records.

*Laura Wells, CRR, RDR*

1    Those are the records.  So I don't -- I don't think that's

2    any surprise to them that we would rely on their pay

3    records.

4        They had the opportunity to take the depositions of

09:24:33   5    Ms. Shelby, as well as many other plaintiffs, and discover

6    how many hours per week they were working.  They have had

7    that information now for almost a year.

8        Might I add, Your Honor, that this motion seems to not

9    be brought in good faith.  They filed it last night,

09:24:50   10    literally the night before trial, as we were getting ready

11    to present our case on damages to the Court this morning.

12        So again, these are last-minute tactics.  It's

13    frankly, I don't feel, being brought in good faith; and

14    their suggestions to the Court simply are not true.

09:25:12   15            THE COURT:  Okay.  Thank you.

16            MR. RAMIREZ:  May I respond, Your Honor?

17            THE COURT:  Yes, you may.

18            MR. RAMIREZ:  So the discovery deadline in this

19    case was September 18th of 2018.  The plaintiffs admit

09:25:26   20    that they did not substantially amend or supplement the

21    disclosure under Rule 26 for the first time until two

22    months after the discovery deadline.  At that point in

23    time, that was the first time that they ever provided a

24    computation of damages.

09:25:41   25        Counsel is correct that we had deposed Ms. Shelby

1    before that, and she had indicated that she may have

2    worked 70 hours a week.  However, the claim at that point

3    was not articulated as one of 70 hours a week every single

4    week over a 91-week period.

09:25:58    5        We took depositions of some of the other plaintiffs as

6    well.  Again, there was no articulation or explanation

7    with respect to the extent of the hours that they claimed

8    to have worked.

9        When the plaintiffs provided their first supplement

09:26:13   10    to -- and they did provide initial disclosures back in

11    October of 2016.  That document provided some kind of bare

12    recitation of the types of damages that would be available

13    under the FLSA.

14        Fast forward to November of last year, which again is

09:26:28   15    two months after discovery closed.  We received a one-page

16    document that has the list of the plaintiffs and has

17    figures that they have provided totaling up to

18    $1.7 million for these 18 people in the lawsuit at that

19    time.  We are provided with no information related to how

09:26:46   20    they calculated that number or the number of hours that

21    they are claiming that underlie that calculation.

22        Fast forward to a month ago, and we receive an updated

23    version of that document; and for the first time, the

24    plaintiffs provided individual sheets for each opt-in

09:27:09   25    plaintiff that listed the hours that they worked.  For

09:27:24

1  Ms. Shelby, for example, they provided a calculation that

2  lists the 91 weeks and has 70 hours listed for every

3  single week.  That is their claim.  That is the claim that

4  they made.  But they did not provide or explain the extent

5  of that claim until a month ago.

6      Plaintiffs' counsel is indicating that we took certain

7  steps during the course of discovery in order to uncover

8  this information, but there has been no explanation as to

9  why plaintiffs did not provide that until a month ago.  We

09:27:43  10  took discovery.  We deposed people.  We asked for

11  information in discovery requests.  We have been before

12  this Court before on a few discovery issues.

13          THE COURT:  Yes, you have.

14          MR. RAMIREZ:  So, Your Honor, we did what we

09:27:56  15  could in order to uncover the extent of these claims; but

16  plaintiffs did not articulate and fully explain what they

17  were asking this Court to find until a month ago.

18          THE COURT:  Well, I understand that that is your

19  contention.  But why do you wait until the night before

09:28:11  20  trial to file a motion to dismiss?  That's way too late.

21  I mean, we are geared up and ready to go.

22          MR. RAMIREZ:  Well, Your Honor, I feel that that

23  puts the --

24          THE COURT:  I know you think they are the

09:28:25  25  wrong-doers, but that doesn't excuse you from moving

*Laura Wells, CRR, RDR*

1    timely for the relief you want.

2            MR. RASPINO:  The defendant's question is what

3    will be done to the wrongdoer in this circumstance with

4    respect to the late disclosure.

09:28:36   5            THE COURT:  Well, if you would have filed the

6    motion earlier, I would have happily granted a continuance

7    because you think you have been disadvantaged by a late

8    disclosure.  I would say, you have more time to get your

9    case ready.

09:28:48  10        Late disclosure of evidence, unfortunately, is not

11   unusual and especially not in cases like this when you are

12   dealing with individuals who are -- plaintiffs who are not

13   maybe entirely familiar with the legal system.

14        I am with you that I would much, much rather see

09:29:11  15   disclosures made on a timely basis, but I'm not sure the

16   appropriate sanction is dismissal, especially not at this

17   hour.  I mean, do you feel unable to go forward with your

18   case?

19            MR. RAMIREZ:  Go forward?

09:29:33  20            MS. VALDERRAMA:  Yes.

21            MR. RAMIREZ:  Yes, Your Honor.  We'll proceed.

22            THE COURT:  Okay.  Do you want to make opening

23   statements or just --

24            MS. WILLS:  We're prepared to make an opening

09:29:48  25   statement.

*Laura Wells, CRR, RDR*

```
 1              THE COURT:  Go ahead.

 2              MS. WILLS:  We need assistance from Mr. Rivera.

 3    We have a PowerPoint presentation.

 4              THE COURT:  See if you can find him.

 5              MS. WILLS:  May it please the Court.

 6              THE COURT:  Counsel.

 7              MS. WILLS:  Good morning, Your Honor.  I am

 8    Rhonda Wills.  Along with my co-counsel, Patrick Raspino,

 9    we have the honor of representing today Sherry Shelby, who

10    is the lead plaintiff.  She is also the class

11    representative of the other plaintiffs in this matter.  We

12    also have with us three of the other opt-in plaintiffs,

13    Barbara Michaelis, Lauren Young Hafner, and Rodney Hale.

14         This is a Fair Labor Standards Act case where there

15    are violations of the FLSA, including overtime violations

16    and failure to maintain accurate pay and time records.

17         There are critical issues that have already been ruled

18    on by summary judgment by Your Honor that have now

19    narrowed this case.  Your Honor ruled that these

20    plaintiffs were indeed misclassified as exempt when, in

21    fact, they are nonexempt workers.  And we expect that the

22    evidence is going to show that since Your Honor made that

23    ruling that they were misclassified, Boxer Property, the

24    defendant, has now reclassified this position as being

25    nonexempt, as it should have been all along.
```

1     Your Honor also ruled that the fluctuating workweek

2  will apply and that overtime is to be calculated at

3  halftime.

4     Your Honor also ruled that with respect to the statute

09:31:57  5  of limitations a two-year statute of limitation will

6  apply.

7     So the only remaining issues -- the only remaining

8  issue to be determined by the Court in this case during

9  this bench trial will be the issue of damages.

09:32:13  10     Based on Your Honor's ruling, there were initially 18

11  plaintiffs.  Seven of those plaintiffs now are out of the

12  case due the statute of limitations, and there are 11

13  plaintiffs that remain, and four of them will be

14  testifying before the Court.

09:32:32  15     So just to give Your Honor an overview of basically

16  what these plaintiffs did, they were leasing agents for

17  Boxer Property, the defendant.  And basically, their job

18  was to lease commercial office space in a Boxer-managed

19  office building.

09:32:47  20     The evidence is going to show that they were supposed

21  to lease these office spaces the Boxer way; and the Court

22  is going to hear exactly how stringent the Boxer way was,

23  how many work hours that required in order to do things

24  the Boxer way.

09:33:04  25     As a part of leasing these commercial office spaces,

1    they did tours with prospective tenants of the vacant

2    office spaces and the building amenities; and ultimately,

3    their goal was to obtain lease agreements with office

4    tenants.

09:33:19  5       They were also required to maintain and cover the

6    office.  The standard office hours for the Boxer lease

7    offices were 8:30 to 5:30; but the evidence is going to

8    show that they worked before and well beyond those hours,

9    based on company policies and company requirements, very

09:33:36  10   stringent requirements.

11       Plaintiffs also had to handle a great deal of

12   paperwork and do various other administrative tasks.  They

13   didn't have a secretary.  They didn't have any sort of

14   administrative assistants.  In fact, they had to do all of

09:33:51  15   the paperwork and all of the administrative tasks

16   themselves.

17       They were also required to answer phone calls from

18   prospective tenants.  These phone calls would typically

19   come into a 1-800 number and then be directed to the

09:34:05  20   leasing offices.  Some of the calls came in directly to

21   the leasing offices; and Boxer also provided these leasing

22   agents with cell phones that they were required to carry

23   with them and answer 24 hours a day, seven days a week.

24   The evidence is going to show that they had to answer

09:34:22  25   those calls at all times.

They were also required to prepare ads that they put on Craigslist and these had to be updated daily, multiple times a day, well into the evening.  One of the main ways that Boxer would get tenants into their buildings was to use these Craigslist advertisements.

They were also required, the evidence is going to show, to call prospective tenants and to get leads by working the phones, trying to get people in, trying to get people to see the available office space.  That required them to make phone calls to prospective tenants as well as brokers.

They were also required to attend meetings and various training because Boxer was very, very stringent about leasing being done in a particular way.

In addition to that, they also had to provide support for other leasing agents.  If a leasing agent didn't know how to handle something with a tenant, they were required to field questions from other leasing agents.

The evidence is also going to show that Boxer wanted to make sure that their leasing agents all did things the same way.  So when a new leasing agent came on board, they would have the new leasing agent shadow a current leasing agent to see how the Boxer way was, to see how things were done.

So this is an overview of the many, many job tasks

1    that these plaintiffs had as leasing agents for Boxer.

2         Boxer Property Management Corporation basically is a

3    company that manages commercial office buildings.

4              THE COURT:  Slow down a little bit.  Go ahead.

09:35:58    5         MS. WILLS:  Boxer manages commercial office

6    buildings in various markets across the country.  One of

7    the largest is here in Houston.  Boxer employs all the

8    plaintiffs or employed all of the plaintiffs as leasing

9    agents.

09:36:09    10        They have, as I mentioned, very strict standards for

11   leasing their office space the Boxer way.  And they

12   trained their leasing agents to lease all of their office

13   space in a uniform manner.  And the evidence is going to

14   show that Boxer Property Management had this manual for

09:36:28    15   its leasing department.  It was known by the leasing

16   agents as the Boxer bible.  In a moment, Your Honor is

17   going to get to see some of the excerpts from the Boxer

18   bible, which the leasing agents had to know, chapter and

19   verse, and had to follow, chapter and verse.  And because

09:36:45    20   of these very strict, onerous requirements, the leasing

21   agents were required to work very, very long hours and to

22   work weekends.

23        So essentially there are two questions that the Court

24   will need to answer in this trial.  There are just two

09:37:03    25   basic questions.

09:37:15

1       The first question is going to be, how much overtime

2  did the plaintiffs work?

3       And then the second question is going to be, did Boxer

4  Property know or should they have known that the

5  plaintiffs were working this overtime?

6       Okay.  So question one, how much overtime did the

7  plaintiffs work?

8       The evidence is going to show that Sherry Shelby, our

9  lead plaintiff, worked an average of at least 70 hours per

09:37:31

10  week.  The evidence is going to show that Ms. Shelby was

11  the top performer, perhaps the top performer in the nation

12  at various times for Boxer Property.

13       She was one of the main leasing agents that Boxer

14  Property had new leasing agents shadow.  They even flew

09:37:49

15  people from out of town to shadow Sherry Shelby because

16  Sherry Shelby was so good at what she did as a leasing

17  agent for Boxer Property.

18       The evidence is going to show the other plaintiffs,

19  the opt-in plaintiffs, also worked an average of at least

09:38:04

20  60 hours per work.

21       The evidence is going to show that there are many

22  weeks that Ms. Shelby worked more than 70 hours, and the

23  opt-in plaintiffs worked more than 60 hours.  So these,

24  Your Honor, are conservative numbers that we are

09:38:17

25  presenting to the Court.

1    None of the plaintiffs were ever paid any overtime

2  because they were misclassified as exempt employees.  They

3  were paid a salary.  They were told they weren't entitled

4  to overtime, and they were told they had to work all the

09:38:30    5  hours that Boxer required them to work in order to get

6  this job done.

7    The evidence is going to show that Boxer Property,

8  though, had them putting in every pay period these

9  cookie-cutter time cards.

09:38:42   10    THE COURT:  Now, is that something they were told

11  to do orally or is that in the bible?

12    MS. WILLS:  Which part, Your Honor?

13    THE COURT:  That they were to use cooker-cutter

14  time sheets to report only 40 hours.

09:38:56   15    MS. WILLS:  The evidence is going to show, Your

16  Honor, that they were told to do that.  We believe that

17  there is also going to be a video that may also show that

18  they were told, you are a salaried employee.  Just put in

19  your 40 hours in order to get your paycheck.

09:39:08   20    And we're going to talk about it more, Your Honor, but

21  sometimes this time was even put in not by the plaintiffs

22  themselves but the leasing coordinator would put the time

23  in.  Supervisors would put the time in.  I mean, they just

24  put in 40 hours and get your paycheck.  It doesn't matter.

09:39:24   25  You are exempt.  You are not getting any overtime.  It was

1    literally just a placeholder.

2         Even the national director of leasing put in 40 hours

3    every week; and his testimony was, yeah, everybody just

4    basically put in 40 hours.

09:39:39   5         The human resources director, the national human

6    resources director who actually had to come down here to

7    give her deposition, said the same thing.  Yeah, we put in

8    40 hours.

9         So the plaintiffs' actual work hours, though, were far

09:39:58  10   beyond 40 hours.  As I mentioned, Sherry Shelby, 70-plus

11   hours a week.  The other plaintiffs, 60-plus hours a week.

12   So they were working before and after the standard office

13   hours, which were 8:30 to 5:30.

14        The evidence is going to show that they worked through

09:40:16  15   meal breaks, that, basically, meal breaks for these

16   leasing agents pretty much involved either brown-bagging

17   it or somebody running to Luby's or McDonald's and

18   bringing something back.  But ultimately, pretty much

19   everybody eating at their desk.

09:40:30  20        Lunch was a really busy time.  A lot of prospects

21   would call in during lunch because that was lunchtime for

22   everybody.  So that was a very busy time.  Tours were

23   often scheduled during the lunch hour; and multiple,

24   multiple calls would come in during that time.

09:40:43  25        The evidence is also going to show that they were

1    working weekends.  They were required to work weekends.

2    They were expected to work weekends.  The evidence is

3    going to show that on average they were all working at

4    least six days a week.  And the evidence is going to show

09:40:57    5    that they remained on call 24 hours a day, seven days a

6    week with those cell phones that Boxer Property gave to

7    them and told them they had to answer at all times.

8         There is also going to be evidence of e-mails showing

9    the late nights, the early mornings, the working during

09:41:14    10   what should have been lunch and working on the weekends.

11        So there are uniform company policies in the company

12   handbook that required these leasing agents to work more

13   than 40 hours, what I referred to before as the Boxer

14   bible.

09:41:32    15        So just to give the Court some of the excerpts from

16   the Boxer bible, here are the leasing expectations in the

17   Boxer bible about hours of work.  Every leasing

18   representative is expected to arrive at work on time and

19   leave when the tasks for the day have been completed.  And

09:41:52    20   the evidence is going to show it would be late into the

21   evening and sometimes well into the night before the tasks

22   for the day had been completed.

23        It goes on to say in the Boxer bible, arrival time is

24   at 8:30 a.m. and departure is 5:30 p.m.  However, these

09:42:11    25   times are subject to prospect requirements and scheduled

          appointments, and important unexpected tasks take

          precedent over regular schedules.  The prospect always

          comes first.  These plaintiffs were told, you are expected

          to put in the time and effort required to get a lease

          signed.  The leasing and management office is always open

          for a prospect.  And the evidence is going to show they

          meant always open.

               The Boxer bible also talks about the leasing

          expectations with respect to answering the cell phone they

          gave them and responding to e-mails and other

          communications.

               Leasing calls.  Leasing calls are extremely important

          and have the highest possible priority taking precedent

          over most other assignments.  Leasing representatives are

          expected to answer their cell phones or reply to other

          leasing communications after regular business hours.

               The evidence is going to show that meant they were

          supposed to take those phone calls at all times and the

          1-800 number would roll them right over to these leasing

          representatives, and they had to answer the call.  In

          fact, the evidence is going to show, Your Honor, if they

          did not answer that call, the call would then get

          escalated and would go to a supervisor, and then

          ultimately go to the national director of leasing if they

          didn't answer the call, and they were subject to being

1    fired.

2         These other leasing communications that they were

3    supposed to respond to after regular business hours were

4    e-mails.  We only have the e-mails from Ms. Shelby, but

09:43:57   5    those e-mails alone will show all of the late evening

6    e-mails, the morning e-mails, the weekend e-mails.  And

7    the Boxer bible said they were required to reply to these

8    leasing communications, meaning e-mails, after regular

9    business hours.

09:44:14  10         Then it says an exception would be touring or signing

11    a lease with another prospect.  Every leasing call should

12    be viewed as a potential lease.  And because of that, they

13    had to answer these phones 24/7.  The only exception is if

14    somebody wants to do a tour or sign the lease, then that

09:44:31  15    takes precedence and that needs to happen any time a

16    prospect wants that to happen.

17         The Boxer bible also talks about the company's

18    philosophy, and the company's philosophy shows their

19    management style.  Company quality standards include

09:44:50  20    making themselves available to meet tenant needs at all

21    times.  Responding to emergencies may require after-hours

22    activity and responding to nonemergencies requires an

23    after-hour response or acknowledgment, which means whether

24    it's an emergency or nonemergency, doesn't matter.  If

09:45:13  25    it's after-hours, you have got to respond.  You have got

09:45:37

1  to acknowledge because the company's philosophy is you

2  need to make yourselves available at all times.

3       The Boxer standards, the Boxer bible also specifically

4  talks about weekends.  So Boxer had something called

5  mystery shops.  And the way these mystery shops worked was

6  someone would come in, pretending to be a prospective

7  tenants, or they would call in pretending to be a

8  prospective tenant.  They had no way of knowing whether

9  this was a real prospective tenant or a mystery shopper.

09:45:55

10  A mystery shopper would be wearing a wire and video and

11  record the conversation and, when they met with them,

12  would record the actual interaction that they had with the

13  leasing representative.

14       And then, the leasing agent would be graded on how

09:46:08

15  well they did with the mystery shop.  And if they didn't

16  do well, could be on a PIP, performance improvement plan,

17  or could ultimately be terminated for not doing well with

18  these mystery shops.

19       So Boxer told these plaintiffs about these shops and

09:46:25

20  when these shops could happen and what these shops meant.

21  Boxer shop.  Individuals acting as prospects or tenants

22  may call or visit the buildings at any time, even on

23  weekends, and will make use of sound and video recordings

24  to be sure that you are following the procedures outlined

09:46:49

25  in this manual.

*Laura Wells, CRR, RDR*

                    1     So Boxer put them on notice:  We'll have people spy on
                    2   you to make sure that you are doing things the Boxer way,
                    3   that you are following the Boxer bible.  And they are
                    4   going to spy on you.  They are going to videotape you.
09:47:05     5   They are going to record you.  And if you are not
                    6   following the Boxer bible, if you are not doing it the
                    7   Boxer way, you are subject to being fired.
                    8     And they told them this could even happen to you on
                    9   weekends.  So if you get a call on a weekend, you better
09:47:19    10   answer it.  If someone wants to do a tour or make a visit
                  11   on a weekend, you better do it.
                  12     So we see this e-mail from a supervisor to the
                  13   plaintiffs, and it's an e-mail in which the supervisor
                  14   tells the leasing agents that they need to stay until the
09:47:39    15   job is done.  And, Your Honor, this is just one example;
                  16   but the evidence is going to show these types of
                  17   communications were sent to the plaintiffs all the time.
                  18   This happened to them constantly.
                  19     In this particular e-mail, though, it says, we have to
09:47:55    20   turn over every stone and leave no man behind.  It's time
                  21   to stay until the job is done and come in early.  We are
                  22   not in a position to be taking it easy or planning days
                  23   off.  On that note, don't entertain special requests
                  24   regarding time off.  If it is not on fire or someone is
09:48:14    25   not dying, the answer is no, you may not come in late or

1    leave early.  You need to stay until the job is done.  We

2    have got to turn over every stone.

3         And the e-mail goes on to just tell them, look, you

4    need to start calling people, working phones, work harder,

09:48:35    5    work harder.  The evidence is going to show they were

6    constantly being told this, Your Honor.

7         Here is an e-mail chain.  This is an e-mail chain --

8    and again, Your Honor, we only have e-mails from

9    Ms. Shelby.  In this particular e-mail chain, Ms. Shelby,

09:48:51    10    our lead plaintiff, is actually talking with Lauren

11    Hafner, Lauren Young Hafner, who is also here and will be

12    testifying before the Court.

13         I'll read from the bottom up.  Sherry Shelby says to

14    Lauren Young Hafner, I'm not sure if you are getting your

09:49:08    15    after-hours calls.  Basically, I have gotten a couple of

16    calls from your area over the last couple of days.

17         And Lauren replies to Ms. Shelby, I have had one call

18    after 8:00 p.m. the past two evenings with no VM, meaning

19    voice mail.  Do you answer your phone that late?

09:49:29    20         And before Ms. Shelby can reply to her, the supervisor

21    chimes in, the supervisor being Jerry Watson; and he says,

22    We are on call evenings and weekends unless you have

23    arranged for somebody else to cover for you.

24         So it was very clear to these plaintiffs you are on

09:49:51    25    call evenings and weekends; and if your phone rings that

28

1   late, you better answer it.

2       Now, as I mentioned before, Your Honor, these time

3   cards that they had them do were, basically, just

4   cookie-cutter placeholders because they contended that

09:50:08   5   they were exempted salaried employees.  So they weren't

6   keeping up with having them actually track how many hours

7   they actually worked.  They didn't care about that.

8       The time cards are going to show that some of the

9   plaintiffs literally just put eight hours, eight hours,

09:50:24   10   eight hours, and totaled 40 hours a workweek.  Others put

11   in cooker-cutter time 8:00 to 4:00, 8:00 to 4:00, 8:00 to

12   4:00.

13           THE COURT:  They had to list the hours they

14   showed up and the hours they left?

09:50:37   15           MS. WILLS:  It doesn't, Your Honor.  It's just

16   40 hours.  Some of them literally just have eight hours

17   down.  It just shows eight hours.  I'll show the Court

18   some examples in just a moment.

19           THE COURT:  I thought there was -- earlier there

09:50:47   20   was evidence they had to be there 8:30 to 5:30.

21           MS. WILLS:  Well, that just shows you, Your

22   Honor, that these time cards meant nothing.  They just

23   meant nothing.  Typically, the time cards had the exact

24   same start time and end time on the hour every day; and

09:51:03   25   some of them literally just said eight hours.

1          THE COURT:  Okay.

2          MS. WILLS:  Management knew that these time cards

3    were inaccurate.  They knew it wasn't really tracking

4    their actual hours that they worked.  These were literally

09:51:17   5    just placeholders.  In fact, some of these time cards

6    weren't even filled out by the plaintiffs.  The leasing

7    coordinators would do them or supervisors would do them.

8    It didn't matter who did them because they really didn't

9    mean anything.  They didn't really reflect anything about

09:51:31   10   when they were actually working.

11         So here is an example of time cards being filled out

12   by the leasing coordinator.  This is an e-mail from Lauren

13   Reis, who was the leasing coordinator.  She is sending

14   this to Sherry Shelby, our lead plaintiff, Ms. Shelby.

09:51:50   15   And Sherry Shelby, she says to her, I have already filled

16   in the time cards, meaning the leasing coordinator is,

17   like, don't worry about the time cards.  I have already

18   handled those.  And Sherry Shelby just replies, You are

19   the best.  I have so much trouble with that every time.

09:52:05   20   Thank you.  And the evidence is going to show --

21         THE COURT:  What is ADP?

22         MS. WILLS:  ADP is their timekeeping system, Your

23   Honor.  And this happened all the time.  You know what, I

24   don't have time sheets for people.  I'm just going to go

09:52:19   25   put the 40 hours in.

1    The evidence is going to show that this happened all

2    the time.  And they were well aware of it and they just

3    put in the 40 hours just like the leasing coordinator

4    said, hey, don't worry about it.  I have already filled in

09:52:35    5    the time cards, taken care of them.

6        Here are some examples, Your Honor, of Sherry Shelby's

7    time cards, the entries for October of 2014; 8:00 a.m. to

8    4:00; 8:00 a.m. to 4:00; 8:00 a.m. to 4:00, just Monday

9    through Friday.

09:52:51    10        Rodney Hale, February 2015, same thing, 8:00 a.m. to

11    4:00; 8:00 to 4:00; Monday through Friday.

12        We see the time cards for Barbara Michaelis, and it

13    just has eight hours.  It doesn't even have times.  It

14    just has eight hours every day, just eight hours, eight

09:53:10    15    hours.  And they actually called it salary work, hours

16    worked, eight hours, just eight hours every day.

17        We have the same thing for Lauren Hafner.  Just eight

18    hours every day.  Just eight hours.

19        This is Betty Jean Larson.  She is the director of HR.

09:53:31    20    And during her deposition I asked her about these

21    cookie-cutter time sheets, and Your Honor actually asked

22    her a question about it as well.  This is what she had to

23    say.

24        "QUESTION:  So every single day, every single entry

09:53:45    25    has 8:00 a.m. to 4:00 p.m.; is that correct?

*Laura Wells, CRR, RDR*

1    "ANSWER:  Yes.

2    "QUESTION:  Every single day has exactly eight hours;

3    is that correct?

4    "ANSWER:  That's correct.

09:53:58   5    "QUESTION:  And every single start is exactly on the

6    hour of 8:00; is that right?

7    "ANSWER:  That's what the time sheet says.

8    "QUESTION:  And every single stop time is precisely

9    4:00 p.m. every day; is that correct?

09:54:11   10   "ANSWER:  That's what the time sheet says, yes.

11   "QUESTION:  Do you really believe, as a director of

12   human resources, that it is realistic to have a time sheet

13   showing 8:00 a.m. on the dot to 4:00 p.m. on the dot every

14   single day?  Do you believe that that is realistic as

09:54:32   15   being an accurate reflection of time worked?

16   "ANSWER:  In this time system, no.

17   "QUESTION:  So then clearly what you have in front of

18   you is an inaccurate time sheet, correct?

19   "ANSWER:  I have in front of me what Ms. Shelby

09:54:47   20   entered in her time sheet.

21   "QUESTION:  Objection.  Nonresponsive.  What you have

22   in front of you, ma'am, is an incorrect time sheet.  It's

23   inaccurate, isn't it?

24   "ANSWER:  It may be.

09:54:57   25   "QUESTION:  So if I understand correctly, under ADP

*Laura Wells, CRR, RDR*

1    the time for every single person every single day is 8:00

2    to 4:00; is that correct?

3        "ANSWER:  If I recall correctly, which I may not.

4        "QUESTION:  And Mr. Hale's time sheets also show what

09:55:13    5    time every single workday?

6        "ANSWER:  8:00 a.m. to 4:00 p.m.

7        "QUESTION:  Is it fair to say that the time sheets for

8    all of the leasing representatives say 8:00 a.m. to 4:00

9    p.m. every day?

09:55:33    10        "ANSWER:  Without looking at them, I cannot give you a

11    definitive answer.

12        (Inaudible.)

13        "ANSWER:  I would assume so.

14        "QUESTION:  So is it your testimony, Ms. Larson, that

09:55:44    15    the time that is entered at the start of the day is not a

16    reflection of the actual time that they start working?

17        "ANSWER:  They do not enter time when they start the

18    day.

19        "QUESTION:  And so the same would be the same for the

09:56:00    20    end of the workday.  They don't enter time when they end

21    their workday either, do they?

22        "ANSWER:  No, they do not."

23        (End video.)

24        So we have it straight from the director of human

09:56:09    25    resources that these time sheets, basically, are useless.

They admit it.  She is the person in charge of human
resources at this company and has been, the evidence is
going to show, since 2014, which is the relevant time
period here.  And during that entire time period the
director of human resources has admitted that these time
sheets that they kept did not reflect the start times that
these plaintiffs started working and did not reflect the
end times of when the plaintiffs ended their workday.

So we have, Your Honor, evidence that is going to show
that this defendant, this company failed to maintain
accurate time records for their workers.

So the second question that Your Honor will need to
answer is, did Boxer Property know or should they have
known that the plaintiffs were working overtime?

We believe that the answer to this is going to be an
unequivocal yes; and I'll just go over some of the ways,
Your Honor, that they knew or should have known.

We believe the evidence is going to show, number one,
we have this practice of these cookie-cutter time sheets
which we have just gone over with the Court.  So they
knew.  They knew, yeah, these time sheets aren't
reflecting the time that they started and the time that
they ended work.

We have also just gone over various company policies,
the Boxer bible, what the Boxer expectations were, that

*Laura Wells, CRR, RDR*

1    they had to answer calls at all times, that, yeah, if you

2    get a call after 8:00 p.m., you better answer the phone.

3    If somebody wants to do a tour or prospect wants to meet

4    with you or somebody wants to visit after-hours, before

09:57:47    5    hours, on the weekends, yes, you are expected to do that.

6    That is the most important thing.  You have to keep

7    working until the task is done.  Those company policies

8    certainly should have put them on notice of the long hours

9    that their employees were being required to work in

09:58:04    10   leasing.

11        We also have cell phone records.  Again, we have

12   limited cell phone records.  We have cell phone records

13   for Ms. Shelby, and those cell phone records are going to

14   show Ms. Shelby with her company-issued cell phone having

09:58:21    15   after-hour calls.  We have the e-mail that Your Honor just

16   saw where a supervisor stepped in and said, yeah, you

17   better be answering your phone when Ms. Hafner, bless her

18   heart, is, like, I'm getting these calls after 8:00.  Am I

19   really supposed to be taking these calls after 8:00?  And

09:58:37    20   the boss said, absolutely you better.

21        We also have e-mails.  Again, Your Honor, we are

22   limited in what we were given.  We have the e-mails of

23   Ms. Shelby; but those e-mails, there are many, many, many

24   of them that we put into evidence that show these e-mail

09:58:53    25   communications before the office opened, after the office

1    closed, during what should have been a mealtime, on

2    weekends.  So we have these e-mail communications, and we

3    have a directive in the Boxer bible that they were

4    expected to respond to these leasing communications, even

09:59:12    5    if they were after hours.

6         We also have something that, Your Honor, the evidence

7    is going to show, one of them anyway, that this is a

8    company that loved to monitor their employees.  Oh, these

9    folks loved to monitor these people and keep tight tabs on

09:59:29    10   them to make sure they were doing things the Boxer way.

11        They had this nationwide system called Lync.  And the

12   evidence is going to show that the way this Lync system

13   worked was it was like an Outlook Messenger system.  And

14   every leasing representatives that worked for the company

09:59:45    15   nationwide, all the supervisors, the head of leasing,

16   everybody had to be logged in to Lync when they were

17   sitting at their desk.

18        And Lync was the supervisors could look and see who

19   was logged in to Lync; and if you weren't logged in to

10:00:01    20   Lync, the supervisor would call you and say, I see you are

21   not logged in to Lync.  What is going on?  And through

22   Lync they could communicate with all the other leasing

23   representatives across the country.  And everyone could

24   see with every leasing agent across the country who was on

10:00:18    25   and who wasn't.  All the supervisors could see this.  The

1  director of leasing could see this.  So at all times,

2  Boxer could see that their leasing representatives were on

3  Lync, were at their desk, were working.

4       And, Your Honor, they had this system set up such that

10:00:36  5  it would go idle if they didn't click on the computer

6  every so often.  So if they were away from their desk, the

7  supervisors knew because they weren't on Lync.  And Lync

8  would show them, okay, they have stepped away from their

9  desk.  So these supervisors, this company, they knew

10:00:55  10  exactly when these leasing representatives were working.

11  They knew.

12       I'll skip ahead a little bit.  In addition to that,

13  Your Honor, as Your Honor has heard, they had cameras.

14  Every single --

10:01:09  15            THE COURT:  Yeah, I remember that.  I remember

16  that.

17            MS. WILLS:  Every single leasing representative

18  had a camera on their desk; and at all times the

19  supervisor, the nationwide director could go into that

10:01:18  20  camera and see if they were sitting at their desk or not.

21  So when they went on Lync, if they didn't see them active

22  on Lync they could go on the camera and say, hmm, I don't

23  see them on Lync.  I'm looking at the camera.  I don't see

24  them sitting at their desk.  So that's how they kept up

10:01:35  25  with where they were.

1    They also had a system called Salesforce, another way

2  for them to monitor these leasing representatives.

3  Salesforce was where they had to put down or were supposed

4  to put down when they had tours, when they were meeting

10:01:49  5  with prospects, all their schedules.

6    So the supervisor could see, okay, it's 7:00 to 8:00

7  p.m. they have a tour with this prospective tenant.  They

8  would see the name of the company.  And so they knew at

9  all times when they were going to be doing tours, when

10:02:05  10  they had appointments, when they were sitting at their

11  desk, when they were on line, when they were working on

12  their computer.  They were able to monitor this at all

13  times.

14    And as I mentioned before, they also had these mystery

10:02:18  15  shoppers which could come in at any time and spy on these

16  leasing representatives.  They never knew when they were

17  going to show up, and they would video and audio record

18  them.

19    This was a company that kept tight tabs on their

10:02:29  20  leasing representatives.  At a minimum, they should have

21  known, but we believe the evidence is going to show that

22  they actually knew these long hours that they were

23  working, Your Honor.

24    So here is just one e-mail that we have pulled that is

10:02:44  25  an example of the monitoring that this company could do of

 1    its leasing representatives.  This is an e-mail for the

 2    direct supervisor Rodney Hale, one of the plaintiffs, who

 3    is here with us today.  And this happened on a Friday

 4    evening when Mr. Hale was going to be leaving for vacation

 5    with his family and he was going to be out on vacation

 6    with his family the following week.

 7         So here is how the e-mail reads.  The supervisor says

 8    at 4:45, I logged into the cameras on Boxer central and

 9    both Rodney's offices located at 13201 and 13831 were

10    empty.  So the supervisor is going on the camera, looking

11    at both offices that Mr. Hale works at, and on the camera

12    she sees it's 4:45.  I don't see him at his desk.

13         She said, The lights were out.  The computer was

14    inactive.  Then she says, Rodney's last-scheduled

15    appointment in Salesforce was a lease signing from 2:00

16    p.m. to 3:00 p.m.  So then she went into Salesforce to

17    check on when he was supposed to be doing a tour.

18         So she is using Salesforce.  She is using the cameras;

19    and when she is saying his computer is inactive, she is

20    really referring to the Lync system because that's the way

21    she could tell if he was working on his computer or if it

22    was inactive.

23         Then she goes on to say, Then I tried calling him

24    several times, 5:05 p.m., 5:11 p.m., and 5:15 p.m. with no

25    response.  So now she is using a company-issued cell

1  phone, and she is calling him on the company-issued cell

2  phone.  And she makes three rapid calls:  5:05; 5:11;

3  5:15.  Does not answer his phone.

4      So then she uses the next tool that Boxer has for

10:04:41  5  monitoring the sales representatives.  She sends him an

6  e-mail which -- at 5:11, which he was supposed to respond

7  to because it doesn't matter.  You have to always respond

8  to the e-mails.  And he did not respond.

9      And apparently he didn't respond within four minutes

10:04:56  10  because then she said, at 5:15, I checked Lync.  This is

11  where she goes on to the Lync system.  And Lync showed

12  that he had been away from the system for an hour.  So the

13  supervisor was able to go into Lync and see when was the

14  last time he was working on his computer.

10:05:14  15      This was a company, Your Honor, that could monitor

16  their employees across the country.  They had all the

17  tools in place.  They knew these long hours they were

18  working.  At a minimum they should have known.  These

19  folks kept tight tabs on their leasing representatives.

10:05:33  20      And again, I would like to show the Court a brief clip

21  from Betty Jean Larson, who is the director of human

22  resources; and it's very clear from the director of human

23  resources that Boxer Property knew that their leasing

24  agents were working overtime.

10:05:49  25      "QUESTION:  Who is in charge of human resources at

*Laura Wells, CRR, RDR*

1    Boxer Property?

2         "ANSWER:  I am.

3         "QUESTION:  Is it fair to say that leasing

4    representatives were required to work whatever hours they

5    needed to work in order to perform their leasing duties?

6         "ANSWER:  Yes.

7         "QUESTION:  And so it's fair to say that leasing

8    representatives, if they needed to work past 5:30 in order

9    to lease an office space, that was something they were

10   expected to do in accordance with Boxer Property

11   standards?

12        "ANSWER:  Yes.  I think that's a fair statement.

13        "QUESTION:  Would you agree with me that this training

14   that they were given under the Boxer Property way and the

15   Boxer Property standards, if they needed to be at the

16   leasing office on a weekend in order to lease an office

17   space, that was something they were expected to do?

18        "ANSWER:  Yes."

19        (End video)

20        So, Your Honor, we believe that the two questions that

21   the Court needs to answer:  One, how much overtime were

22   they working?  We believe we are going to be able to put

23   on evidence to show a minimum of 70 hours a week for

24   Sherry Shelby, a minimum of an average of 60 hours a week

25   for the others, and we believe the question of whether or

 1    not Boxer Property knew or should have known the evidence

 2    is going to show they unequivocally either knew or they

 3    certainly should have known

 4            THE COURT:  Okay.  All right.  Thank you very

10:07:15  5    much.

 6            MS. VALDERRAMA:  May it please the Court.

 7            THE COURT:  Yes, ma'am.

 8            MS. VALDERRAMA:  We're going to be a little more

 9    low tech than our colleagues.

10:07:33  10            THE COURT:  That's fine.

11            MS. VALDERRAMA:  However, I would ask my

12    colleague to put up Exhibit 81 and the attachment, which

13    is Exhibit A.

14        When my colleague, Mr. Ramirez, was talking about the

10:07:47  15    damages and the disclosures in this case, this is the

16    document that we received that for the first time

17    identified the amount of money specifically that was being

18    asked for.  And that's the first page of the Exhibit A.

19    If you scroll down Exhibit A, you see for the first time

10:08:03  20    where the plaintiffs actually lay out.

21        (addressing Ms. Galindo)  Can you zoom in on it a

22    little bit so we can see it more clearly?

23        This is for Ms. Shelby herself.  You can see that

24    there is a statement that hours worked per week are 70.

10:08:21  25    And then there is a calculation that appears for the first

 1   time where the plaintiffs apparently have done whatever

 2   they need to do and they are identifying the amount that

 3   is owed.

 4        And then, if you take a look at that document, you see

 5   that there are 70 hours that are claimed for every week

 6   for that particular plaintiff.

 7        (addressing Ms. Galindo)  And, Samantha, if you can

 8   roll it down.  Keep going.

 9        For every plaintiff there is a similar statement.

10   Below Ms. Shelby you can see the hours that are claimed

11   for every single week is 60.  So the plaintiffs have

12   identified that there are 70 and 60 hours per week that

13   these individuals worked; and it's for each of the

14   plaintiffs, including each of the plaintiffs that are

15   sitting here at this table and who are going to testify as

16   to --

17             THE COURT:  What is true of each of them?

18             MS. VALDERRAMA:  I'm sorry?

19             THE COURT:  What is true of each of these

20   plaintiffs?

21             MS. VALDERRAMA:  The plaintiffs who are sitting

22   at the table also are going to testify, we assume, that

23   they each worked 60 hours per week.

24             THE COURT:  All right.

25             MS. VALDERRAMA:  Now, after the opening statement

*Laura Wells, CRR, RDR*

there are a couple of things that come to mind.  First of
all, you either will love or hate Boxer Property.  You
either want them as your property manager because they are
so attuned to detail and they have what they call the
Boxer bible.  It's actually called the Boxer Management
Style.  It's a guideline to ensure that there is
uniformity for their individuals to work across the United
States.

    And in that Boxer bible what you'll find is that there
actually is some instruction; and you'll recall that the
argument was that these plaintiffs, Ms. Shelby, knew they
were supposed to follow this Boxer bible to a T.  Well, in
this Boxer bible you will find that there are actual
instructions about how a person is supposed to maintain
their time records.

    And if you get to exhibit -- that would be 13, this is
difficult to read, Your Honor.

    (addressing Ms. Galindo)  If we can zoom in.

    There is a list here for the employees who are exempt
employees.  It essentially tells them that they are
supposed to record their hours worked.  They are supposed
to put in the actual hours worked and it's preferable to
do it on a time basis.  It also states that they are not
supposed to be working from home.  Employees are not
supposed to be working from home.

                    And why is that important?  Well, I'm sure that when
you look at the Exhibit 81, which was the disclosures that
showed these hours, it must come to the Court's mind, as
it did to the mind of all of us, is how do you hit
70 hours a week?  What does that require for a person to
work 70 hours a week?

                    THE COURT:  Well, how does this fit with the
notion that you are supposed to respond to telephone calls
at all hours?  How is that consistent with not working
from home?

                    MS. VALDERRAMA:  Answering telephone calls was
not from home, Your Honor.  You could pick up your phone
calls whenever they came in, if they came in, by having
your phone with you but --

                    THE COURT:  If you are at home at the time,
that's not working from home?

                    MS. VALDERRAMA:  No.  That's just carrying a
phone with you.  Working from home would mean that you are
taking your work home and trying to do some of your normal
business from home.  Telephone calls are a separate thing.
You just have your phone with you.  You answer it if you
need to.  And I'll get to that in response to lay out our
case on this point.

                    The first thing that's most important is that there is
this claim for 70 hours and 60 hours.  In order to achieve

1    a 70-hour workweek, Ms. Shelby would have to work 13 hours

2    every day and five hours every weekend.  Each of these

3    other plaintiffs would have to work -- to hit 60 hours a

4    week they would have to work 11 hours per day and five

10:12:04    5    hours every weekend.  That is what they have asked the

6    Court to pay these plaintiffs for.

7         Now, there was, I'm sure, some perception from the

8    Court that there is an eight-hour entry that's entered

9    into every single time card that is filed by any of these

10:12:27   10    plaintiffs.  If we could take a look at Exhibit 12,

11    please.

12              THE COURT:  Well, why were there time sheets

13    required at all if Boxer's notion was these are exempt

14    employees?

10:12:46   15              MS. VALDERRAMA:  There are lots of reasons to

16    have time cards, Your Honor, for exempt employees; and

17    that was a question that was never asked, of course.

18         The reason to have time cards is that in order to

19    maintain a paid time off system for exempt employees, you

10:13:00   20    need to be able to track what hours they work.  That is

21    one reason why you need to have those employees log their

22    hours.

23         A second reason why it's important for Boxer -- and,

24    of course, this is per Boxer.  For Boxer to have those

10:13:16   25    hours logged is because under the Family Medical Leave

1   Act, even for exempt employees, you have to be able -- on

2   an hourly basis be able to monitor the time that's

3   required for employees and to see whether they are hitting

4   the numbers under the law that are required.

10:13:32   5        And then finally, Boxer Property Management

6   Corporation is entitled, as an employer, to use its time

7   records to evaluate how hard its employees are working and

8   to assure that if you are a manager you can tell whether

9   you have got somebody who is working too hard or somebody

10:13:51   10   who is not working enough.

11        THE COURT:  If everybody is putting in the same

12   time every day, how does that help?

13        MS. VALDERRAMA:  Well, Judge, that's the fallacy

14   here.  The plaintiffs have to prove that everybody put in

10:14:02   15   the same time every day not because they were the hours

16   that they worked but because that was something that they

17   did and they weren't the hours that they worked.  That's

18   the problem here.

19        If the Court would please take a look at -- this is

10:14:16   20   the video that trained employees on how to record their

21   time.

22        "UNIDENTIFIED SPEAKER:  As a salaried employee you

23   clock in a little different.  Let me show you how that

24   works.  First, you want to go to time management.  You can

10:14:31   25   do it here over on the left-hand side or you can click it

```
 1  right here on this widget on the front page.  So we're
 2  going to click 'web time sheet.'  Now, on the old ADP time
 3  system you were able to --
 4           THE COURT:  Why don't you stop it.  He is going
 5  way too fast.
 6           "UNIDENTIFIED SPEAKER:  -- you need to do a
 7  couple of extra steps."
 8           MS. VALDERRAMA:  Okay.  If -- the significance of
 9  the video, Judge, is that -- if we could just go through
10  the next five minutes or a few minutes.  What he basically
11  said is that you enter your time differently.  He showed
12  where you click to enter the time.
13           THE COURT:  Yeah.
14           MS. VALDERRAMA:  And then -- would you roll it.
15       "UNIDENTIFIED SPEAKER:  One of them is you want to go
16  ahead and click 'add hours'; and when you do, you are
17  going to get this drop-down menu.  And then we want to go
18  ahead and pick the day that you want to actually clock in
19  and put your amount of hours that you work.
20       "So I'm going to do Monday, 8-31.  I'm going to put
21  down 10 hours.  And then I'm going to click over here on
22  'add hours.'  And as you can see, it populates right down
23  here at the bottom ten hours of work.
24       "If you are someone who works a kind of a normal
25  schedule, like eight hours a day, and you just want to be
```

*Laura Wells, CRR, RDR*

1  able to put in eight hours for the whole week because

2  that's what you typically do, you can also do that as

3  well.

4      "You go right here to 'add hours.'  And this time I'm

10:15:38   5  going to do Tuesday, 9-01, to Friday, 9-04; and I'm just

6  going to put eight hours.  And so that will populate that

7  when I hit the 'add hours.'  The whole week will be

8  populated with eight hours.  You'll see that coming in

9  here at the bottom.  And there you go.

10:15:53  10      "So let's say you accidentally put in the wrong hours

11  for something and you want to edit it.  It's very simple.

12  You just go in to where you have done it.  Let's say on

13  Wednesday I actually put in eight hours.  I actually only

14  worked seven hours.  So I can click on that.  That pulls

10:16:08  15  that back up right here.  I'm going to put seven hours.

16  I'm going to hit 'update hours' and it will now populate

17  that to seven hours.

18      "One of the other things, like with ADP, here is all

19  your different pay periods.  You have your previous pay

10:16:21  20  period, your current pay period, and you also have your

21  part-time pay periods.

22      "Over here is the 'add and edit comment.'  If you

23  would like to make a comment on one of your days, for

24  whatever reason.  Let's say you only worked a six-hour day

10:16:33  25  because you had to leave early for a dentist appointment.

1   You could go in here.  You could pick the day.  You could

2   say 'dentist' and then 'add comment,' and you'll notice

3   over here under the 'comments' it's going to add a 'C'

4   that lets your supervisor know what your comment was,

5   which was 'dentist.'

6       "And that's really about it.  Very similar to the way

7   we did before, but just realize in the past you were able

8   to just go in here and start typing.  You are not able to

9   do that in the Paycom system."

10      (End video)

11      All right.  So as you can see, Judge, the evidence is

12  going to show that people are instructed to put in the

13  actual hours worked.  The training video, actually the

14  very first number that was suggested you put in was a

15  ten-hour workday.  Then there was a suggestion if you have

16  a regular schedule, if you the employee determine you have

17  a regular schedule, then you can go and you can do this

18  more than once.  If you have a date when you don't work a

19  full regular schedule, it doesn't say leave eight.  It

20  says you can go ahead, and you can change the time.

21      That's the instruction from Boxer Property Management

22  Corporation to its exempt employees, it's salaried

23  employees; and it was a training video that every single

24  one of the plaintiffs had to see.

25      So that brings us to the question -- I'm sure that the

10:17:57

1   Court reached the conclusion, having heard the opening
2   statement from the plaintiffs, that the records that are,
3   for example, I believe it's Exhibit 2 of the -- presented
4   by defendants that all of those records are going to show
5   that the plaintiff worked eight hours a day because that
6   is the position apparently that is taken.
7        If you would take a look at the very first record --
8        (addressing Ms. Galindo)  And would you zoom in,
9   Samantha.

10:18:08

10       The very first record for the time period in the
11  two-year limitations statute -- this is Ms. Shelby's
12  record -- you can see that there is the couple of 8.5,
13  8.5, 8.5.  So somebody made a decision in connection with
14  entering that time that it was not just an eight-hour day

10:18:30

15  but that it was an 8.5-hour day.  Of course, those are
16  Ms. Shelby's records.
17       (addressing Ms. Galindo) Can we have the next one.
18       This is a time card for a period of February of
19  2015 -- February 1 of 2015 to February 28th of 2015.  And

10:18:51

20  once again, this is a time card report with notes from ADP
21  from Ms. Shelby.  If you look at that time card, you can
22  see that, yeah, there are a couple of eights; but there
23  are tens.  There are eights.  There are tens.  There are
24  nines.  There are eights.  There are eights.  There are

10:19:07

25  eights.

1          THE COURT:  Yeah, I get it.

2          MS. VALDERRAMA:  You can see there is a Saturday

3     where there is four entered.

4          THE COURT:  All right.

10:19:14  5          MS. VALDERRAMA:  What we have here is while it

6     was represented to this Court that there is this sort of

7     automatic requirement --

8          THE COURT:  Not too fast.

9          MS. VALDERRAMA:  There is this sort of automatic

10:19:22  10    requirement that people put in eights or that people did

11    put in eights, Ms. Shelby's own time records contradict

12    that.  They show that Ms. Shelby made decisions to put in

13    time that was different from eights.  It might be more

14    than eight.  It might be less than eight.  But certainly

10:19:39  15    it was a choice that Ms. Shelby made.

16         (addressing Ms. Galindo)  Can we have the next time

17    card, please.

18         When they went to the new Paycom system -- that old

19    Paycom system was -- that old system was ADP.  That was

10:19:52  20    the first system.  Then they went to a new system called

21    Paycom.  And in Paycom, once again, this is a time

22    sheet --

23         (addressing Ms. Galindo)  Can you zoom it for me.

24         It's a time sheet for the time frame of December 5 of

10:20:07  25    2015 through, I believe it is, December 19 of 2015,

*Laura Wells, CRR, RDR*

1    because they have two-week pay periods.  Once again, this

2    is Ms. Sherry Shelby's time entries.

3        On that time card, as you can see, she has 11, 11, 11,

4    and then she has a Saturday that has a six and then she

10:20:27    5    goes on to have 11, 11, 11, and 14.

6        So the suggestion that eights were required but it was

7    not allowed for employees to put in their actual hours is

8    false and that is the point -- that's the first point of

9    contention here.

10:20:50    10    We are here before the Court because we are trying to

11    figure out, based on the Court's ruling, how much

12    overtime, if any, these individuals worked.

13        Now, I know that you just listened to a very long

14    explanation of the details and the focus of Boxer

10:21:08    15    Property's work, what they expect of their -- the high

16    standards that they have for their leasing agents.  But if

17    you paid attention to the documents that were thrown up,

18    what was very interesting was there was only one e-mail or

19    one reference to Lync -- of all the documents, there was

10:21:26    20    only one that occurred outside of 8:30 to 5:30 hours and

21    it was a -- it was actually an e-mail, a Lync question

22    that occurred during work hours, and it was from

23    Ms. Hafner to Ms. Shelby.

24        And she said, I got these calls with no voice mail.

10:21:47    25    Do I have to return them?

Day 1 - 53

1         The date on that e-mail was 2015.  So that means that
2    the very first time that Ms. Hafner was ever contemplating
3    that she had to answer a call after hours was on that date
4    when she e-mailed Ms. Shelby because up until then it's
10:22:07  5   very clear that she didn't think that she had to.
6         So if, in fact -- and then here is the other issue.  I
7    will tell you, Your Honor, that the Boxer Property
8    Management Corporation representatives who are here, they
9    would be delighted if their leasing agents had to answer
10:22:25 10   calls more often than they do after hours.
11         But what is important for the Court and important for
12   us is not that there may be a couple of calls one night a
13   week or maybe once every two or three weeks.  What is
14   important is whether there are 20 hours of overtime worth
10:22:47 15   of calls or 30 hours of overtime worth of calls for each
16   of those plaintiffs.
17         That's why we are here.  We are not here looking at
18   outlying issues where there is a diminutive issue and
19   somebody receives a call.
10:23:02 20         THE COURT:  I understand.
21         MS. VALDERRAMA:  Going back to the e-mail
22   relating to Mr. Hale and the time frame of that particular
23   e-mail.  Again, that e-mail was sent during work hours;
24   and each time that Mr. Hale was being requested to respond
10:23:19 25   to his employer was during regular work hours.  So there

*Laura Wells, CRR, RDR*

1    was nothing unusual about that.

2         What was unusual is that he didn't answer by Lync.  He

3    didn't answer by telephone.  And you heard how important

4    it is for Boxer Property that a person answer their phone

10:23:38    5    because every call could be a prospect.  It could be a

6    lease.  And so the very concept that somehow Boxer

7    Property Management Corporation is going to be held to

8    have -- remember the issue we're talking about now is how

9    much time these individuals worked, is that evidence that

10:23:57    10    Rodney Hale was not at work is being presented of evidence

11    that he worked 20 hours every week -- of every week that

12    he was an employee there, that is just -- it's difficult

13    to see how that could be presented to this Court for any

14    sort of evidence that there was work done outside of the

10:24:20    15    normal hours.

16         THE COURT:  Well, I think that he was presented

17    to show that there was regular oversight of employees'

18    schedules and their comings and goings.

19         MS. VALDERRAMA:  Let's talk about that for just a

10:24:33    20    minute, Your Honor.  I think maybe it was presented for

21    that.  I would ask then, Judge, why then were there no

22    e-mails and communications up here that actually show that

23    these people were working a lot of hours or sending

24    e-mails or being tracked down at 7:00 at night?  Because

10:24:47    25    in order to work 11 hours a day, they are going to have to

*Laura Wells, CRR, RDR*

 1    be working at 7:00 at night.  Why is there no evidence?

 2    Why is the only evidence of tracking somebody down during

 3    the regular work hours?

 4        And let's talk again about that video.  When she

 5    initially spoke to the Court and raised one of the first

 6    things --

 7            THE COURT:  Not too fast now.  We have got to

 8    stay up with you.

 9            MS. VALDERRAMA:  I'm sorry, Your Honor.  It was

10    one of the first things that Ms. Wills said.  She said

11    that I learned that they were, quote, recording my

12    plaintiffs.  And I'm afraid that that may be a

13    misconception that has very much seeped into this case.

14        There is no recording with those cameras.  Those

15    cameras cannot tell you where somebody was the second

16    before you look at it or the second after you look at it.

17    It is a live stream.  And it is live stream because the

18    cameras are actually monitored by three receptionists who

19    take calls from people who have seen this 777 Call Boxer,

20    you know, rent property from us; and they say, hey, I

21    would like to think about looking at some open space in

22    that building.

23        So they call the corporate number; and the corporate

24    answering service, the receptionist, they do have in front

25    of them regularly these screens that are not recordings

*Laura Wells, CRR, RDR*

1  but they can look at those screens and they can say they

2  were interested in Building A; but the guy at Building A,

3  he is out.  So now I'm going to allow them to talk to

4  somebody at Building B, who is a cover guy.  If there is

5  nobody at Building B, maybe the woman at Building C will

6  be the right one to do.

7      That's the purpose.  That's why there is no recording.

8  They are not trying to figure out where people were or how

9  long they were there.

10     Boxer knows that its leasing representatives, if they

11 are doing their jobs, are not going to be at their desks.

12 That's the only reason to have cameras there.  They know

13 they are supposed to be out doing tours.  They are

14 supposed to be out in the neighborhood.  They are supposed

15 to be out checking the buildings.  They are supposed to be

16 out selling.

17     So the long and short of it is there is no recording.

18 So just to make sure that is straight.  So when Ms. Bunyi

19 was looking for Mr. Hale -- and I know his lawyer said

20 that he was apparently -- we don't know this, but she

21 indicated in her statements to the Court that he was

22 preparing to go on vacation that weekend with his family.

23 Well, we don't know that.  And the fact that he is going

24 on vacation that weekend doesn't mean that he is not

25 supposed to stay at work until 5:30.

*Laura Wells, CRR, RDR*

1    So that's sort of a non sequitur.  It doesn't prove

2    that he worked 11 hours that day, which he would have had

3    to do that week if he was going to be paid by this Court

4    for 20 hours of overtime that week, which is the claim

10:27:42    5    that the plaintiffs have made.

6        All right.  So with respect to the oversight then, all

7    I have heard is that there is this sort of ordinary

8    oversight.  There is a valid use of a camera system for a

9    valid business purpose that has no design to harm

10:28:01   10    employees but it does have a design to assist those

11    employees who are trying to lease their buildings and to

12    assist those prospects who are trying to find a live

13    person to talk to because -- I don't know how the Court

14    feels about it, but I will tell you that I am very off-put

10:28:18   15    when I call my airline and I'm trying to get something

16    done or somewhere else and I can't talk to a live person.

17    So it's a business decision to have it done that way.

18        And then -- so what we have is we have time sheets

19    where employees have been instructed on how to input that

10:28:40   20    time.  They have been instructed to input it to match the

21    actual hours worked.  I know there was a suggestion that

22    the Court would never see anything but eights.  But in

23    reality, we have shown you that even with the plaintiff

24    the time sheet entries range from five hours per day to

10:28:58   25    14 hours a day.  She has never been -- no one has ever

 1   spoken negatively to her about it.

 2        However, the plaintiff testified in this case, Your

 3   Honor, that the hours she entered in her time sheets are

 4   false.  She has said that those hours are false and cannot

10:29:16   5   be relied upon because they are just not correct.

 6        And that is exactly what is the issue here for the

 7   Court.  All of the things that Boxer requires of its

 8   leasing agents, its leasing representatives, I know it

 9   sounded like there is a lot they have to do.  But my

10:29:42  10   assistant has a lot she has to do, and she can get it done

11   in the time frame that's allotted for her job.  The

12   leasing representatives at Boxer Property can generally

13   get done what they need to do within the time that's

14   allotted for their jobs.

10:29:58  15        And the evidence is going to show that the time sheets

16   that were entered by Sherry Shelby not only captured more

17   than eight hours a day but they probably captured more

18   time than she actually worked.  At the very beginning of

19   this case, during the class certification piece of it,

10:30:21  20   Ms. Shelby signed an affidavit that said the Court could

21   not rely on her time sheets.  And that's important because

22   she is the class plaintiff, and she is representing that

23   those time sheets are not reliable.

24        Why would a plaintiff not want the Court to rely on

10:30:36  25   their time sheets?  Well, if the gap between what they are

1   claiming and what their time sheets entered under the

2   proper training that they received is different, is

3   significantly different in terms of damages, what you have

4   is someone who is rather than allowing a case to proceed

10:30:57   5   on fact, they are deliberately testifying in a matter to

6   undermine the validity of the facts that are -- that can

7   be validated.

8       And so the evidence in this case is going to show that

9   all of the plaintiffs received that same training.  They

10:31:15   10   all followed the, quote, Boxer bible, which I will go

11   ahead and endorse with Ms. Wills it was expected that

12   people follow that Boxer bible.  The Boxer bible told them

13   that they should put their time in accurately.

14       THE COURT:  Well, you know how these cases go.

10:31:31   15   You know it better than I do.  You seldom find a written

16   instruction or a recorded instruction to violate the law.

17   It's the kind of thing that's done by word of mouth.

18   That, as I understood it, is what plaintiffs claim

19   happened here.

10:31:47   20       MS. VALDERRAMA:  That doesn't seem to be the

21   truth here though, Your Honor, because if the instruction

22   was to put in eights, the proof is in the pudding.  Where

23   are the eights?

24       I mean, that's the dilemma for the Court, and that's

10:32:00   25   been the dilemma for Boxer all along.  How do you deal

*Laura Wells, CRR, RDR*

1    with a claim -- and if I may, Your Honor, I have in the

2    old-fashioned handwritten demonstrative, if I can hand it

3    to the Court.

4            THE COURT:  Do you have a copy for the other

10:32:12   5    side?

6            MS. VALDERRAMA:  I do.  I absolutely do.

7        The dilemma for a defendant that is trying to

8    determine, after the Court has ruled that its leasing

9    representatives who are in good faith after the DOL has

10:32:35  10   investigated and who look, as the Court has appropriately

11   indicated, who actually look like outside sales folks, the

12   dilemma is what do you do with a case like that when the

13   plaintiff says you can't rely on your records, even though

14   you have records that are carefully -- people are

10:32:53  15   carefully trained on and even though you know that the job

16   is not nearly as onerous as the plaintiffs have to report

17   that it is.  Okay.

18       So if you look at this particular exhibit, let's just

19   say it's a demonstrative, what you have is each of the 11

10:33:09  20   plaintiffs listed on the side.  And you have Ms. Shelby,

21   who is the class plaintiff, highlighted in the yellow.

22   And then you also have the two-year limitations period

23   that would show what applies for each of those plaintiffs,

24   and some of them don't have a full two years because some

10:33:25  25   them their termination dates are before the end of the

 1   two-year period.

 2        So, for example, Andrea Johnson, the very last

 3   plaintiff, if you look at the total number of workweeks

 4   called, which is the fourth column over, you can see that

10:33:40   5   Ms. Hafner, at the time this was prepared, had 187 total

 6   workweeks.  Mr. Hale had 106.  The plaintiff had 91.

 7   Ms. Michaelis had 49, and so on and so forth.

 8        It also captures the total hours worked.  It captures

 9   the total overtime hours that are reported.  It goes on

10:34:05  10   then to show that if you take that average -- and you can

11   see that a number of the plaintiffs actually report

12   overtime hours.  Mr. Clinch reports overtime hours.

13   Ms. Perkowski reports overtime hours.  Mr. Brady reports

14   overtime hours.  Ms. Michaelis has overtime hours.

10:34:27  15        THE COURT:  I've got it.  I've got it.

16        MS. VALDERRAMA:  And Ms. Hafner has her own

17   overtime hours, and the plaintiff has her overtime hours.

18   If you use the plaintiff's own overtime hours, you'll see

19   that if you go to the column -- the 14th column, it says

10:34:48  20   "average reported overtime weekly hours worked for the

21   entire period" because that is the damages model that

22   these plaintiffs disclosed to us finally.  It was served

23   on us on March 8th, and we got it a few days into the next

24   week.

10:35:02  25        But that's the damages model that they have come to

1   court to prove, and that's their burden.  They have to

2   prove the damages model that for every week that these

3   people were employed that we owe those plaintiffs

4   20 hours, if it's not Ms. Shelby, and 30 hours if it's

10:35:20   5   Ms. Shelby.

6        Now, if you take Ms. Shelby's time there and you look

7   under the average overtime hours reported from the time

8   sheets that she actually recorded, you can see that there

9   is an average number of hours that are overtime hours, if

10:35:39   10   you spread it out across the entire period, of 1.82 hours.

11        That includes those time sheets where she reported

12   straight 11s.  It includes those time sheets where she

13   reported straight 10s.  It includes those time sheets

14   where she said she worked on Saturdays.  It includes that

10:36:02   15   time where she says she worked 14 hours a day.

16        This is the data that was turned over to the plaintiff

17   in October of 2016.  This is the data that, before she

18   ever wrote her affidavit, Ms. Shelby knew would result in

19   a 1.82 hours per workweek finding when she made the

10:36:21   20   decision to tell the Court that those hours that are

21   entered are wrong and that that 1.82 actual hours per week

22   should be treated as 30.

23        That's why we are here, Your Honor.  This is not the

24   kind of case where a company that has records is able to

10:36:44   25   simply look the other way and essentially say that, yes,

*Laura Wells, CRR, RDR*

1    these people worked 30 hours per week when, in fact -- 30

2    overtime hours per week or 20 overtime hours per week when

3    the data, even the plaintiff's data, which showed she

4    worked some extraordinary hours, doesn't result in

5    anything close to that, frankly.

6        One last thing, Your Honor.  As you know, Betty Jean

7    Larson is the manager --

8            THE COURT:  Yes.

9            MS. VALDERRAMA:  -- of human resources.  And you

10   got to see a clip where there was a big discussion about

11   8:00 as a start time and where Ms. Larson was, basically,

12   grilled about whether that could actually ever be a true

13   start time and how could you believe people would start at

14   that time.  And she honestly said, no, she didn't think

15   people would always start at the same time.

16       At the very end of that clip, the very last two

17   questions she was asked, was the only information that is

18   relevant to this Court about that time entry.  Ms. Larson

19   was asked:

20       "So are you testifying that the plaintiffs put in a

21   start time of 8:00, every single one of these people put

22   in a start time of 8:00?"

23       And she said, "No.  I don't believe they did."

24       And then she said, "Well, so are you saying they put

25   in a finish time of 4:00?"  Again, with the presumption

*Laura Wells, CRR, RDR*

1    that it's an 8:00 to 4:00 time frame that's being entered.

2        And Ms. Larson said, "Honestly, no, I don't believe

3    they did."

4        And what the Court is going to learn is that that time

10:38:31    5    entry is not a time entry at all.  That's an ADP fiction.

6    It's what ADP does somewhere in order for it to be able to

7    figure out how it's going to account for the hours that

8    are actually logged in by the employees.

9        And if Ms. Larson had been courteously asked the

10:38:56    10    question as to why she believed what she did, instead of

11    their being a conclusion that because that line happens to

12    be on every time sheet, therefore, the time sheets are

13    false, she would have responded that that is not an entry

14    that any of these plaintiffs will ever testify they made

10:39:10    15    because they didn't enter it.  It was an ADP entry.  It's

16    not a record of Boxer Property

17            THE COURT:  Okay.

18            MS. VALDERRAMA:  And that's been the problem with

19    this case throughout, Judge.  We have been upfront and

10:39:23    20    straightforward with our evidence.  We have done what we

21    can.  We provided these records from which you can get

22    these numbers.  They have been in the plaintiffs' hands

23    since October of 2016.

24        And yet here we are still deliberating over or looking

10:39:39    25    at a presentation of five or ten minutes of the

1   presentation about an entry on a time sheet that has

2   nothing to do with whether these plaintiffs worked the

3   30 hours, if you are Ms. Shelby, of overtime that they now

4   must prove because that's their case or whether the other

10:39:59   5   plaintiffs worked 20 hours of overtime per week, which

6   they must testify to and prove under oath because that's

7   their case.

8           THE COURT:  Okay.  Thank you very much.  We'll

9   take a 15-minute break.

10:40:11   10          MS. VALDERRAMA:  Thank you, Your Honor.

11          (Recess from 10:40 a.m. to 11:06 a.m.)

12          THE COURT:  Are we ready to present any evidence?

13          MS. WILLS:  We are, Your Honor.  I just want to

14   make sure we have our exhibit notebooks up here.

11:06:20   15          THE COURT:  You can be seated.  Do you want to

16   call your first witness?

17          MS. WILLS:  Your Honor, at this time, we would

18   invoke the Rule.

19          THE COURT:  Okay.

11:06:58   20          MS. VALDERRAMA:  Your Honor, I think the Rule had

21   to be invoked before the opening statement.

22          THE COURT:  The Rule doesn't apply to opening

23   statements.

24          MS. WILLS:  Not to openings statements, no.

11:07:06   25          THE COURT:  Anybody who is not an expert and not

*Laura Wells, CRR, RDR*

```
 1   the appointed designee of a corporation needs to be
 2   excused.  You can -- one person from your corporation can
 3   stay.
 4            MS. VALDERRAMA:  I understand that.  I have got
 5   some here.  Judge, we have our general counsel who has
 6   been subpoenaed and head of HR who has been subpoenaed,
 7   and we have our head of our leasing operations, all the
 8   top executives which have been subpoenaed.
 9        Mr. Kakhnovets is going to be our corporate
10   representative.  That's not a problem.  I asked opposing
11   counsel what her schedule was for my witnesses, and she is
12   not able to tell me.  So I'm wondering if it would be
13   possible for them to not have to stay in the courthouse
14   but be able to return to their office.
15            THE COURT:  Yeah, I think so.
16            MS. WILLS:  I believe so, Your Honor.
17            THE COURT:  Are you going to call them as part of
18   your case in chief?
19            MS. WILLS:  We are, yes, Your Honor.
20            THE COURT:  Can you give them a few hours notice?
21            MS. WILLS:  Yes, sir.
22            THE COURT:  That's fine then.
23            MS. VALDERRAMA:  Thank you, Your Honor.
24        So Mr. Rentz and Ms. Larson, you are free to return to
25   your office.
```

1          Thank you, Judge.

2               THE COURT:  Okay.  Do you want to call your first

3     witness now?

4               MS. WILLS:  One other housekeeping matter, Your

11:08:25   5     Honor.  Just so that we understand, especially since

6     witnesses that we subpoenaed are being excused and I'll

7     need to give them time to get them back.  In terms of how

8     we're going to proceed, I know that defendant's counsel

9     and I are both calling, I believe, a number of the same

11:08:40  10     witnesses.

11          Are these people going to have to return twice or when

12     the witness takes the stand both sides are expected --

13               THE COURT:  We can do it either way.  I don't

14     know what she will agree to.  We can do it either way.

11:08:51  15               MS. VALDERRAMA:  It depends.  I'm sorry, Judge.

16     It depends.  Some of the information that I need to put on

17     is not going to be ripe, and I think we want to hear the

18     plaintiffs tell their story before we have to rebut it

19     because --

11:09:06  20               THE COURT:  Okay.  That's just your choice.

21     Okay.  It will be a little bit more inconvenient for the

22     witnesses.

23               MS. VALDERRAMA:  At some point, on a witness

24     basis, we may be able to simply release the witnesses who

11:09:17  25     are plaintiffs, if they choose to go home.

1          THE COURT:  Okay.  All right.  Let's go ahead and

2    call the first witness.

3          MS. WILLS:  At this time, Your Honor, we call

4    Sherry Shelby.

11:09:25   5          THE COURT:  Okay.  Ms. Shelby, we'll have you in

6    the seat nearest me.  Before you take your seat,

7    Mr. Rivera will administer the oath.  Raise your right

8    hand, please.

9          THE WITNESS:  Yes, sir.

11:09:41  10      (Witness sworn by the case manager.)

11          THE COURT:  Try to make yourself as comfortable

12    as you can.  Speak directly into that mic, if you would,

13    please.

14          THE WITNESS:  How is that?

11:09:49  15          THE COURT:  That's good.  That's good.

16          THE WITNESS:  A little close.

17                    **SHERRY SHELBY,**

18    having been first duly sworn, testified as follows:

19                    **DIRECT EXAMINATION**

11:09:54  20    BY MS. WILLS:

21    **Q.**   Good morning, Ms. Shelby.  How are you?

22    **A.**   Very well.  Thank you.

23    **Q.**   Great.  Could you please introduce yourself to our

24    Honorable Court?

11:10:02  25    **A.**   My name is Sherry Shelby.

*Laura Wells, CRR, RDR*

Q.   And, Ms. Shelby, tell us a bit about yourself, where
you live, your family.

A.   I live in the Houston Bay Area, and I am a mother of
one and a grandmother of two in the real estate business.

         THE COURT:  Tell me, again, just briefly:  Did
you have any education past high school?

         THE WITNESS:  Some college, yes.

         THE COURT:  Okay.

BY MS. WILLS:

Q.   Ms. Shelby, at some point did you go to work at Boxer
Property?

A.   Yes, ma'am.

Q.   And what was your job title there?

A.   Leasing representative.

Q.   Were you also known as a leasing agent?

A.   Yes, ma'am.

Q.   And how long did you work at Boxer Property?

A.   Approximately five and a half years.

Q.   Can you give us your best estimate on your start date
and end date?

A.   I started on November 15th, 2010, and I believe that
my dismissal was February 25th of 2016.

Q.   And who was your supervisor that you reported to when
you worked at Boxer?

A.   At that time, Jerry Watson.

*Laura Wells, CRR, RDR*

1   **Q.**   And how long was Jerry Watson your supervisor?

2   **A.**   I don't recall exactly the period of time, but it was

3   a brief period of time of my tenure.  And so if I was

4   going to estimate, I would say about two or three months.

5   **Q.**   And other than Mr. Watson, who were your other

6   supervisors during the five and a half years that you were

7   a leasing agent there?

8   **A.**   Prior to Jerry was Alanna Vladd.  And prior to Alanna,

9   that was Dawn Eastridge.

10  **Q.**   Now, who was in charge nationwide of the leasing

11  department?

12  **A.**   That would be Alex Kakhnovets.

13  **Q.**   And what did Mr. Kakhnovets do?

14  **A.**   He was national director of leasing.

15  **Q.**   And what sort of interactions did you have with

16  Mr. Kakhnovets?

17  **A.**   Well, on several occasions we discussed that I would

18  possibly be promoted.  He would also -- he was very

19  encouraging and complimentary in regard to my performance

20  on a regular basis at the meetings.  He pulled me aside

21  and commented on my performance and told me I was doing a

22  great job.

23       In the conversations regarding performance, do you

24  want specifics on that or --

25  **Q.**   What about at sales meetings?  Did you have any

11:11:36 (line 5)
11:11:52 (line 10)
11:12:06 (line 15)
11:12:31 (line 20)
11:12:45 (line 25)

1    interaction with Mr. Kakhnovets there?

2    **A.**   Yes.

3    **Q.**   Tell us about that.

4    **A.**   Well, generally Alex was in our meetings mostly to

11:12:55   5    observe; but for a period of time he generally would take

6    the floor for a few moments to make announcements or

7    comment on our performance from the previous month or

8    possibly directives or possibly reprimands for things that

9    we weren't doing right that he wanted to address and make

11:13:12   10   sure that we all understood to be a part of our job and

11   what our expectations were.

12   **Q.**   And what, if anything, did Mr. Kakhnovets talk to you

13   and the other leasing agents about with respect to how

14   hard you needed to work?

11:13:27   15   **A.**   Well, it was made very clear in the meetings by

16   Mr. Kakhnovets that we were to answer our phone calls at

17   all times.

18        It was made very clear that we were expected to meet

19   our Salesforce quotas and exceed to be able to gain our

11:13:41   20   bonuses, if that were going to be, you know, something

21   that we would receive that particular month.

22        Also, in regard to following Boxer protocol, such as

23   what the system was called the four, two, four, which was

24   the way we showed property.  Four things about the

11:14:00   25   building, two things about the suites, four things about

11:14:17

1    Boxer on the way back to the suite, and the closing

2    process.  He was very engaged with -- with the agents.

3    **Q.**   You said with the agents.  So who -- who would be at

4    these meetings where Mr. Kakhnovets talked about these

5    things about working hard and that sort of thing?

6    **A.**   Generally all of the leasing agents, unless someone

7    had an emergency situation and could not be there, as well

8    as the regional supervisors, Mr. Kakhnovets, and from time

9    to time either Andrew Segal or Justin Segal may also visit

11:14:38 10   the meetings to make comments or updates about things that

11   were going on in the company.

12   **Q.**   And please tell the Court who Andrew Segal and Justin

13   Segal are.

14   **A.**   Andrew Segal is the owner of this company.  I'm not

11:14:53 15   exactly sure at this time what Justin's -- his legal

16   position is.  I'm not sure if he is the CEO or the

17   president of the company at this time.

18   **Q.**   And when Mr. -- when the Mr. Segals were at the

19   meetings, what sorts of things did they tell you and the

11:15:12 20   other leasing representatives?

21   **A.**   Two different things.  One particular time they came

22   in to tell us about one of the buildings in Dallas that

23   had been foreclosed on.  They were wanting to let us know

24   that they had defaulted on their loan, and they were

11:15:25 25   concerned that we may encounter brokers or different

*Laura Wells, CRR, RDR*

1    people that might would be concerned about Boxer's

2    security due to that.  And so they wanted to give us some

3    directives about how to respond to those questions if it

4    came up.

11:15:40    5        THE COURT:  Did Boxer own these properties or

6    just manage them?

7            THE WITNESS:  Boxer owned some of their

8    properties, and they managed some of their properties.

9            THE COURT:  The one that was foreclosed on, did

11:15:50   10    it own and manage?

11           THE WITNESS:  He did not clarify that in the

12   meeting but he -- he insinuated that they owned the

13   building by stating that it had been foreclosed on.

14           MS. VALDERRAMA:  I apologize for having to

11:16:02   15    object.  There is no foundation that's been laid that this

16   witness knows who owns the buildings.

17           THE COURT:  Well, she is quoting an adverse

18   party.  I think that's permissible.  I'm going to allow

19   it.

11:16:14   20    BY MS. WILLS:

21   Q.   What, if anything, did Mr. Segal, either of the

22   Misters Segal, talk to you or the other representatives

23   about how hard they expected you to work?

24   A.   Well, let's just say that Boxer took great pride in

11:16:35   25    having the best leasing agents in town.  They were very

1  particular about the way we did things, as we mentioned

2  about the Boxer management style, Boxer bible, even

3  kiddingly they would refer to it as the Boxer bible.

4  That's where it came from.  We didn't make it up.

11:16:53  5      They were just very, very particular about everybody

6  doing everything the Boxer way from right on to having the

7  pen cup on your -- on your desk in the right place with

8  the amount of pens that you could do the Boxer pen cup

9  challenge when you turn the cup upside down the pens

11:17:15  10  wouldn't come out.  Justin would actually come in your

11  office and make sure of that.

12      Where did your business cards go?

13      Did you have folders where you were supposed to have a

14  certain amount of folders made up?

11:17:24  15      Did you have your floor plan book?

16      They would even go as far as they themselves would get

17  on line on our website and make sure that we had uploaded

18  properly every floor plan to the website.  If that wasn't

19  done properly, then we would get an e-mail from either the

11:17:41  20  director or regional where that information had flowed

21  down from corporate.

22      They would check what we called -- we had a system

23  called Boxer Manager where we maintained, like, the square

24  footages of the suites that were available, suites that

11:17:57  25  were leased, things like that.  They were constantly

1    looking at that to -- you know, making sure we were

2    keeping those things up-to-date.  That's how they would

3    gauge part of what we did in production was to be able to

4    look at that and see what we had available.

11:18:10    5    So there were many other things.  I'm sure I don't

6    recall every single thing that they discussed.  But that

7    and then just they would, you know, just encourage us to

8    be sure, you know, that we always had our phones on

9    because that was super important, that it was not

11:18:24    10    acceptable, that we were to be on call 24 hours a day, and

11    that we would be reprimanded if we were not taking our

12    calls.

13    **Q.**  So I would like to talk a bit about the job duties and

14    responsibilities for the leasing representatives at Boxer

11:18:42    15    Property.  I understand that the number one thing that you

16    needed to do as a leasing representative at Boxer was to

17    lease office space; is that correct?

18    **A.**  Yes, ma'am.

19    **Q.**  Could you please tell us what -- you have referred to

11:18:56    20    this as leasing the Boxer way.  Could you please walk us

21    through what leasing the Boxer way required of you in

22    order to lease office space at a Boxer managed property?

23    **A.**  Well, it all started with the phone call.  So

24    typically a prospect would call in either from a building

11:19:15    25    sign, potentially a Craigslist ad.  Maybe they saw us on

1  LoopNet or CoStar, which are websites that, you know,

2  commercial properties advertise their buildings in.

3       And the number one goal -- that's where it started --

4  was to set an appointment.  That was your absolute number

11:19:33  5  one goal when you got a phone call was to get the person

6  into the office.

7       Once you would get the appointment, you would get them

8  into the office, typically if the appointment was set out

9  a couple of days you would want to call them the day

11:19:47  10  before to remind them to be sure that they were going to

11  make it for their appointment.

12       They would come in.  They would sit down.  We were

13  required to discuss a little -- have a little interview

14  with them in regard to how many employees they had in

11:20:01  15  their office, what type of company it was, so that maybe

16  we could gauge possibly what type of office equipment, you

17  know, desk space, were they going to have cubicles, did

18  they need private offices and, you know, what type of

19  lease, how long of a term they were looking for, and just

11:20:19  20  kind of interview them and see what we had that might

21  would fit their needs to make sure we were a good fit for

22  their company.  Once we would do that, we would find out

23  what size of space they needed, based on how many people.

24       We had a book similar to this that we kept on our desk

11:20:34  25  at all times, and we kept the available floor plans,

       1    multiple copies of each suite that would be vacant at the

       2    time.  And we would show them the plans before we would

       3    leave the office and say, you know, does this look like

       4    something that would work for you?  We would pick out the

11:20:50  5    ones that would.

       6        Generally, Boxer really didn't want us showing more

       7    than three that was in our handbook at the time.  There

       8    were times that we would and we did, if necessary, in

       9    order to close a deal.  But we tried to keep it to that to

11:21:03 10    minimize the decision-making process for the actual

      11    prospect.

      12        So from that point then, we would go and we would

      13    gauge which ones they wanted to look at; and we would

      14    leave the office.  The tour would actually start in the

11:21:17 15    office or the appointment would start in the office.

      16        So we would come through and just, you know, mention

      17    that the property manager is on site if they had any

      18    issues.  We would exit from the office.  And then we would

      19    start in most buildings -- most of the buildings had a

11:21:34 20    lobby or atrium.  We would want to point out all the

      21    amenities that were available in the building.

      22        And as you are walking in the building, you are

      23    pointing out the amenities.  That may be that we have a

      24    conference room or a deli or restrooms, men and women's

11:21:48 25    restrooms on every floor, free parking.

1  Then we would graduate into the actual suite and they
2  would want us to point out at least two things about the
3  suite.  So that might mean that we have floor to ceiling
4  windows.  We have the solar lighting that turns itself off
5  and on.  We may have put wood laminate.  It could have
6  been a feature of an open concept, you know, a lot of
7  different things, depending on the suite.

8  Most of the suites all looked the same.  They liked to
9  keep all the suites the same.  They called them Boxer
10 standard.  Until the very end of my tenure, then they
11 started changing the decor some in some of the buildings.
12 But even the carpet, the paint, everything was standard
13 even throughout the building typically unless it's Boxer
14 work style --

15           THE COURT:  Okay.  That's good enough.

16           THE WITNESS:  Okay.

17 BY MS. WILLS:

18 **Q.**  Okay.  So after you showed them the building

19 amenities, you showed them the available vacant office

20 suites they might be interested in, what was your next

21 step?

22 **A.**  As we were walking back to the office we were to

23 discuss four things about Boxer or about our lease.  So

24 that's when we would go into, you know, we have a very

25 short lease.  The actual lease is four or five pages.

1    We would talk about, you know, the 24-hour

2  maintenance.  We would talk about 24-hour access to the

3  building.  We would talk about there is no application fee

4  for the lease.  We would talk about you can sign the lease

11:23:11  5  and have your keys today.

6        So we would want to make sure that we touched on at

7  least four, you know, hot points so that we could get them

8  back to the office to close.  And at that point you were

9  always to ask are you ready to go back to the office to

11:23:24  10  sign your lease, because that's what they consider a

11  close.  If you didn't ask a tenant to come back to your

12  office to sign a lease, then on your shop you would lose a

13  significant amount of points.

14  **Q.**   So at this point you have shown them the vacant suites

11:23:39  15  in the building.  So then the next step was for you to go

16  back to your office there in the building?  Is that what

17  your goal was?

18  **A.**   Yes.

19  **Q.**   Okay.  And what would happen if you could get them

11:23:50  20  back there to your office in the building?

21  **A.**   Well, at that point, we want them to sign the lease.

22  We want to put the pressure on them.  You know, this is

23  the only one we have like this.  And we were also

24  authorized in different buildings for particular

11:24:02  25  incentives to get them to sign.

1    So we may have been able to waive a deposit.  We may

2    have been able to give them a free month, and we would put

3    that pressure on them to lead them to believe that this

4    offer would not exist if they didn't sign right now.

11:24:18    5    So that's what our goal was, to get the lease signed

6    before they left the office.

7    **Q.**  And explain to the Court the process.  If they said,

8    Okay.  Great.  I need this office.  I like this office.  I

9    want this office.  Explain to the Court, please, the

11:24:31    10   process of generating the lease and getting it signed.

11   **A.**  Okay.  So at different points in my tenure -- at one

12   point we handwrote the leases.  Later on, they actually

13   became what they call a DocuSign system.  So the contract

14   would be in the system, and we would go in and just type

11:24:50    15   in the information.  For instance, the name of the

16   company, their tax ID numbers or Social Security, all

17   their pertinent information for their private company.

18   Attaching floor plans and other addendums or exhibits that

19   would go with the lease.

11:25:07    20   And at that point they -- we had a little sign pad or

21   they would jump over into your seat, if your sign pad

22   didn't work, and they would just electronically sign the

23   lease.

24   They would write a check for their deposit and first

11:25:22    25   month's rent, whatever was due, give us a copy of their

1    driver's license, and they could literally leave with

2    their keys.

3    **Q.**   Now, how did -- in what ways did prospective tenants

4    find out about you guys?  How did they find out about a

11:25:39   5    Boxer managed building?

6    **A.**   Well, most tenants if you would look at the sales

7    reports -- when I was there, the production reports would

8    be -- this is something they would go over in some of the

9    sales meetings -- would be the sign on the building was

11:25:55   10   the absolute number one -- the absolute number one way

11   that we got people in.

12        And then, of course, the Craigslist ads I think some

13   people had more production with those than others; but

14   they were very productive in my buildings.

11:26:12   15        Also, local area brokers would bring clients in.  And

16   also, clients would see us on CoStar, LoopNet; and we also

17   got referrals.  We gave incentives.  I believe it was a

18   $50 bonus or something off their rent that they got for

19   referring someone that signed a lease with us.

11:26:34   20   **Q.**   So if a prospective tenant was interested, would they

21   call in?

22   **A.**   Yes.  Oh, they would walk in, too.  Uh-huh.

23   **Q.**   Well, let's talk about the calls first.

24   **A.**   Okay.

11:26:44   25   **Q.**   When calls would come in, tell the Court, please, the

Direct Examination of Sherry Shelby      Day 1 - 82

1  various ways that calls might come in.

2  **A.**   Well, they would either come in on the office phone or

3  they would come in on a cell phone, on our company-issued

4  cell phone.

11:26:57  5  **Q.**   And when you say the office phone, where was the

6  office phone?

7  **A.**   On our desk.

8  **Q.**   In your office there at Boxer, the Boxer-managed

9  building?

11:27:05  10  **A.**   Yes, ma'am.

11  **Q.**   And where -- and so, who routed the calls to the

12  office, or did they come directly to the office?

13  **A.**   Well, we did get calls that came directly to the

14  office; and we always speculated how that would happen.  I

11:27:19  15  don't know if that -- they would get the number off of the

16  internet somewhere where those leads come from.  But most

17  of the time they came through the corporate office and the

18  corporate leasing coordinators or -- I think that's what

19  they were called.  I think they were leasing coordinators.

11:27:37  20  They would take the call; and then, they would route it to

21  whatever appropriate building it was.

22  **Q.**   Once the office was closed to the public for the day,

23  how did the calls get routed?

24  **A.**   Well, they had it set up to where if you -- you were

11:27:56  25  always on call; but you had, generally, a couple of people

*Laura Wells, CRR, RDR*

1   that would be a back-up for you.

2        So, for instance, if I got a call from my building and

3   say I was in the ladies' room and didn't grab the call,

4   then whoever was in back-up for me, it would go and

11:28:12    5   roll -- they wouldn't send it to my voicemail.  It would

6   roll over.  Hypothetically, it would roll to the next

7   leasing agent in line.  If that person missed it, it

8   rolled to the next.  After that, generally, it would go to

9   a supervisor; and that's when you knew you were going to

11:28:27    10  be in trouble if it got to a supervisor.

11  **Q.**   And you mentioned that your company-issued cell phone

12  you would get calls.  Is that a number that you gave out?

13  **A.**   Yes, ma'am.

14  **Q.**   And please tell the Court on what occasions you would

11:28:46    15  give out your company-issued cell phone number?

16  **A.**   Well, it was on our business card.  And also, any time

17  I made a call.  So, for instance, if someone called in

18  and, you know, they didn't get anyone and the coordinator

19  put it into Salesforce and we came in the next day, we

11:29:06    20  would call them.

21       But we would always leave our cell number for them to

22  call back because we were moving around having

23  appointments in the office, and we wanted to be sure to

24  get those calls.  So they would call directly to our cell

11:29:21    25  phone or sometimes they would call back to the office

1  because they would see, you know, a missed call and

2  potentially it would say Boxer Property.

3  **Q.** Now, you mentioned Craigslist ads.  Could you please

4  tell the Court what that is.

11:29:34   5  **A.** Yes.  Craigslist is a free marketing internet website

6  that we would post our suites and buildings on in order to

7  attract potential prospects looking for office space.

8  **Q.** What phone number would be listed in the Craigslist

9  ad?

11:29:52  10  **A.** Usually -- it would depend on the agent on that.  Some

11  agents did put their cell phones.  Some did put the

12  corporate number and some put both.  My ads usually had

13  both.

14  **Q.** And how frequently were the leasing agents required to

11:30:10  15  post Craigslist list-outs?

16  **A.** Well, we were -- we were required to have a minimum of

17  100 at the time when I was there.  However --

18        THE COURT:  100 for how long?

19        THE WITNESS:  A month, yes, sir.

11:30:25  20        THE COURT:  All right.

21        THE WITNESS:  However, part of our potential

22  subjective bonuses would be based on the persons that did

23  the highest performance.  So in order to get in that range

24  where you could possibly get any kind of bonus, you would

11:30:42  25  have to get up to probably around 600 or more.  At one

1    point it got up to around a thousand ads.

2    BY MS. WILLS:

3    **Q.**   Per month?

4    **A.**   Yes.  That the agents were posting to get the bonus.

11:30:54  5    **Q.**   And explain to the Court then, in order for you to do

6    a thousand Craigslist ads a month, please explain to the

7    Court the frequency with which you were having to do

8    Craigslist postings?

9    **A.**   Part of the issue with Craigslist, it won't

11:31:10  10   continuously let you post at one time.  It will think it's

11   a spam or something.  So you had to gradually do them.

12   You couldn't just boom, boom, boom, boom put in 100 and be

13   done with it in 20 minutes.  It's like you could put in

14   one ad and then in a minute or two you could put in

11:31:26  15   another.  So it was a quite lengthy of a period of time.

16        So generally in the evenings, you know, I would have

17   to sit and, like, watch TV or something and actually sit

18   there and post ads because you couldn't sit there and do

19   it all throughout the day.

11:31:47  20   **Q.**   And what were the office hours during which the

21   leasing office was generally open?

22   **A.**   Well, the door says 8:30 to 5:30.

23   **Q.**   And in actuality, though, how -- what hours was the

24   office open?

11:32:08  25   **A.**   The office is always open, according to Boxer.  So if

*Laura Wells, CRR, RDR*

1    you were in that office, if you got there at 7:30 or 8:00,

2    the office was open.

3    **Q.**    And how about in the evenings?  How late would the

4    office stay open in the evenings?

11:32:23    5    **A.**    Again, if you were there, it was open.  So if I was

6    there at 8:00 and a tenant or prospect came in, I was

7    expected to show space.

8         THE COURT:  So you are open as long as there was

9    an agent there?  Well, it wasn't open when no one was

11:32:41    10    there, right?

11         THE WITNESS:  Well, if no one was there, they

12    would call us still.  As they said, we were expected to do

13    tours potentially.

14         THE COURT:  But if nobody was calling an agent

11:32:50    15    for a tour and no one was in the building, the building

16    was locked up, wasn't it?

17         THE WITNESS:  Yes, sir.  That's correct.  Yes,

18    sir.

19    BY MS. WILLS:

11:32:58    20    **Q.**    And were there any administering of duties that you

21    had for working in the office, just sort of paperwork or

22    administrative duties?

23    **A.**    As far as processing the leases?  We were -- we kept

24    stringent requirements on the leasing files even though we

11:33:17    25    were -- there at the very end of my tenure, we were

1    transitioning to what they were trying to do is a

2    paperless system; but it actually was creating more paper

3    than the non-paper system.

4         So a lot of the times, at the end of the day, after

5    you had been touring your own appointments all day, you

6    would have to spend, you know, an hour or two at the end

7    of your day just trying to stack your files and get your

8    paperwork in order because you would have to send that to

9    the corporate office, along with the check.

10   Q.   And what sort of paperwork are you referring to?

11   A.   The leases, the addendum, the exhibits, the driver's

12   license information, the application, the contact sheets,

13   all the tenant information that was provided.

14   Q.   And were there any other office requirements that

15   Boxer had in terms of how you were required to maintain

16   the lease office space?

17   A.   Yes.  Every office was required to be the same.  So

18   your business cards, your pen cups, your brochures for the

19   buildings, everything had to be in the same place at all

20   times.  Everyone had -- we weren't allowed to have

21   anything on our desk except a computer, a pen, no

22   post-its, very, very stringent.  If they walked in and

23   your office was not considered a Boxer standard, you could

24   be written up for that.

25   Q.   And with respect to these brochures, who prepared the

Direct Examination of Sherry Shelby          Day 1

1  brochures?

2  **A.**   We did.

3  **Q.**   When you say "we," are you talking about the leasing

4  representative?

11:34:47  5  **A.**   Yes, ma'am.

6  **Q.**   Tell me what went into preparing those brochures?

7  **A.**   Depending on your portfolio of buildings, generally

8  you would put a copy of your lease, a copy of, like,

9  brokerage services that identified us as licensed agents,

11:35:03  10  your business card, your building brochures, and any other

11  potential incentives that they may have going on at that

12  time.  Sometimes they would have flyers or something

13  printed up for people that would refer and different

14  things.

11:35:20  15  **Q.**   You have talked a lot about meeting with prospects and

16  touring the Boxer-managed building that you worked in with

17  them.  How many times did you have to meet with or tour

18  with a prospect before they signed a lease?

19  **A.**   You know, that actually -- it varied.  There were

11:35:40  20  times that we would tour one time, and that would

21  typically be on, say, a small office, like a one-room

22  office.  Those people generally were able to make

23  decisions much quicker than people that would have

24  anything over a one-person company.

11:35:55  25       But with people that had something over that size, it

1  usually -- always you had to tour multiple times because

2  they had to make big decisions.  Is this going to work?

3  Sometimes they had to bring other people, you know, within

4  the company back to look at the space also.  Sometimes

11:36:11  5  they had a broker that would come before and then bring

6  the client.

7      So I have had people that I toured, you know, multiple

8  times, multiple times on multiple, multiple occasions.

9  **Q.**  And once a lease was signed, was there ever a

11:36:30  10  build-out for the vacant office space?

11  **A.**  Yes.

12  **Q.**  Who handled the build-out of the office space?

13  **A.**  If it was for a prospect that was coming in, then that

14  would be something that we would do.

11:36:45  15  **Q.**  Would that be the Boxer construction person?

16  **A.**  No.  The leasing representative.  We would actually

17  talk with the agent or, excuse me, with the prospect about

18  what they needed done.

19      So, for instance, if you were looking at a space with

11:36:59  20  the prospect and they said, you know, this space would be

21  perfect but that one wall is a problem, I need this wall

22  knocked out between these two rooms, then we would sit

23  down on the floor plan and we would, you know, put that

24  information in.  It was seven or eight layers of

11:37:16  25  information.

*Laura Wells, CRR, RDR*

1    And then we would send it to corporate to the

2    construction department.  And then the construction

3    department would finalize the plans.  And then they would

4    also do the -- submit for the permits and handle the

11:37:29  5    management of the construction.

6    **Q.**   And who was communicating with the tenant through this

7    process?

8    **A.**   During -- before they signed the lease?

9    **Q.**   After they signed the lease.

11:37:40  10   **A.**   Generally after they signed the lease, sometimes the

11   leasing representative would communicate, but sometimes it

12   would be the property manager.  So it would just depend on

13   the circumstances.

14   **Q.**   And were there meetings between the tenant and the

11:37:55  15   construction department about their build-out?

16   **A.**   Not unless -- usually unless it was a really big

17   build-out; but if it was a small job, it usually wasn't

18   necessary for them to actually go meet with someone.  They

19   would on the bigger jobs though.

11:38:10  20   **Q.**   And on those bigger jobs would the leasing

21   representatives also attend these construction meetings?

22   **A.**   Maybe on occasion but not necessarily required.

23   **Q.**   Now, were there cameras in the offices?

24   **A.**   Yes.

11:38:29  25   **Q.**   Please explain to the Court how the cameras worked.

*Laura Wells, CRR, RDR*

11:38:49

11:39:06

11:39:20

11:39:35

11:39:51

 1  **A.**  Well, most of the offices I ever went into, the camera
 2  was always above your -- above your seat.  So they could
 3  literally sit it down above you.  Or it was over in the
 4  corner because they wanted to be able to see whoever was
 5  in the room.  So it really depended how the office was
 6  laid out as to where it was.  They had mine above me at
 7  one time and had to move it.  So it would -- but it
 8  usually was on the ceiling somewhere in there.
 9  **Q.**  Would the camera show a leasing representative sitting
10  at his or her desk?
11  **A.**  Yes.
12  **Q.**  To your knowledge, who had access to these cameras?
13  **A.**  Our supervisors, directors, president of the company,
14  the coordinators that took the calls.
15  **Q.**  And how do you know that?
16  **A.**  Well because they would tell us they could see us on
17  there, you know.  You could walk into the corporate
18  office, and they had a monitor system set up where you
19  could peek around the corner, and you could look at your
20  own office.  You could see the cameras, that they were
21  watching them.  Supervisors would let us know that they
22  could see us on those cameras.  They knew if we were in
23  our offices or not.
24  **Q.**  Now, I would like to talk about -- before I move on,
25  how many leases a month were you doing as a leasing rep at

1    Boxer?

2    **A.**    I'm going to give you an estimate because I don't know

3    the exact number, but I was considered a top producer.

4    And if I had the inventory and you are talking about

11:40:06    5    leases, so I'm going to include renewals and expansions or

6    downsizes; but probably somewhere between, I would say, 10

7    and 20 would be an average.

8    **Q.**    That's per month?

9    **A.**    Yes, ma'am.

11:40:20    10    **Q.**    And you said with each lease sometimes you would have

11    to do multiple tours?

12    **A.**    Yes.

13    **Q.**    Please explain to the Court what you meant about

14    renewals?

11:40:30    15    **A.**    An existing tenant that wants to stay in the space.

16    So we would have to prepare the documents to continue that

17    lease for them.

18    **Q.**    So in addition to getting new tenants, you had to also

19    work with existing tenants?

11:40:44    20    **A.**    Yes, ma'am.

21    **Q.**    And then you said expansions of leases.  How did that

22    work?

23    **A.**    Well, oftentimes, you know, since Boxer had such

24    graduated sizes, they really focused primarily on the

11:40:55    25    small tenant, that is sort of their business model; but

1  they do have some buildings where we had large tenants.

2  And the expansions, you know, the way to get them in would

3  be to let them know that at any time within their term

4  without penalty they could expand to a larger space.  So

5  that would vary.  Maybe they had to move to a whole new

6  space and sometimes they would maybe absorb a space that

7  was vacant next door.  We would open it up and work them

8  in together and make them into one space.

9  Q.   So how were you able to figure out who was up for

10  renewal or who might want to get an expansion?  How did

11  that work?

12  A.   Well, we had a system that would let us know.

13       Now, when I first started, it was different; but there

14  toward the end, the automatic system would let us know

15  every month who was up for renewal.  We had a system that

16  Boxer created.  It was their own software.  And it would

17  prompt us to let us know about 90 days prior to a tenant's

18  lease expansion [sic], and then we would start contacting

19  the tenant, either via phone call or via e-mail or a

20  notice or something like that.

21  Q.   And were there ever times when you would make sort of

22  cold calls to prospective tenants?

23  A.   Do you mean like --

24  Q.   People that hadn't leased in a Boxer building but you

25  wanted to just call them and see if maybe they wanted to

           1  come in, cold calls.  Did you ever do that?

           2  **A.**   Occasionally.  That wasn't something that I had to do

           3  really very often; but if things were slow, we could get

           4  on the internet and you could actually, if you were

11:42:41   5  interested in the building, you could actually pull that

           6  building up and see what tenants were there and call

           7  tenants and you could cold call them.

           8  **Q.**   Were there any leads in Salesforce that you ever

           9  called?

11:42:52  10  **A.**   Any leads for --

          11  **Q.**   In Salesforce for prospective tenants that maybe had

          12  been out and hadn't leased?  Were there any requirements

          13  to follow up with leads in Salesforce?

          14  **A.**   Oh, yes.  Absolutely.

11:43:03  15  **Q.**   Please explain that to the Court.

          16  **A.**   Well, when I started working for Boxer, I was told

          17  that you don't kill a lead unless they were actually dead.

          18  Like the person is dead.  That's what I was told when I

          19  was trained.

11:43:19  20       Now, of course, for a long time I took that literally.

          21  So I beat people up pretty bad, you know.  But, yes,

          22  ma'am, we were expected until that -- you know, until that

          23  tenant or that prospect told us, I am not going to lease

          24  space in your building, you were expected to continue to

11:43:36  25  call them, e-mail them, leave them messages, follow-up.

Direct Examination of Sherry Shelby                    Day 2 - 95

1    And in the system it's a -- Salesforce is a contact

2  management system.  So you could actually put your next

3  prompt in there.  So if I called them today and they are

4  not quite ready, I may find out when they may be ready.

11:43:56  5  It might be next week.  It might be a month from now or

6  six months from now.  It might be a year or six months.

7  You would put that in.  Every day you would pull up your

8  list, and it would tell you who you had scheduled along

9  with, you know, potential notes.

11:44:09  10  **Q.**   Now, you mentioned there were some sales meetings that

11  you attended.  Do you recall that testimony?

12  **A.**   Yes, ma'am.

13  **Q.**   How frequently were those held?

14  **A.**   The actual sales meetings were generally once a month.

11:44:22  15  **Q.**   And how long did those sales meetings last?

16  **A.**   They actually held the sales meetings during our lunch

17  hour.  So they would generally last about an hour and a

18  half would be about average.

19  **Q.**   And were these sales meetings voluntary or mandatory?

11:44:40  20  **A.**   Mandatory.

21  **Q.**   Now, was there any work that leasing representatives

22  also needed to do in support of other leasing

23  representatives?

24  **A.**   Yes.  We were expected to help each other, to support

11:44:51  25  each other.  So there were times that, you know, I would

1  have agents contact me, you know, to ask me questions; and

2  then there were times when I would contact other agents to

3  ask them questions.

4       Oftentimes the regionals -- things were progressing so

11:45:08   5  fast with changes and upgrading the systems that

6  oftentimes your regional, once they were placed in that

7  role, they didn't have a day-to-day contact with the

8  systems we were using.  So oftentimes they couldn't help

9  us.  We would have to talk to someone that was actually

11:45:23  10  using the system or maybe someone in IT that would be able

11  to help us.

12  **Q.**  Now, you mentioned training.  When you started at

13  Boxer, what training, if any, were you given as a leasing

14  agent?

11:45:35  15  **A.**  It wasn't a formal training.  You just kind of did a

16  shadow with another agent on their actual portfolio in

17  their office.

18  **Q.**  So when you say "shadow," what do you mean?

19  **A.**  You just follow them around all day long.  Everything

11:45:50  20  they do, you do.  So if they are working on phone calls,

21  they would open up a laptop for you and say, I'm going to

22  call these people.  You call these people.  Okay.  We're

23  going on a tour.  Follow me.  And that was what I mean by

24  shadowing.

11:46:07  25  **Q.**  Did you ever have any leasing -- other Boxer leasing

1  representatives shadow you?

2  **A.**   Yes.

3  **Q.**   And did you have anybody come from out-of-town to

4  shadow you?

11:46:19  5  **A.**   I did.

6  **Q.**   Please tell the Court about that.

7  **A.**   We had some new buildings that Boxer had acquired in

8  the Illinois area.  I'm not sure exactly what town it was

9  outside of Chicago.  And they brought down that particular

11:46:37  10  leasing representative, flew her in, and she stayed, I

11  think, about two weeks in a hotel there close by and came

12  and shadowed me every day.

13  **Q.**   And when you say shadowed you, she basically followed

14  you around to learn how you did your job?

11:46:54  15  **A.**   Yes, ma'am.

16  **Q.**   And she was also a leasing representative?

17  **A.**   Yes.

18  **Q.**   And was there any online training that leasing

19  representatives were given?

11:47:01  20  **A.**   Not at the time that I was there.  At the end of my

21  tenure, they were trying to create modules.  They had

22  hired someone in that department, but it was something

23  really new and fresh that had popped up.  So I'm not sure

24  what they are doing now.

11:47:18  25  **Q.**   Did Boxer have a trainer that actually did training?

```
       1  A.   You mean like at their corporate office?

       2  Q.   Correct.

       3  A.   Not when I was there.  So --

       4  Q.   So the training for leasing representatives was

11:47:34  5  primarily shadowing other leasing representatives to see

       6  how things were done?

       7  A.   Correct.  Correct.

       8  Q.   I would like to talk about the systems at Boxer.  You

       9  have mentioned Salesforce.  Can you please tell the Court

11:47:46  10  what Salesforce is?

      11  A.   It's a contact management system, and it's

      12  internet-based.

      13  Q.   What is Salesforce used for?

      14  A.   Salesforce is used to schedule your appointments,

11:48:00  15  reminders.  Also, they had also -- the DocuSign actually

      16  went through Salesforce.  So you had to log in to

      17  Salesforce to actually do your contracts, your leasing

      18  contracts.

      19  Q.   And what information did you put into Salesforce as a

11:48:18  20  leasing representative?

      21  A.   Well, you would put, you know, the name of the

      22  company, the phone number, their e-mail address, the

      23  person's name and, of course, what their requirements

      24  were, how many employees they had, what type of business

11:48:32  25  it was, maybe even how long they had been in business.
```

 1    Did they currently have an office space?  If so, possibly

 2    might -- maybe where they were located, what was the

 3    reason they needed to move.  Any pertinent information

 4    that may be applicable to help you to locate the perfect

 5    space for them.

 6    **Q.**    And who had access to your Salesforce records of the

 7    leasing representatives?

 8    **A.**    All of the leasing representatives had access, and

 9    none of us had our own password.  So there was one

10    password that everyone used to access the system.

11    **Q.**    Okay.  And did it identify, for example, work that you

12    did in Salesforce verses another sales representative --

13    leasing representative?

14    **A.**    The system had a drop-down that if someone plugged in

15    a particular prospect that called in, whoever put that

16    information in would assign it to the agent of that

17    building.  So the leasing representative of that

18    portfolio, if they called in on my building, if the

19    coordinator put that information in, there was a drop-down

20    that she could click on my name and then it would assign

21    it to me.  And then she would set a call, you know, for it

22    to let me know that I needed to call that person.

23    **Q.**    Was everything that you did put into Salesforce or

24    just some things?

25    **A.**    Well, I'll be honest.  You know, we tried our best to

1    put as much as we could in there; but it wasn't completely

2    possible to put 100 percent of your information in there

3    because sometimes you were just busy and you would forget

4    and -- or, you know, you weren't in the office.  And the

11:50:19    5    next morning when you would come in, you would forget to

6    put it into the system.

7    **Q.**   I would like to direct your attention, if I could, to

8    Plaintiffs' Exhibit Number 45 in the notebook in front of

9    you.

11:50:30    10    **A.**   Which one?  Which book?

11    **Q.**   It's the white notebook, Exhibit 45.

12         MS. WILLS:  May I approach, Your Honor?

13         THE COURT:  You may.

14         THE WITNESS:  I see it.

11:50:40    15         MS. WILLS:  If you could go to 45.

16      Does Your Honor need a set of our exhibits?

17         THE COURT:  I have got a lot of paper here.  I'm

18    not sure.  Did you give me --

19         MS. WILLS:  I'll just put it up on the ELMO, Your

11:50:57    20    Honor.

21         THE COURT:  Okay.

22    BY MS. WILLS:

23    **Q.**   In looking at Exhibit 45, Ms. Shelby, do you see your

24    name there, Sherry Shelby?

11:51:40    25    **A.**   Yes, ma'am.

```
11:51:44
11:52:01
11:52:16
11:52:36
11:52:54
```

 1  **Q.**   And then you see a date there?

 2  **A.**   Yes, ma'am.

 3  **Q.**   Do you see a time there?

 4  **A.**   Yes.

 5  **Q.**   And then it says "tour"?

 6  **A.**   Yes.

 7  **Q.**   Do you see that?

 8  **A.**   Yes, ma'am.

 9  **Q.**   And then it says, "SS sign first EXP APPT."  What does

10  that mean?

11  **A.**   Let's see.  Sign first -- let's see.  Can you scroll

12  it back to the right side?  Let me see.  Does it have a

13  tenant's name on it?

14  **Q.**   It does not.

15  **A.**   It looks like that might have been an expansion

16  appointment, EXP.

17  **Q.**   And if you look down this page, it has various other

18  descriptions.  Were those descriptions that you put in?

19  **A.**   I have never seen anything that said "null."  So I'm

20  not sure what that is supposed to be.

21  **Q.**   And then we have this column here that I will point to

22  with my pen.  Does this indicate essentially -- for

23  example, if it was a walk-in, if there was an appointment

24  set, if it was a first tour?  Was that from a drop-down

25  menu where you put in that information?

Direct Examination of Sherry Shelby - Day 1

1   **A.**   No.  We would have typed that in.

2   **Q.**   Okay.  And then the column here that has the date and

3   time, where would that information come from?

4   **A.**   We did not put that in.  So I am assuming that that

5   must have been something that auto-populated in the

6   system.  I have never -- didn't even know it did that.

7   **Q.**   Okay.  So then here we have some other times listed.

8   And would these be the times that you had indicated, for

9   example, when the appointment was set or when the lease

10  was signed?  For example, here it says "SS signed" and

11  then the time it has is 4:45 p.m. to 5:45 p.m.  Do you see

12  that?

13  **A.**   That may have been -- we typically would allot -- that

14  looks odd.  No.  Because some of those look like an hour

15  and some look like two hours.  I'm not sure exactly what

16  we are looking at right there, if that's the appointment

17  time, why I would have had a two-hour appointment.

18  **Q.**   Okay.  Have you -- but you are familiar with

19  Salesforce and utilizing Salesforce?

20  **A.**   Yes, ma'am.

21  **Q.**   So, for example, here where it has an appointment and

22  a time range, would that be the time range that's

23  estimated for that appointment?

24  **A.**   Yes.  Typically that would be the time range.

25  **Q.**   If it says 4:00 to 5:00 p.m., that's the time range

11:53:10
11:53:28
11:53:48
11:54:08
11:54:24

Laura Wells, CRR, RDR

1    for the appointment?

2    **A.**    Yes, ma'am.

3    **Q.**    And then this is the date set for the appointment?

4    **A.**    Yes, ma'am.

11:54:34    5    **Q.**    I will show you some others.  So here is Page 2 of

6    that same exhibit, which is Bates labeled BPMCSS-002468.

7    Does this appear to be the same type of record?

8    **A.**    Yes, ma'am.

9    **Q.**    So, for example, I'll direct you to the bottom of this

11:54:56    10    one.  It says, "Toured Quinton, and he will let me know in

11    the morning."  And it says this is August 6th, 2014; and

12    it says 6:00 p.m. to 7:00 p.m.  Do you see that?

13    **A.**    Yes.

14    **Q.**    Would that have been the time for the tour?

11:55:14    15    **A.**    Yes.

16    **Q.**    Okay.  And if you could just look at Exhibit 45.  Does

17    Exhibit 45 appear to you to be the records that -- from

18    you that were in Salesforce, to your knowledge?

19    **A.**    You know, Rhonda, I really can't see this.  I do see

11:55:39    20    my name on it, there on the very left, but the print is so

21    small.

22    **Q.**    Okay.  Great.  I mean, I don't want to belabor the

23    Court's time by going through each and every one of these.

24    Would it be fair to say that for the appointments that did

11:55:55    25    get entered into Salesforce, do these appear to be those

*Laura Wells, CRR, RDR*

1    appointments?

2    **A.**    Yes, they do.

3    **Q.**    And then, for example, here there is a long -- that's

4    okay.  I won't belabor this by going through all of these,

11:56:14    5    but these that are in Exhibit 45 appear to be your

6    Salesforce records?

7    **A.**    Yes, ma'am.

8    **Q.**    But it is your testimony that not everything you did

9    was put into Salesforce?

11:56:26    10    **A.**    Correct.

11    **Q.**    Just some of the things?

12    **A.**    Correct.

13              MS. VALDERRAMA:  If we could stop leading the

14    witness and let her respond.

11:56:33    15              THE COURT:  Sorry?

16              MS. VALDERRAMA:  Leading, Judge.

17              THE COURT:  I don't worry too much about leading

18    when I'm sitting without a jury.

19              MS. WILLS:  I'm just trying to get through it,

11:56:42    20    Your Honor.

21              THE COURT:  Huh?

22              MS. WILLS:  I'm just trying to get through it.

23              THE COURT:  I can discount for questions that are

24    leading or lack of relevance or whatever.

11:56:50    25    BY MS. WILLS:

*Laura Wells, CRR, RDR*

Direct Examination of Sherry Shelby    Day 1

1    **Q.**   So the Exhibit 45 information that we have looked at,

2    other than you, who else could see that information?

3    **A.**   Anyone in the leasing department could see it.

4    **Q.**   How about your boss?

11:57:04    5    **A.**   Yes.

6    **Q.**   How about Alex Kakhnovets --

7    **A.**   Yes.

8    **Q.**   -- head of the leasing department, could he see it?

9    **A.**   Yes.

11:57:10    10    **Q.**   And were you aware of whether or not supervisors were

11    going into Salesforce and looking at these Salesforce

12    entries?

13    **A.**   Yes, they were.

14    **Q.**   How do you know that?

11:57:20    15    **A.**   Well, I know for a fact that every day whatever your

16    scheduled tasks were and, you know, that could vary for

17    the particular assignment, what they had scheduled for

18    that day, it was a requirement that you could not leave

19    your assignment until all tasks were complete.

11:57:38    20         So every single day we generally got an e-mail

21    starting in the morning that would reprimand because a lot

22    of agents weren't completing their tasks.  So I know they

23    were looking at them because they were sending out

24    reprimand e-mails because people were not completing them.

11:58:00    25    **Q.**   Now, are you familiar with the Lync system that was

1   used at Boxer --

2   **A.**   Yes, ma'am.  I am.

3   **Q.**   -- or is used at Boxer?

4   **A.**   I am.

11:58:10   5   **Q.**   Please tell the Court what the Lync system is.

6   **A.**   Lync is like an in-house messaging system where all

7   employees that have computer access are able to message

8   one another with questions or requests.

9   **Q.**   And who could see who was on Lync?

11:58:33   10   **A.**   Anyone that was on their computer.  So if I was

11   sitting at my computer -- and your Lync is open because

12   when you start your computer, it comes on.  So you can

13   automatically see -- you know, like I could see the

14   leasing agents that were on or my supervisors that were

11:58:53   15   on.  Not necessarily a property manager, but I could see

16   the leasing representatives.

17   **Q.**   And could supervisors see who was on Lync?

18   **A.**   Yes.

19   **Q.**   Which supervisors?

11:59:07   20   **A.**   All of them.

21   **Q.**   Could Alex Kakhnovets, head of the entire department

22   of leasing nationwide, could he see who was on Lync?

23   **A.**   I would assume so.  There is no reason why he

24   shouldn't have been able to.  We all could see it.

11:59:22   25   **Q.**   And did you have to log in to Lync?  Did it

*Laura Wells, CRR, RDR*

1    automatically come on?  Please explain to the Court how

2    that worked.

3    **A.**   It automatically came on when I signed on to my

4    computer.  So if my computer sat idle, for instance if I

11:59:38    5    didn't touch my keyboard or engage the mouse and it went

6    idle, it would kind of go into a resting mode and it would

7    put, like, a different -- I don't know what the color was.

8    It would put a different light.  So if you were on and you

9    were actively working, it would have a green light.  If

11:59:56    10    you were off and it was idle, it would have a different

11    colored light on there.

12    **Q.**   And did it ever turn red?

13    **A.**   I don't recall, but I know there was a color when you

14    weren't on.  I don't recall what color it was, but I do

12:00:12    15    believe it was red.

16    **Q.**   And when you weren't on, what did that indicate?

17    **A.**   It indicated that you weren't on your computer.  It

18    didn't necessarily indicate that you weren't in your

19    building or that you weren't on your assignment.  It just

12:00:29    20    meant that you weren't on your computer.  You could have

21    turned away from your computer and had a client at your

22    desk, a prospect at your desk, and you could have just

23    been visiting, talking with, you know, a potential

24    prospect or you could have been on an appointment, you

12:00:44    25    know, showing the space.  So -- but it just indicated that

 1   you weren't actually on the computer.

 2   **Q.**   And what made you believe that supervisors were

 3   watching whether or not leasing representatives were on

 4   Lync?

 5   **A.**   Well, because my supervisor on a couple of occasions

 6   late in the evening actually messaged me and said, hey,

 7   what are you doing?

 8         And I said, I'm working.  What are you doing?

 9         I'm working, too.

10   **Q.**   Which supervisor was that?

11   **A.**   Jerry Watson.

12   **Q.**   And did you ever use or did, to your knowledge,

13   leasing representatives use Lync to communicate with each

14   other in various cities?

15   **A.**   Yes.  You can.  Uh-huh.

16   **Q.**   Can you explain to the Court how that worked, how the

17   leasing reps, for example, in Houston were able to

18   communicate with someone in Illinois?

19   **A.**   Well, they were no different.  You could see them on

20   line.  So, for instance, you know, if you had a question,

21   you know, if one of them had a question for me, they could

22   actually just -- I called it instant messaging because it

23   would just pop up on your screen.

24         And then they would say, hey, are you busy?  I have a

25   question.  Whatever.  Whatever their concern was.

12:00:57
12:01:13
12:01:26
12:01:39
12:01:56

Direct Examination of Sherry Shelby    Day 1

```
 1   Q.   What about e-mail?  Was e-mail used?  Was that a
 2   system that was used at Boxer Property?
 3   A.   Yes.
 4   Q.   Explain to the Court how e-mail worked.
 5   A.   How e-mailed worked?
 6   Q.   Well, in terms of when you were supposed to respond.
 7   A.   Well, immediately, as soon as possible.  It was always
 8   important to Boxer to be able to respond, especially to
 9   prospects, as quickly as possible because we wanted to be
10   the first company to reach out to them in order to grab
11   that lease; and they put a great sense of urgency on that.
12   Q.   What about responding to e-mails from others within
13   the company, supervisors and the like?
14   A.   Well, you were always expected to check your e-mails
15   even when you weren't in the office.  So if, you know,
16   someone sent you an e-mail over the weekend and -- you
17   needed to check it.
18   Q.   If you could take a look, please, in the notebooks in
19   front of you.  Starting with Exhibit 70 and going through
20   Exhibit 320.  That's some 250 e-mails that we have.
21          MS. WILLS:  If I may, Your Honor, I don't want
22   to, obviously, use the Court's time by going through all
23   250 e-mails.
24          THE COURT:  Yeah.  This has been informative in
25   terms of what Ms. Shelby's duties were; but in terms of
```

Direct Examination of Sherry Shelby    Day 1

1    whether her hours were cabined within the eight-hour slot

2    or not, I'm not -- I'm not hearing a whole lot.

3              MS. WILLS:  Right.  Do you want me to go through

4    all the e-mails?

12:04:09    5              THE COURT:  No.

6              MS. WILLS:  I didn't --

7              THE COURT:  Is that the best way to show the

8    hours?

9              MS. WILLS:  Her e-mails, yes.  We have -- you

12:04:18    10    know, we have time stamps on the e-mails.  I mean,

11    obviously, we're going to have her talk about it; but if

12    the Court wants to see time stamps on things.

13              THE COURT:  Let's have her talk about it and you

14    can go through the e-mails if there is cross.

12:04:34    15              MS. VALDERRAMA:  All right.  That's fine.

16              MS. WILLS:  Do you want me to get into these now,

17    Your Honor?  It's noon.

18              THE COURT:  We don't need to get into the

19    e-mails.  Talk more about what her hours were on the

12:04:44    20    average day, what her hours were on the average month.

21              MS. VALDERRAMA:  Can I have some clarification?

22    What is the representation being made to the defendants

23    and to the Court as to what the 250 e-mails purport to

24    show?  Even if they don't go through them, what are they

12:05:00    25    there for?

1    MS. WILLS:  The e-mails were basically e-mails

2    where we took those time records and we compared them to

3    the e-mails and all of these e-mails, the 250 of them, we

4    only have the e-mails from Ms. Shelby, are all e-mails

12:05:13    5    that were sent or received different from what is in those

6    time records, either before or after.

7    THE COURT:  For what period of time do these 250

8    e-mails cover?

9    MS. WILLS:  During the relevant time period, Your

12:05:22    10    Honor.  We only pulled the ones for --

11    THE COURT:  Is it a two-week period or one-week

12    period?

13    MR. RAMIREZ:  Two years.

14    MS. WILLS:  Ms. Shelby, I think, has two years in

12:05:33    15    the statute, about a year and a half.

16    THE COURT:  20 a month or something like that?

17    MS. WILLS:  Of the specific?

18    THE COURT:  No.  No.

19    MS. WILLS:  Roughly, that would be a good

12:05:42    20    estimate.

21    THE COURT:  Ten a month?

22    MS. WILLS:  Well, she has about a year and a half

23    in the statute, based on her --

24    THE COURT:  Okay.

12:05:49    25    MS. VALDERRAMA:  Just to make sure I understand,

1    those are e-mails that were pulled by plaintiffs' counsel

2    to compare against the time sheets that were filed by the

3    plaintiff that they say are inaccurate?

4              MS. WILLS:  Correct.  That actually not just that

12:06:02    5    they say are inaccurate but Betty Jean Larson said were

6    inaccurate.

7              THE COURT:  Okay.  Let's go ahead.  Let's move on

8    then.

9              MS. WILLS:  That's what the e-mails are for, Your

12:06:12    10    Honor.

11             THE COURT:  Okay.

12             MS. WILLS:  There is just one e-mail that we

13    talked about in the opening that I would like to have her

14    look at.

12:06:18    15             THE COURT:  All right.

16    BY MS. WILLS:

17    Q.   Could I direct your attention, please, to Exhibit 282.

18    A.   282.

19    Q.   Yes, please.  In that notebook, 282.  It is Bates

12:06:33    20    number BM -- BPMC-047936.

21    A.   Okay.

22    Q.   Okay.  Could you start at the bottom, and we'll work

23    our way up because the bottom appears to be the first

24    e-mail that was sent.  This was an e-mail from you sent on

12:07:11    25    December 3rd, 2015, at 9:14 a.m. to Lauren Young.

Direct Examination of Sherry Shelby       Day 1

1       Do you see that?

2   **A.**   Yes, ma'am.

3   **Q.**   Is Lauren Young the young lady sitting here now that

4   is now Lauren Hafner?

12:07:25  5   **A.**   She is.

6   **Q.**   Could you please explain to us why you were sending

7   this e-mail to Lauren?

8   **A.**   Well, I had received a couple of calls for that

9   particular portfolio that she was assigned; and so, I

12:07:37  10   wanted to clarify if the calls were actually being sent

11   over to her or if they had something messed up with the

12   actual call list.

13   **Q.**   And the subject here is after-hours calls.  Do you see

14   that?

12:07:53  15   **A.**   Yes, ma'am.

16   **Q.**   And what did you mean by that?

17   **A.**   Well, it came in after normal hours after we left the

18   office.  So --

19   **Q.**   And then it appears that about 14 minutes after you

12:08:07  20   sent this e-mail, you get a response from Ms. Hafner; is

21   that correct?

22   **A.**   Correct.

23   **Q.**   And what does she say to you in response?

24   **A.**   "I have had one call after 8:00 p.m. the past two

12:08:23  25   evenings and no voicemail.  Do you answer your phone that

*Laura Wells, CRR, RDR*

1    late?"

2    **Q.**   And then before you have an opportunity to respond,

3    who responds to her?

4    **A.**   Our supervisor.

12:08:37   5    **Q.**   And what does he say in response?

6    **A.**   "We are on call evenings and weekends unless you have

7    arranged coverage."

8    **Q.**   Okay.  What did that mean to you?

9    **A.**   Well, that means that you are on call 24 hours a day

12:08:54   10   unless I called Lauren and said, Lauren, I can't take my

11   calls.  Can you cover for me?  And then we would have to

12   contact -- coordinate with the leasing coordinators to let

13   them know that she would be covering for me.

14   **Q.**   Okay.  Could I also direct your attention, please, to

12:09:11   15   Exhibit 285.  And this is a multiple-page document of

16   e-mails Bates labeled BPMC-048132 through BPMC-0848316.

17   Do you see that?

18   **A.**   Yes.

19   **Q.**   This appears to be an e-mail that you are sending on

12:09:48   20   Friday, December 4, 2015, and you are sending this one at

21   7:21 p.m.?

22   **A.**   Are you looking -- which one are you looking at?

23   **Q.**   I am looking at -- well, we will start at the bottom.

24              THE COURT:  You need to move the screen.

12:10:00   25              THE WITNESS:  Okay.

BY MS. WILLS:

**Q.**   The bottom one is sent first.  It's the DocuSign

system sends this to you on December 3rd, 2015, at

7:30 a.m.  Do you see that?

12:10:12   **A.**   Yes.

**Q.**   Would that have been an e-mail that you received at

7:30 a.m.?

**A.**   Yes.

**Q.**   Then at the top it's an e-mail that looks like you are

12:10:21   sending from yourself to yourself at 7:21 p.m.  Do you see

that the following day?

**A.**   Yes.  Yes.

**Q.**   And what was the purpose of doing that?

**A.**   Generally in the evenings I would go home and continue

12:10:35   to work.  And so sometimes that would mean that maybe I

would review documents.  So I would e-mail them to myself

so that when I got home I could pull them back up and

review something I didn't have time to review in the

office.

12:10:47   **Q.**   Well, on that same day, a minute later, you sent an

e-mail to your boss, Jerry Watson.  Do you see that?

**A.**   Yes.

**Q.**   And you are sending this that same day at 7:22 p.m.?

**A.**   Yes.

12:11:05   **Q.**   And you say, "Jerry, I'm just now leaving and didn't

*Laura Wells, CRR, RDR*

1    take a break at all today.  I'm exhausted.  I'll update

2    the notes on Monday for the relo."  Do you see that?

3    **A.**   Yes.

4    **Q.**   Can you please explain to us what you meant by this

12:11:20    5    e-mail.

6    **A.**   Well, he was asking me for something based on -- this

7    was around the time that they were relocating me to a new

8    assignment, to a new portfolio.  So he must have asked me

9    for something relating to an update in our system.  So I

12:11:35   10    was letting him know that it was going to be Monday before

11    I got it back to him.

12    **Q.**   And you are saying here, "I'm just now leaving."  What

13    did you mean by that?

14    **A.**   Well, I was just now closing out my computer and

12:11:51   15    getting ready to go home.

16    **Q.**   Okay.  And this was on a Friday?

17    **A.**   That was on a Friday.

18    **Q.**   How often would that happen to you that you would

19    still be working at the office that late?

12:12:01   20    **A.**   Almost every day.

21           THE COURT:  So you worked almost every day to

22    7:30?

23           THE WITNESS:  Yes, sir.

24           THE COURT:  Starting when?

12:12:13   25           THE WITNESS:  After about maybe the first year

1    that I was there.

2    BY MS. WILLS:

3    **Q.**   Well, let's talk about during the relevant time period

4    of 2014 to 2016.  Can you please tell the Court what time,

12:12:25    5    typically, you start working and what time, typically, you

6    would stop working Monday through Friday?

7    **A.**   My typical hours were between 8:00 a.m. and 8:00 p.m.

8    **Q.**   Okay.  And --

9            THE COURT:  Did you take a lunch break?

12:12:39    10           THE WITNESS:  Generally we would just eat in the

11    office.  We would either order something from Jimmy John's

12    or the property manager sometimes would bring me something

13    back when she would come back or sometimes I would take a

14    Lean Cuisine or different things and we would eat while we

12:12:55    15    were working.

16    BY MS. WILLS:

17    **Q.**   And where would you sit when -- when you say "eat

18    while you were working," would that be at your desk?

19    **A.**   Yes.

12:13:04    20    **Q.**   And how about weekends?  What hours did you typically

21    work on weekends?

22    **A.**   When I went to the office, I would generally go in for

23    about four hours and that would vary.  So sometimes I

24    might go up there at 8:00 and work until about noon or

12:13:22    25    sometimes I might pop in, you know, at 1:00 and work till

1    about 4:00 or 5:00.  But on the phone calls, we were on

2    call all the time.  So there was no -- unless you were

3    asleep, of course.

4         THE COURT:  When you are talking about weekend

12:13:35    5    work, are you talking about Saturday and Sunday or just

6    Saturday?

7         THE WITNESS:  On the phone calls, it's Saturday

8    and Sunday.  But generally, if I went into the office, it

9    would generally be on a Saturday.

12:13:46    10         THE COURT:  You would work roughly four hours?

11         THE WITNESS:  Yes, sir.  Sometimes a little more.

12    There were some occasions I worked five or six hours on

13    Saturdays; but generally, I tried to not go over four on

14    that.

12:14:00    15    BY MS. WILLS:

16    **Q.**   And can you please tell the Court, starting at 8:00

17    a.m. on a Monday through Friday, sort of walk the Court

18    through your day of an 8:00 to 8:00 schedule.

19    **A.**   Okay.  So generally we would come in or I would come

12:14:13    20    in around 8:00, maybe five minutes before or after, in

21    that range.  We had very antiquated computer systems and

22    they would -- my computer would take 20 minutes or so to

23    come on.  So that would be the first thing I would do is

24    turn on my computer.

12:14:30    25         And in the meantime, once you got your computer up,

12:14:47

    1  then you would open your Salesforce and look at what you

    2  had scheduled for the day.  That would be the number one

    3  thing.  You may have an appointment scheduled right off

    4  the bat.  So you wanted to be prepared for the prospect

    5  when they came in.

    6       So you would check your schedule, check your e-mails,

    7  start following up with e-mails, other people in the

    8  company asking questions, sending documents.

    9       We also had an internal e-mail system that's outside

12:15:04  10  of the normal Microsoft Outlook system, and we created

   11  what they called cases.  And it was a way for upper

   12  management to monitor what was going on with the situation

   13  such as projects for the building or even maybe you

   14  request a marketing -- a marketing project, just anything

12:15:26  15  you needed was expected -- if it was internal, it was

   16  expected to be put in there.  So we would also have to

   17  check our cases and update our cases and follow up on

   18  phone calls, get ready for our appointments, create our

   19  packets, you know, work on marketing, whatever it was on

12:15:44  20  our Craigslist -- and when I say marketing, on Craigslist

   21  and so on.

   22  **Q.**  Tours and prospects --

   23  **A.**  Yes, appointments.

   24  **Q.**  -- and things that you have talked about?

12:15:54  25  **A.**  Renewal appointments, expansion appointments, new

1  appointments.

2  **Q.**  About what time, typically, would you leave the office

3  Monday through Friday?

4  **A.**  Typically around 8:00.

12:16:05  5  **Q.**  And after you left the office around 8:00 p.m., did

6  you do further work after 8:00 p.m.?

7  **A.**  Yes.

8  **Q.**  Okay.  And on a Monday through Friday about total, how

9  many hours did you spend working after 8:00 p.m.?

12:16:17  10  **A.**  About ten hours.

11       THE COURT:  Wait.  Wait.  Wait.  After 10:00

12  p.m.?

13       THE WITNESS:  No, after 8:00 p.m.

14       THE COURT:  You worked another ten hours?

12:16:28  15       MS. WILLS:  For the week.

16       THE WITNESS:  For the week, yes, sir.

17  BY MS. WILLS:

18  **Q.**  So that would be a couple of hours each night?

19  **A.**  Yes.

12:16:33  20  **Q.**  What would you do during the couple of hours each

21  night on a Monday through Friday?

22  **A.**  Generally that's the time you spent working on your

23  Craigslist.

24       THE COURT:  This is while you were at home?

12:16:44  25       THE WITNESS:  Yes, sir.

12:16:55

1    Also, one of the things I had to do is sometimes, like

2  I said, I had to review documents and I wouldn't have

3  time.  For instance, I may be working on a deal with an

4  opposing broker.  Sometimes they would send over a

5  proposal.  You would want to take that home and read it.

6    Or emerging market reports, we would have to compare

7  every month to make sure that we had our productivity

8  match to what they had in the actual report.  So I would

9  take those home and review those as well.

12:17:10    10  BY MS. WILLS:

11  Q.   I think we just put up one example of you sending --

12  at 7:21 you sending a document to yourself.

13  A.   Yes.

14  Q.   Can you explain to the Court how that worked into you

12:17:18    15  continuing to work once you got home.

16  A.   Well, I needed to look at that document.  I needed to

17  review that document.  So I sent it to my personal e-mail

18  so that when I got home I was able to pull it up on my

19  laptop and actually look at it because I wouldn't be able

12:17:32    20  to see it well enough on the actual screen on the little

21  phone that I had.

22  Q.   And so I believe you said that you were having to do

23  sometimes hundreds of Craigslist ads a day?

24  A.   A month, yes.

12:17:47    25  Q.   And how did the Craigslist ads -- how did that work

*Laura Wells, CRR, RDR*

```
 1  into your couple of hours of work that you did after you
 2  left the office?  Please explain that to the Court.
 3  A.   Well, that was a very slow process to post those
 4  because, as I said, the system gauges how quickly you can
```
12:18:04
```
 5  put them in.  So it takes a long time to get -- say, for
 6  instance, if you put in five ads, you put them in too
 7  fast, it would freeze up.  And so then you would have to
 8  wait 10 minutes or 15 minutes and then go back and, you
 9  know, start again.  So you would try to get it timed just
```
12:18:22
```
10  right to where, you know, every couple of minutes you were
11  putting one through.
12  Q.   And so how many Craigslist ads were you then doing
13  usually at night when you got home?
14  A.   It would vary.  In order to get to where we needed to
```
12:18:38
```
15  be at the end of the month to potentially try to get our
16  recognition or our subjective bonus, you were probably
17  going to average -- and this is an average.  Let's see.
18  There is maybe 20 or 25 a day, a night, on those.
19  Q.   And when you were putting up these Craigslist ads, you
```
12:19:03
```
20  would average 20 to 25 a night, how much time would you
21  have to wait between each ad before Craigslist would let
22  you run another one?
23  A.   Generally, I would say, a couple of minutes in order
24  to keep it from freezing up.
```
12:19:17
```
25  Q.   The ads that you posted, did you have to make any
```

1   changes to it before you posted a new one?

2   **A.**   Sometimes, yes.

3   **Q.**   And was that because the system required that?

4   **A.**   Yes.

12:19:28   5   **Q.**   So just to recap, can you explain to the Court

6   8:00 a.m. to 8:00 p.m., those were the times when you were

7   at the office, correct?

8   **A.**   Yes.

9   **Q.**   And you said that your lunch was typically a working

12:19:43   10   lunch where you sat at your desk?

11   **A.**   Yes.

12   **Q.**   Is that fair?

13   **A.**   Yes.

14   **Q.**   And then after you left the office, you said each

12:19:48   15   night you worked for a couple of more hours generally; is

16   that right?

17   **A.**   Yes.

18   **Q.**   And please tell the Court when you went home that

19   evening and worked a couple of more hours what you were

12:19:59   20   doing during that time.

21   **A.**   I would be reviewing the reports, reviewing documents

22   such as leases, et cetera, and working on Craigslist ads

23   and taking phone calls when they came through, potentially

24   checking e-mails if I had something come through.

12:20:13   25   **Q.**   And we saw the e-mail exchange that you had with

*Laura Wells, CRR, RDR*

1    Lauren Young Hafner where you mentioned getting calls that

2    were meant for her after 8:00 p.m.; is that right?

3    **A.**    Correct.

4    **Q.**    Please explain to the Court on Saturdays what you

12:20:32    5    would do when you would come into the office on Saturdays.

6    **A.**    On Saturdays it could have potentially been because I

7    had a prospect that wanted to look at space on Saturdays.

8    However, sometimes if we had to work on a construction

9    drawing, that would be a time that we might would come in

12:20:52    10    and try to work on that because we would be undisturbed.

11    Also, just general clean-up.  If you were just so slammed

12    that week, you know, you would come in and get your files

13    organized and get your office cleaned up and back to Boxer

14    standards.

12:21:08    15    **Q.**    And what about tours?

16    **A.**    Yes.  We would do tours on Saturdays occasionally.

17    **Q.**    And were there any other things you did on Saturdays?

18    What about Craigslist?

19         THE COURT:  She said that.  She said that.

12:21:21    20    **A.**    Yeah.  Yes, ma'am.

21    BY MS. WILLS:

22    **Q.**    Okay.  We have now talked about the, I believe you

23    said, average of 70 hours a week that you worked during

24    the time you worked at Boxer?

12:21:35    25    **A.**    Yes.

*Laura Wells, CRR, RDR*

1 **Q.** The estimates that you have given to the Court, would

2 that be pretty consistent each workweek that you worked?

3 **A.** Yes.

4 **Q.** Okay. If I could direct your attention, please, to

12:21:55 5 Exhibit 1. I will represent to you that Exhibit 1

6 includes records that were produced to us that we were

7 told by Boxer were time cards that were for you during

8 your employment there.

9   In looking at Exhibit 1, do you recognize any of these

12:22:59 10 instruments?

11 **A.** No. I mean, I can't say that I do.

12 **Q.** Okay. Who prepared your time? Who filled out your

13 time?

14 **A.** Well, sometimes we would put -- I would put it

12:23:13 15 through, but sometimes a coordinator would put it through.

16 **Q.** And when the coordinator did your time, what

17 information, if any, did you give the coordinator about

18 how much time to put in for you?

19 **A.** None.

12:23:31 20 **Q.** What were you told, if anything, about recording time

21 as a leasing representative at Boxer?

22 **A.** I was told on multiple occasions by multiple different

23 people that it didn't matter what you put in there because

24 Boxer wasn't going to pay you overtime.

12:23:53 25 **Q.** What was your understanding about why Boxer wasn't

12:24:05

12:24:18

12:24:48

12:25:06

12:25:22

1  going to pay you overtime?

2  **A.**   Because we were exempt from overtime.

3  **Q.**   So what was your understanding about why you needed to

4  put in any time at all?

5  **A.**   I never really understood that.

6  **Q.**   Would you have gotten your paycheck if time wasn't put

7  in for you?

8  **A.**   Somebody would have put it through.  If I didn't put

9  it in, they would have put it through.

10 **Q.**   I would like to direct your attention, if I could, to

11 -- we're still at Exhibit 1.  If you could look at the

12 page that's Bates marked BPMC-000460.  Do you see that

13 where it says you, Sherry Shelby?

14 **A.**   Yes.

15 **Q.**   And it is the time period of Monday, June 1, 2015, and

16 it goes through -- for a two-week period to Friday,

17 June 19th, 2015.  Do you see that?

18 **A.**   Yes.

19 **Q.**   Okay.  So the week that's June 1st through June 5th,

20 it has 12:00 a.m. to 8:00 a.m.   Do you see that?

21 **A.**   Yes, I do.

22 **Q.**   Do you have any explanation as to why the time would

23 say 12:00 a.m. to 8:00 a.m.?

24 **A.**   I don't have a clue.

25 **Q.**   Those weren't the standard office hours, were they?

1    **A.**   No, ma'am.

2    **Q.**   Then we see, going further down, all the other entries

3    say 8:00 to 4:00.  Do you see that?

4    **A.**   Yes.

12:25:33    5    **Q.**   Was that the typical time that was entered for you,

6    8:00 to 4:00?

7    **A.**   Apparently so.  I mean, I don't know.  I would have to

8    look through these records to see, but it's not the time

9    that we worked.

12:25:47    10    **Q.**   Sure.

11           THE COURT:  Did you ever enter time for the hours

12    you put in on Saturday?

13           THE WITNESS:  Yes.  On a couple of occasions I

14    did.

12:25:58    15           THE COURT:  So you must have thought it had some

16    relevance then, huh?

17           THE WITNESS:  Well, there was an issue there at

18    the very end of my tenure.  I had a supervisor I was

19    not -- it was a new supervisor, and we were having

12:26:12    20    difficulty working together.  And so I wanted to let him

21    know that there toward the end of my tenure that I had

22    been there because he was acting like I wasn't giving

23    enough in my position and I was working really hard, you

24    know.

12:26:30    25           THE COURT:  Well, I understood Boxer to say that

*Laura Wells, CRR, RDR*

1    one reason for keeping track of hours was whether you got

2    vacation time or whether you got comp time.  Was that ever

3    explained to you?

4            THE WITNESS:  We did not get comp time.  We did

12:26:44   5    have PTO but no comp time.

6            THE COURT:  But would that have been a reason

7    that would make sense to you as to why you'd keep track of

8    hours?

9            THE WITNESS:  Yes, sir.  Yes, sir.  They would be

12:26:55  10    able to keep track of the PTO if we took a day off.

11    You'll see there it says PTO.

12            THE COURT:  Yeah.

13    BY MS. WILLS:

14    **Q.**  I would like to direct your attention, if I could, to

12:27:15  15    Exhibit 3.

16    **A.**  3?

17    **Q.**  Yes, please.  These are the time records for another

18    class member by the name of Mark Brady.  You'll see here

19    on Mr. Brady's records we have 12:00 a.m. to 8:00 a.m.

12:28:01  20    And then it goes 8:00 a.m. to 4:00 p.m. for the rest of

21    the entries.  Do you see that?

22    **A.**  Yes.

23    **Q.**  Then we also have the same thing for Mr. Brady again,

24    8:00 a.m. to 4:00 p.m.  Do you see that?

12:28:16  25    **A.**  Yes.

1  **Q.**  And we have again for Mr. Brady 8:00 a.m. to 4:00 p.m.

2  Do you see that?

3  **A.**  Yes.

4  **Q.**  We have again for Mr. Brady 8:00 a.m. to 4:00 p.m.  Do

12:28:38   5  you see that?

6  **A.**  Yes.

7  **Q.**  And then we go to these that don't even have times.

8  It just has eight fours hours for a total of 40 hours.  Do

9  you see that?

12:28:54   10  **A.**  Yes.

11  **Q.**  Forty hours?

12  **A.**  Yes, ma'am.

13  **Q.**  We have the same thing again for Mr. Brady, just eight

14  hours, forty hours.  Do you see that one?

12:29:04   15  **A.**  Yes, ma'am.

16  **Q.**  We have the same thing again for Mr. Brady, eight

17  hours every day, Monday through Friday, 40 hours.  Do you

18  see that?

19  **A.**  Yes, ma'am.

12:29:19   20  **Q.**  We have the same thing again for Mr. Brady --

21        MS. WILLS:  Your Honor, I don't want to belabor

22  this.  We are putting these into evidence for the Court's

23  review.  I can go through all of them.

24        THE COURT:  I don't think you need to go through

12:29:30   25  all of them.  I understand your point.

*Laura Wells, CRR, RDR*

1      MS. WILLS:  I can go through some of the other

2  class representatives, if the Court would like, maybe some

3  of the other class members.

4      THE COURT:  Okay.  Maybe we can do that quickly.

12:29:42   5      MS. WILLS:  I'm sorry?

6      THE COURT:  Maybe we can go through a few of the

7  other class reps quickly if that means we don't have to go

8  through with the class reps themselves.

9      MS. WILLS:  I'll go through some of the people

12:29:49   10  that aren't here, Your Honor, so you can see them as well.

11  When the other class members testify, we will do theirs.

12  BY MS. WILLS:

13  **Q.**   Who is this person?  I can't read this.  Who is this?

14      THE COURT:  I'll tell you what.  Let's stop for

12:30:13   15  our lunch break.  We'll resume at 1:15.

16      (Recess from 12:30 p.m. to  1:18 p.m.)

17      THE COURT:  Okay.  Are we ready to resume?

18      MS. WILLS:  We are, Your Honor.

19      THE COURT:  Resume your position.

01:20:44   20      THE WITNESS:  Thank you.

21      THE COURT:  You may inquire.

22      MS. WILLS:  Before we resume, Your Honor, just

23  one housekeeping matter.  We have read Your Honor's local

24  rules.  I just wanted to be clear.  Our understanding is

01:21:07   25  because there were no objections filed to any of our

Direct Examination of Sherry Shelby       Day 1

```
     1   exhibits, they have been admitted.  I haven't been

     2   offering admitting them based on Your Honor's standing

     3   order.

     4          THE COURT:  Normally that's what we do; is that

01:21:16   5   right?  No objections, then we admit them.

     6          MS. WILLS:  There were no objections by them.

     7          MS. VALDERRAMA:  We have no objection.

     8          THE COURT:  They are admitted.

     9          MS. WILLS:  That's why we haven't been offering

01:21:26  10   them.

    11          THE COURT:  It is always good to check.

    12          MS. WILLS:  I'll proceed.

    13   BY MS. WILLS:

    14   Q.   If you could pull out that first big notebook you were

01:21:32  15   looking at before we took a break.

    16          THE COURT:  Which one was that?

    17   BY MS. WILLS:

    18   Q.   It's the first notebook that starts with tab one.  I'd

    19   like for us to take a look at some of the time records of

01:21:43  20   some of the opt-in plaintiffs that you are representing.

    21   Could I direct you, please, to Exhibit 11.  Exhibit 11 is

    22   the time record for Robert Harrington.  Do you see that?

    23   A.   Yes.

    24   Q.   And do you see for each day there is time entered for

01:22:19  25   Mr. Harrington that just says eight hours?  Do you see
```

1    that?

2    **A.**   I do.

3    **Q.**   Again, we're looking at the time records for

4    Mr. Harrington, and do you see there every single entry it

01:22:32    5    simply says eight hours.  Do you see that?

6    **A.**   Yes.  Yes.

7    **Q.**   Again, we're looking at the time records for

8    Mr. Harrington, and every single day it says just eight

9    hours.  Do you see that?

01:22:42    10    **A.**   Yes.

11    **Q.**   Again, we're looking for the time records -- at the

12    time records for Mr. Harrington, and every single day it

13    says eight hours.  Do you see that?

14    **A.**   Yes, ma'am.

01:22:54    15    **Q.**   Again, we're looking at the time records for

16    Mr. Harrington and each day it says eight hours, Monday

17    through Friday, for a total of 40 hours each workweek.  Do

18    you see that?

19    **A.**   I do.

01:23:06    20    **Q.**   Again, we're looking at the time cards for

21    Mr. Harrington, and do you see it says, again, eight hours

22    each, Monday through Friday, for a total of 40 hours?

23    **A.**   Yes.

24    **Q.**   We are still looking at the time records for

01:23:24    25    Mr. Harrington.  And do you see there it says for every

01:23:39

01:23:56

01:24:09

01:24:28

01:24:50

```
 1  single workday, Monday through Friday, it just says eight
 2  hours Monday through Friday.  Do you see that?
 3  A.   Yes.
 4  Q.   Again, we're looking at the time records for
 5  Mr. Harrington, and Monday it just has time for Monday
 6  through Friday, eight hours each day.  Do you see that?
 7  A.   Yes.
 8  Q.   The same thing, next entry, it says Monday through
 9  Friday, eight hours each day, for Mr. Harrington.  Do you
10  see that?
11  A.   Yes.
12  Q.   Again, we're looking at the time records for
13  Mr. Harrington, and it says eight hours, Monday through
14  Friday, each day.  Do you see that?
15  A.   Yes.
16  Q.   Again, we're looking at the time records for
17  Mr. Harrington, and it has a total hours of 40.  It looks
18  like there are -- I don't know.  I can't figure this out.
19  It looks like there is a holiday in there, but it totals
20  40 hours each workweek.  Do you see that?
21  A.   I do.
22  Q.   Again, we're looking at the time records for
23  Mr. Harrington, and it has Monday through Friday, eight
24  hours each day, for a total of 40 hours each workweek.  Do
25  you see that?
```

1    **A.**   I do.

2    **Q.**   We're still looking at the time records for

3    Mr. Harrington.  It has the same thing, eight hours each

4    Monday through Friday?

01:24:59   5    **A.**   Yes.

6    **Q.**   Again, we're looking at the time records for

7    Mr. Harrington.  It has the same thing, Monday through

8    Friday, eight hours each day.  Do you see that?

9    **A.**   Yes.

01:25:16   10            MS. WILLS:  I won't belabor this, Your Honor.

11            THE COURT:  Yes.  I get the pattern.

12    BY MS. WILLS:

13    **Q.**   So let's take a look at Exhibit 13.  These are the

14    time records for another opt-in plaintiff, Andrea Johnson.

01:25:40   15    And we're looking at the time records for Ms. Johnson.

16    And it has 8:00 to 4:00 every single day, and it looks

17    like Monday through Friday.  Do you see that?  8:00 to

18    4:00.  8:00 to 4:00.  8:00 to 4:00.  Do you see that?

19    **A.**   Yes.

01:26:00   20    **Q.**   And again it -- we are looking at the time records for

21    Ms. Johnson, and it says 8:00 to 4:00.  Do you see that?

22    **A.**   Yes.

23    **Q.**   Okay.  Let's take a look at the records for another

24    opt-in plaintiff.  Let's take a look at Exhibit 15, the

01:26:17   25    records for Travis Lemley.  For Mr. Lemley it looks like

1  it's eight hours each day, and it looks like 8:00 to 4:00.

2  Then there are some 12:00 a.m.s to 8:00 a.m.s but mainly

3  it's 8:00 to 4:00 and one week it's 12:00 a.m. to 8:00

4  a.m.   Do you see that?

01:26:50  5  **A.**   I do.

6  **Q.**   The same thing again.  It's eight hours each day.

7  8:00 a.m. to 4:00 p.m., but then it looks like there is

8  one 12:00 a.m. to 8:00 a.m. in there.  The rest are

9  8:00 a.m. to 4:00 p.m.  Do you see that?

01:27:06  10  **A.**   Yes.

11  **Q.**   Again, looking at the records for Mr. Lemley, the same

12  thing again.  8:00 a.m. to 4:00 p.m.  Do you see that?

13  **A.**   I do.

14  **Q.**   8:00 a.m. to 4:00 p.m.  8:00 a.m. to 4:00 p.m.  Still

01:27:22  15  looking at the records for opt-in plaintiff Mr. Lemley.

16  Again, it's 8:00 a.m. to 4:00 p.m.  8:00 a.m. to 4:00 p.m.

17  Do you see that?

18  **A.**   I do.

19  **Q.**   Still looking at the records for Mr. Lemley.  8:00

01:27:35  20  a.m. to 4:00 p.m.  8:00 a.m. to 4:00 p.m.  Do you see

21  that?

22  **A.**   Yes.

23  **Q.**   Looking at the time records again for Mr. Lemley, it's

24  8:00 a.m. to 4:00 p.m.  Although, sometimes there is a

01:27:49  25  12:00 a.m. to 8:00 a.m. that creeps in there.  It looks

```
 1    like some PTO time somebody stuck in there.  12:00 a.m. to
 2    8:00 a.m. for PTO time.  Generally, it's 8:00 a.m. to 4:00
 3    p.m., but only eight hours each day.  It's Monday through
 4    Friday.  Do you see that?
 5  A.  Yes, ma'am.
 6  Q.  I am still looking at the time records for Mr. Lemley.
 7    Same thing.  8:00 a.m. to 4:00 p.m. or there is a
 8    12:00 a.m. to 8:00 a.m. stuck in there, but it's still
 9    nothing more than eight hours a day, Monday through
10    Friday?
11  A.  Correct.
12          MS. WILLS:  I'll move on, Your Honor, to another
13    opt-in plaintiff.  I don't want to belabor the point.
14          THE COURT:  Yeah.  I think I get the point.
15          MS. WILLS:  Just very quickly then, I'll show the
16    records of one other opt-in plaintiff.
17          THE COURT:  Okay.
18    BY MS. WILLS:
19  Q.  I'm looking at Exhibit 19 now.  It's Phillip Owens.
20    And again, each entry is eight hours, Monday through
21    Friday, eight hours a day, Monday through Friday.  Do you
22    see that, ma'am?
23  A.  Yes.
24  Q.  Again, looking at the records for Phillip Owens,
25    opt-in plaintiff, eight hours a day Monday through Friday.
```

*Laura Wells, CRR, RDR*

1  Do you see that?

2  **A.**  Yes.  Yes.

3  **Q.**  Again, looking at the records for Mr. Philip Owens,

4  it's eight hours a day, Monday through Friday.  Do you see

5  that?

6  **A.**  Yes.

7  **Q.**  What was your understanding as a leasing

8  representative about whether or not leasing

9  representatives at Boxer Property would be paid any

10  overtime?

11  **A.**  We did not get overtime.  That was my understanding.

12  **Q.**  How did you come to that understanding?

13  **A.**  Well, we were exempt, and we were told.  I had

14  multiple conversations with different supervisors in

15  regard to either receiving overtime or possibly receiving

16  comp time.  I tried to get them to start giving me some

17  comp time for all the extra time.  They said they didn't

18  do that either.

19        THE COURT:  What were you paid during these

20  years?

21        THE WITNESS:  My salary?

22        THE COURT:  Yes.

23        THE WITNESS:  When I left with my bonuses it was

24  right at $80,000 a year.

25        THE COURT:  Okay.

*Laura Wells, CRR, RDR*

BY MS. WILLS:

Q.   I want it to be really clear.  I wanted to make sure
that we were clear to the Court.  Typically, the office
would close to the public around 5:30; is that correct?

01:30:33  A.   Typically.

Q.   But there were times that the office would be open
even to the public after 5:30; is that correct?

A.   Yes.  If you were in the office, the office would be
considered to be open.

01:30:46  Q.   Would you explain to the Court what you would be doing
at the office from 5:30 to 8:00 during that time period?

A.   Well, typically, what I would do is once the property
manager left between 5:00 and 5:30, that's when I would
finish up with the Salesforce tasks for the day.  If I had
01:31:02  any additional e-mails to return, I would finish those.
And once I was complete with those is when I would catch
up with processing all my paperwork, stacking my leasing
files, filing, putting everything away so that we would be
fresh and ready to go for the next day.

01:31:19  Q.   And were these tasks that you needed to do during that
time period generally?

A.   What do you mean by needed to do during that time
period?

Q.   Well, from 5:30 to 8:00, were these things -- what
01:31:32  would be causing you to do these things later in the day?

**A.** Well, during the day you are dealing with your
appointments. You are dealing with tenants that are
coming in the office. You are dealing with renewals. You
are dealing with expansions. You may have to work on a
construction drawing. There is a lot of activity that
goes on in the office. When property managers are out for
extended periods of time, there is a lot of disruptions
from the tenants that come in.

So by the time everyone would finally leave, that
would give you an opportunity to actually catch up on,
like I said, finishing up your Salesforce tasks, finishing
up your last few e-mails, and also putting your paperwork
together and having your files ready and stacked.

Also, like if we may have to fill out a credit card
authorization and send those up to accounting, potentially
creating what we call CME cases after we have walked
spaces for work orders about things that need to happen in
your suites or possibly things that you have seen
throughout the building.

So it was just a time you could actually work
uninterrupted and catch up on all the things that needed
to be done.

**Q.** Who knew that you were working -- starting to work on
average at 8:00 a.m.? Who knew you were starting to work
before the office opened at 8:30?

01:32:55

01:33:13

01:33:25

01:33:42

01:33:55

1    **A.**    Well, my supervisor knew, Jerry Watson.  I know for

2    sure he knew.

3    **Q.**    And what makes you believe he knew?

4    **A.**    Well, because he would schedule appointments with us.

5    Sometimes we would do, like, an online appointment where

6    they -- where you can link together multiple people on the

7    internet, and he would schedule appointments for us at

8    8:30.  So he knew we would have to be there by 8:00 to be

9    able to be prepared for a meeting at 8:30.  It would take

10   20 minutes to get your computer on.  So he knew that we

11   would have to be there early.

12   **Q.**    Who knew or should have known that you were working

13   during lunch?

14   **A.**    Everybody knew.  I mean, it wasn't a secret.  You

15   know, in order to -- you are on Lync.  Everybody can see

16   you.  So if you are not actually working, it's going to go

17   idle, and they are going to see you are not actually

18   working.  Still, that doesn't mean you weren't in your

19   office.  But if I'm working during lunch, I'm working, and

20   oftentimes I had a sandwich in my hand and I'm, you know,

21   working on Salesforce or whatever it was.  So you would be

22   able to see me on line.

23   **Q.**    What about with the cameras?

24   **A.**    Absolutely on the cameras.  Yes.  Yes.

25   **Q.**    Who knew that you were working on the weekends?

1   **A.**   Jerry knew.

2   **Q.**   How?  What makes you believe that he knew or should

3   have known you were working on weekends?

4   **A.**   Because I would tell him.  Uh-huh.  I would tell him,

01:34:07   5   you know, I came in Saturday, you know, because the

6   assignments, you would have so much on you -- really, you

7   should have had in some -- I don't believe that anyone in

8   our actual case had two people in their office.  But a lot

9   of assignments actually had two leasing representatives

01:34:26   10   that would be assigned.  So one of them would work the

11   renewals and the expansions, and the other one would

12   possibly do the new leases.

13        So if you didn't have that situation going on, you are

14   trying to really juggle the job of two people, and there

01:34:42   15   was no time for rest.

16   **Q.**   And I would like to direct your attention, if I could,

17   please, to Exhibit 47 in that notebook in front of you.

18   Do you recognize Exhibit 47 as being the notice of consent

19   that you filed in this case to start this lawsuit?

01:35:15   20   **A.**   47, yes, ma'am.

21   **Q.**   Is that your signature on Exhibit 47?

22   **A.**   It is.

23   **Q.**   And it's dated June 1, 2016; is that correct?

24   **A.**   That is correct.

01:35:34   25   **Q.**   I'd like you to take a look, please, at Exhibit 2.

Direct Examination of Sherry Shelby    Day 1

```
              1   And I will tell you that Exhibit 2 has been represented to

              2   us as being your pay records.  Do these appear to be your

              3   pay records, your earning statements from the time period

              4   of June 2014 until your employment ended in 2016 or early

    01:35:59  5   2016?  I think it ended in February of 2016.

              6   A.   Yes, ma'am.  They do have my name on them.

              7   Q.   If you could please take a look at -- if you could

              8   take a look, please, at Exhibit 58.

              9   A.   58?

    01:36:34 10   Q.   Take a look at Page 8 of Exhibit 58.

             11   A.   Sorry.  These books are -- excuse me.  You said 58?

             12   Q.   Yes, ma'am.

             13   A.   That's a --

             14   Q.   I'll put it up for you.  Exhibit 58 is your damage

    01:37:09 15   model, Ms. Shelby.  If you will look at the bottom of

             16   your -- if you will look at the number of hours per

             17   workweek on average, how many hours per workweek on

             18   average are you asking the Honorable Court to compensate

             19   you for?

    01:37:26 20   A.   70.

             21   Q.   And that would be for the time period of June 1st,

             22   2014, through the end -- through February or March 4th of

             23   2016; is that correct?

             24   A.   Correct.

    01:37:40 25              THE COURT:  Why did you leave?
```

*Laura Wells, CRR, RDR*

1          THE WITNESS:  Why did I leave?

2          THE COURT:  Yes.

3          THE WITNESS:  Well, when I started with Boxer

4     they had in the Boxer Management Style they had about a

01:37:50     5     two to three paragraph proprietary information and

6     confidentiality agreement; and about the five-year mark in

7     January, they had created this internal system where we

8     would electronically acknowledge things.  They sent out an

9     annual acknowledgment that year.

01:38:09     10         That particular year that I left, when the annual

11    acknowledgment came over, it was glitching; and we

12    couldn't read it.  I was able to finally print it out.

13    And it turned out that what they had done was they had

14    took the confidentiality agreement and turned it into a

01:38:25     15    proprietary information, confidentiality, non-compete

16    contract.  And I actually printed that.  It was five or

17    six pages, I believe.

18         So I sent that over because I was concerned because I

19    was having problems with that new supervisor and I was

01:38:41     20    concerned that because it said for whether you quit or

21    whether they terminated you, I believe it was a period of

22    two years.

23         THE COURT:  You couldn't work anywhere else in

24    the same field?

01:38:52     25         THE WITNESS:  Right.  And so I paid an attorney.

1    I sent it to an attorney.  It was not Ms. Wills.  I don't

2    recall his name.  I would have to go into my e-mail.  I

3    paid an attorney $500 to review it.  And he did confirm to

4    me that it was a non-compete contract, and I would be held

01:39:07    5    to it.

6        So I loved my job.  I enjoyed my job.  And I wanted to

7    keep my job.  And I went to Boxer, and I tried to

8    negotiate the terms of the agreement.  Can we maybe, you

9    know, maybe let's do a year.  You know, I want it to be

01:39:22    10   reasonable and try to work with them.

11       And we went back and forth on a couple of different

12   e-mails over a couple of days and then, finally, they just

13   didn't want to work with me on it and they terminated me.

14           THE COURT:  Okay.

01:39:35    15   BY MS. WILLS:

16   **Q.**  If you'll look at the bottom, Ms. Shelby, of the

17   damage model.  Can you tell the Court how much you are

18   asking the Court to award to you in this matter?

19   **A.**  $58,572.02.

01:39:49    20   **Q.**  And you understand, of course, that you are not here

21   just as yourself but you are also representing everyone as

22   a class representative?  You understand that, correct?

23   **A.**  Yes, ma'am.

24   **Q.**  So I would like for you to also, in looking at

01:40:03    25   Exhibit 58, I would like to take a look at the damages for

1  the class members that you are representing who will not

2  be testifying today so that you can please tell the Court

3  how much money you are seeking on their behalf?

4  **A.**   Yes, ma'am.

01:40:16  5  **Q.**   I would like to start with Mark Brady, who is also an

6  opt-in plaintiff.  Do you see that Mr. -- how many hours

7  per week are you asking on average are you asking this

8  Honorable Court to pay Mr. Brady for in this matter?

9  **A.**   60 hours.

01:40:30  10  **Q.**   And that is where the time period of the pay period

11  starting in June, 2015 through March of 2016; is that

12  correct?

13  **A.**   That is correct.

14  **Q.**   Can you please tell this Honorable Court the amount of

01:40:41  15  money you are asking that Mr. Brady be awarded?

16  **A.**   $15,111.89.

17  **Q.**   Then Trevor Clinch, who is also an opt-in plaintiff in

18  this matter, how many hours per workweek on average are

19  you asking this Honorable Court to compensate Mr. Trevor

01:41:03  20  Clinch for?

21  **A.**   60 hours.

22  **Q.**   That's for the pay period of June 2015 through the end

23  of November 2015; is that correct?

24  **A.**   That is correct.

01:41:10  25  **Q.**   How much money are you asking this Honorable Court to

*Laura Wells, CRR, RDR*

1    award to Mr. Clinch?

2    **A.**    $10,818.48.

3    **Q.**    If we could now take a look at the damage model for

4    Robert Harrington, who is also an opt-in plaintiff in this

01:41:30    5    matter.    How many hours per workweek on average are you

6    asking this Honorable Court to award to Mr. Harrington?

7    **A.**    60.

8    **Q.**    That's for the pay period of August of 2016 through

9    May of 2017; is that correct?

01:41:44    10    **A.**    That is correct.

11    **Q.**    And how much money are you asking this Honorable Court

12    to award to Mr. Harrington?

13    **A.**    $19,696.77.

14    **Q.**    And this is the damage model for Andrea Johnson, who

01:42:00    15    is also an opt-in plaintiff in this matter.    How many

16    hours on average per workweek are you asking this

17    Honorable Court to award Ms. Johnson?

18    **A.**    60.

19    **Q.**    That's for the pay period of July 2015 through August

01:42:14    20    of 2015; is that correct?

21    **A.**    That's correct.

22    **Q.**    And how much money are you asking this Honorable Court

23    to award to Ms. Johnson?

24    **A.**    $1,921.80.

01:42:28    25    **Q.**    Taking a look at the damage model for opt-in plaintiff

         1    Travis John Lemley, how many hours per workweek on average
         2    are you asking this Honorable Court to award to
         3    Mr. Lemley?
         4    **A.**   60.
01:42:41  5    **Q.**   That's for the time period of December 2014 through
         6    November of 2015?
         7    **A.**   That is correct.
         8    **Q.**   And how much money are you asking this Honorable Court
         9    to award to Mr. Lemley?
01:42:51 10    **A.**   $20,817.22.
        11    **Q.**   Taking a look at the damage model for Phillip Owens --
        12    Mr. Owens is also an opt-on plaintiff on this matter -- on
        13    average, how many hours per workweek are you asking this
        14    Honorable Court to compensate Mr. Owens for?
01:43:16 15    **A.**   60.
        16    **Q.**   And that's for the pay period of June 2016 through
        17    September of 2016?
        18    **A.**   That is correct.
        19    **Q.**   And how much money are you asking this Honorable Court
01:43:24 20    to award to Mr. Owens?
        21    **A.**   $4,160.25.
        22    **Q.**   Taking a look at the damage model for Darylann
        23    Perkowski, how many hours per workweek are you asking this
        24    Honorable Court to award to Ms. Perkowski?
01:43:44 25    **A.**   60.

                          *Laura Wells, CRR, RDR*

1    **Q.**   And that's for the pay period of July 2015 through

2    January of 2016?

3    **A.**   That is correct.

4    **Q.**   And how much money are you asking this Honorable Court

01:43:53    5    to award to Ms. Perkowski?

6    **A.**   $13,618.29.

7    **Q.**   And if you could take a look at the exhibits in our

8    notebook that are marked exhibit numbers -- in looking at

9    the exhibits, 3 through 33, do those appear to be the --

01:44:38    10    do those appear to include the pay records for the opt-in

11    plaintiffs that you have just testified about?

12    **A.**   3 through 33?

13    **Q.**   Well, I'll go through them.  Exhibit 4 are the pay

14    records for Mr. Mark Brady.

01:44:52    15    **A.**   Okay.

16    **Q.**   Exhibit 6 are the pay records for opt-in plaintiff

17    Trevor Clinch.

18    **A.**   Okay.

19    **Q.**   Exhibit 12 are the pay records for opt-in plaintiff

01:45:04    20    Robert Harrington.

21    **A.**   Yes.

22    **Q.**   Exhibit 14 are the pay records for opt-in plaintiff

23    Andrea Johnson.

24    **A.**   Yes, ma'am.

01:45:13    25    **Q.**   Exhibit 16 are the pay records for opt-in plaintiff

1    Travis John Lemley.

2    **A.**    Yes, ma'am.

3    **Q.**    Exhibit 20 are the pay records for opt-in plaintiff

4    Phillip Owens.

01:45:27  5    **A.**    That's correct.

6    **Q.**    And then Exhibit 22 are the pay records for opt-in

7    plaintiff Darylann Perkowski.

8    **A.**    That is correct.

9    **Q.**    And does Exhibit 58, Exhibit A to Exhibit 58, does

01:45:46  10   that reflect the total amount of damages that you are

11   asking this Honorable Court to award to the plaintiffs in

12   this matter for unpaid overtime pages and liquidated

13   damages?

14   **A.**    Did you say eight to 58?

01:46:00  15   **Q.**    Exhibit 58, Exhibit A to Exhibit 58.

16   **A.**    Yes, ma'am, it does.

17           THE COURT:  What is the total?  I'm sorry.

18           THE WITNESS:  The total amount?

19           MS. WILLS:  I'll put up that slide for you, Your

01:46:18  20   Honor.  I will tell you that this does not include all of

21   the -- this is the summary of damages and, as noted here,

22   it does not include all of the pay records for Lauren

23   Young Hafner, who is still employed by the company.  It's

24   only through November of 2018, and the additional pay

01:46:38  25   records have not been produced to us.

BY MS. WILLS:

**Q.**   But based on what we have to date, can you please tell Your Honor what the total damages would be.

**A.**   Your Honor, it's $256,348.43.

01:46:52
            THE COURT:  Okay.  This -- I mean, it sounds like both sides are acknowledging that the time sheets are not accurate for different reasons.  You're saying that the system put them in.  You're saying that the employees were told not to write down more than that.

01:47:12
            MS. VALDERRAMA:  No.  I'm sorry, Your Honor.  I don't mean to interrupt.  We are not saying the system put them in.  We're saying that the line on the time sheets that has a date and hours for the exempt employees, we're saying that's not a Boxer number.  We're saying that's

01:47:30
part of ADP's back office.

            THE COURT:  That's what I'm saying, too.  You are not saying it's the correct number?

            MS. VALDERRAMA:  What we are saying is it's the number that the employees actually put in, because each

01:47:40
one of those numbers was put in -- the number eight was put in by the employee.  We're saying that is an accurate number.

            MS. WILLS:  Your Honor, we find that representation to be preposterous, especially given the

01:47:57
testimony that was given right here in this courtroom that

01:48:08

01:48:20

01:48:32

01:48:41

01:48:53

 1    we put up on the screen from the director of human

 2    resources that said they know the time records aren't

 3    right.  We know they didn't start at that time.

 4         THE COURT:  I don't think -- from what I have

 5    heard thus far, I don't think we can treat the time

 6    records as being accurate, that everybody worked to the

 7    minute 8:00 a.m. to 4:00 p.m.

 8         MS. VALDERRAMA:  I'm sorry.  I'm not

 9    understanding the -- the time records are not there to set

10    the time limit when the exempt employees have to work.

11    Exempt employees do not have to be -- they do not have to

12    record a start and end time.

13         THE COURT:  Where do we look to find that

14    information then?

15         MS. VALDERRAMA:  The hours that the employee put

16    in?

17         THE COURT:  That they actually worked, yeah.

18         MS. VALDERRAMA:  We're looking at the audit

19    record, and it's the actual number put in by the employee

20    where they put the eight.  Where it populates it with an

21    8:00 to 4:00, that's not a true number.

22         THE COURT:  I know.  Where do I look to find the

23    true number?

24         MS. VALDERRAMA:  The true number you look at the

25    eight or the 14 or the 11 or whatever it is that's in the

01:49:09

01:49:23

01:49:36

01:49:44

01:50:03

1  record.  There has been nothing that's been presented so

2  far, Your Honor, to indicate that, apart from Ms. Shelby's

3  testimony, that there is any work, other than for her,

4  after hours that's required of these class members.

5        MS. WILLS:  Your Honor, I beg to differ, and we

6  can certainly stand here and put on more evidence, if Your

7  Honor needs it.  We're trying not to belabor the point.

8  It's very, very, very clear their HR director sat here and

9  said, yeah, no, these time records are not accurate.

10       And the law provides that when an employer fails to

11  keep accurate time records then all we need, frankly, is

12  testimony from the worker.

13       THE COURT:  That's where I was going.  What this

14  case is about really is credibility.

15       MS. WILLS:  It is.

16       MS. VALDERRAMA:  I'm sorry?

17       THE COURT:  What this case is about is witness

18  credibility.

19       MS. VALDERRAMA:  A great deal, yes.

20       MS. WILLS:  It is, Your Honor.  And we believe

21  that Boxer Property has been very disingenuous to this

22  Court.  We're going to put on more evidence that those

23  cameras did record.  They have sat here and repeatedly

24  have argued that, oh, no.  No.  The cameras were just

25  there.  First, they weren't even on them.  Then they

 1  didn't look at them, and then they didn't record them.

 2      They have made misrepresentation after

 3  misrepresentation to this Court, and I think I just heard

 4  counsel trying to somehow, despite everything we have all

 5  been listening to all morning, stretch the truth to

 6  somehow suggest that these time records are in any way

 7  accurate when they are not.  They are clearly not.  Some

 8  of them 12:00 a.m. to 8:00 a.m.   They don't even make

 9  sense.

10      The director -- the national director of human

11  resources said, We know they are not accurate.  Those

12  words came out of her own mouth.  That's why I played that

13  video clip for the Court this morning.  She right there in

14  the witness stand in this federal courtroom and said that.

15  No, we know they are not accurate.

16          MS. VALDERRAMA:  Your Honor, I don't understand

17  how a line on an audit sheet for a time entry -- because

18  the Court can't see the actual application where there is

19  something that has a drop-down box and the employee puts

20  it in.

21      But I'm having a hard time understanding how no

22  testimony about -- there has been no testimony that any

23  plaintiff entered the number 8:00 a.m. to 4 :00 p.m.

24  That's -- no plaintiff has said they did it.

25          THE COURT:  I'm assuming that number is

1    irrelevant to our concerns here.

2            MS. VALDERRAMA:  It is.  It's an artifact.

3            THE COURT:  Okay.  That's all I wanted to

4    establish.  That's all I wanted to establish.

01:51:29   5            MS. WILLS:  At this time, Your Honor, we'll pass

6    the witness.

7            THE COURT:  Okay.  Cross.

8                         **CROSS-EXAMINATION**

9    BY MS. VALDERRAMA:

01:52:29   10   **Q.**   All right.  Ms. Shelby, you and I have met before at

11   deposition.  Do you recall that?

12   **A.**   I do.

13   **Q.**   Do you recall at the deposition that you testified

14   under oath?  You took an oath to tell the truth?

01:52:40   15   **A.**   Yes, I do.

16   **Q.**   All right.  As I am understanding it from your

17   testimony, you are saying that you are entitled to be paid

18   for 30 hours of overtime for every week in which you were

19   employed by Boxer Property; is that correct?

01:52:53   20   **A.**   I believe in my testimony in the deposition statement

21   was that -- approximately that I worked 70 hours a week.

22   Excuse me.

23   **Q.**   All right.  Your lawyer just put up an Exhibit A with

24   numbers on it.  I'm asking whether or not it is your

01:53:11   25   testimony that as a matter of fact that the hours that you

01:53:26

01:53:39

01:53:53

01:54:03

01:54:41

1  worked every week that you worked for Boxer Property were

2  -- included overtime of at least 30 per week because I

3  think you were here when your lawyer said that that was a

4  conservative estimate?

5  **A.**   Yes.

6        MS. WILLS:   (Standing.)

7  **A.**   Sorry.  Let me elaborate that.  So, yes, it is

8  approximately 70 hours a week.  It could have been more.

9  BY MS. VALDERRAMA:

10  **Q.**   Okay.

11  **A.**   So on some weeks it may have been an hour less.  So

12  70 hours is a conservative estimate, yes, ma'am; and that

13  was my testimony in the deposition.

14  **Q.**   All right.  Do you remember that you signed a

15  declaration in this lawsuit?

16  **A.**   Yes, ma'am.

17  **Q.**   And do you remember that in that declaration -- you

18  stated in that declaration that you entered hours into

19  your time sheets?

20  **A.**   I don't recall saying that.

21  **Q.**   Would you take a look at Exhibit 14.  Do you see that

22  at Page 14 you are talking about your time sheets?  Do you

23  see that?

24  **A.**   Yes, ma'am.

25  **Q.**   All right.  And you executed this deposition or you

*Laura Wells, CRR, RDR*

01:54:50

1    signed it on February 27th of 2017, correct?

2    **A.**   Yes, ma'am.

3    **Q.**   Did you type up this declaration?

4    **A.**   I did not type that, no.

5    **Q.**   All right.  So you signed it, though, and you read it

6    before you signed it?

7    **A.**   Yes, ma'am.

8    **Q.**   And it says that while there were occasions -- read

9    along with me on 14.  While there were occasions in my

01:55:00  10   employment --

11           THE COURT:  Too fast.  There were occasions...

12   BY MS. VALDERRAMA:

13   **Q.**   While there were occasions in my employment in which I

14   recorded more than 40 hours per week on my time sheets,

01:55:10  15   that means you recorded more than 40 hours per week,

16   correct?  That's what it said?

17   **A.**   That's what it states.

18   **Q.**   Was it accurate?  Was it truthful when you said you

19   recorded more than 40 hours?

01:55:19  20   **A.**   When I recorded more than 40 hours?

21   **Q.**   Yes, ma'am.

22   **A.**   Well, of course.  I wouldn't have lied.  If I worked

23   more than 40 hours, I worked more than 40 hours.

24   **Q.**   All right.  I'm talking about the time sheet entry

01:55:31  25   that says in that Paragraph 14 that you entered into your

*Laura Wells, CRR, RDR*

01:55:42

01:55:57

01:56:14

01:56:34

01:56:48

```
 1   time sheet or you recorded in your time sheet more than
 2   40 hours during a workweek, correct?
 3   A.   Yes.
 4   Q.   All right.  And then it says those time sheets do not
 5   accurately reflect all hours that I worked during those
 6   weeks.  And you are referring to the specific weeks where
 7   you entered time that was in excess of 40?
 8   A.   That's correct.
 9   Q.   Why would you enter time that's in excess of 40 if you
10   have been told to enter eight?
11   A.   Okay.  Well, if I had an issue maybe with a supervisor
12   and they wanted to know what I was there for, how long I
13   was there for that day.  Honestly, I don't really recall.
14   I will say that my comment in regard to the information
15   not being accurate was also reflective of the fact that I
16   never recorded my working lunches and I never recorded any
17   time after and I was not consistent with recording that I
18   was working late every single day.
19   Q.   The question is:  For the time entries that you put
20   in, you picked the number to put in, are you telling the
21   Court that those entries are not accurate, that you worked
22   more time than the time you put in on your time sheets?
23   A.   Yes.
24   Q.   And your explanation for that is that sometimes your
25   supervisor talked to you about something and you wanted to
```

1  put it in at that time?

2  **A.**   Yeah.

3       MS. VALDERRAMA:  (addressing Ms. Galindo)  Can

4  you put up Exhibit 2.

01:56:56  5  BY MS. VALDERRAMA:

6  **Q.**   So these are the time card reports with notes for you.

7  If you look at -- this is the very first pay period in the

8  time frame that is applicable for the case that's before

9  the Court.  Do you see that?

01:57:16  10  **A.**   I do.

11  **Q.**   All right.  Do you see that in this very first, at the

12  very beginning you are already putting in time entries

13  that are greater than eight.  You have got 8.5 for Monday,

14  June 9.  You have got 8.5 for Tuesday, June 10th.  You

01:57:32  15  have got 8.5 for June 11.  You have got 8.5 for June 12.

16  You go all the way down until June 19th.

17       MS. VALDERRAMA:  (addressing Ms. Galindo)  Can

18  you put that back, please.

19  BY MS. VALDERRAMA:

01:57:52  20  **Q.**   So do you see that where you have entered that from

21  the very first day?

22  **A.**   I see that information, yes.

23  **Q.**   You are saying that when you put that time in there,

24  you just made it up?

01:58:00  25  **A.**   What I'm saying is I didn't leave work at 4:00.  So

*Laura Wells, CRR, RDR*

```
01:58:17
```

 1   that could not possibly be right because the time

 2   reflected on that sheet says that I worked from 8:00 a.m.

 3   to 4:00 p.m., and I would have never left the office at

 4   4:00 p.m. unless it would have been a doctor appointment

 5   or something that I prearranged with my supervisor.

 6         So, therefore, based on that, if I had -- if that was

 7   accurate and it said 7:30 to 8:00 p.m., then you would see

 8   that those hours would be reflective; and that would have

 9   only been of my hours in the office without recording any

10   lunch times and without recording any after-hours times or

11   weekend times.

12   **Q.**   Ms. Shelby, I just want to make sure I'm

13   understanding.  You put in the 8.5, correct?

14   **A.**   I don't know that I put in the 8:5.  I don't know that

15   I put that in or that I put in the 8:00 to 4:00 or how

16   that actually came to that.

17   **Q.**   All right.  So --

18   **A.**   I know that I didn't work till 4:00 p.m., and I know I

19   didn't work to 4:30 p.m. ever --

20   **Q.**   You testified --

21   **A.**   -- without a doctor appointment or situation where I

22   prearranged that.

23   **Q.**   You testified that at the beginning of this that you

24   did not recognize those entries that have numbers on them,

25   correct?

*Laura Wells, CRR, RDR*

01:59:22

**A.**   That's what I'm saying.  I don't -- I don't recognize that.  I don't know why that would say 8.5.

**Q.**   Are you now saying that you actually put in 8:00 a.m. as a start time when you logged your time?

**A.**   That is what I'm telling you.  I don't know.  It's so inaccurate that I can't really even have an opinion about it because of the different times.  Just like I didn't work 12:00 a.m. to 8:00 a.m.

01:59:38

**Q.**   All right.  For a moment, just for a moment Ms. Shelby, ignore that column --

**A.**   Uh-huh.

**Q.**   -- and accept for a moment these are audit records that show -- that are the records that are used to show the hours that an employee put into their time card.  All right?

01:59:52

MS. WILLS:  I'm going to object.  I think that's an improper hypothetical.  She is asking her to accept her reality rather than her giving testimony.

THE COURT:  Well, it's cross.  I'm going to allow it.  I'm going to allow it.

02:00:02

BY MS. VALDERRAMA:

**Q.**   All right.  So, Ms. Shelby, just ignore that column.  You don't know why that column is there; is that correct?

**A.**   What do you mean I don't know why it's there?

02:00:13

**Q.**   You don't know why that column is there.  You have

Cross-Examination of Shelly Shelby      Day 1

1  testified it doesn't make any sense to you.  You don't

2  know why it's there?

3  **A.**   Right.

4  **Q.**   In the column that says hours that has variations in

02:00:27   5  the amount of time that's entered, do you agree that you

6  put in the variances and time?

7  **A.**   Not necessarily.

8  **Q.**   Well then who would have put in 8.5 hours for you?

9  **A.**   Well, I know that I'm not the only person who had

02:00:38  10  access to my time.

11  **Q.**   So you just don't know?

12  **A.**   I know that coordinators have access to turn in your

13  time.

14  **Q.**   Are you saying that the coordinators -- is it your

02:00:48  15  testimony today that the coordinators put in 8.5 hours for

16  you?

17  **A.**   I know that whenever I talked to them in the past they

18  said -- one of them.  Okay.  One of them told me that they

19  only put in eight hours a day.  That doesn't mean that --

02:01:00  20  in the period of time that I worked there, there were, I

21  think, three different coordinators -- that each one of

22  them did that.  I don't know.  I only know what the one

23  told me.

24  **Q.**   All right.  And you said one of the coordinators told

02:01:13  25  you that they only put in eight hours for you?

Cross-Examination of Shelly Shelby                    Day 1

```
 1  A.   Right.

 2  Q.   And the other coordinators, you don't know what they

 3  put in for you?

 4  A.   No.  Because if you'll reflect to the e-mail that she

 5  put in as an exhibit earlier on when she, Lauren Reis

 6  Shelton, said that she had already turned in my time, she

 7  did not tell me what she had put in.

 8  Q.   Well, let's look at that.  We'll just jump to that.

 9        MS. VALDERRAMA:  (addressing Ms. Galindo)  Can we

10  look at the Plaintiffs' Exhibit Number -- I believe it's

11  283.  No.  That's not it.

12  A.   That's an e-mail from 6:37 p.m.

13  BY MS. VALDERRAMA:

14  Q.   No.  I'm sorry.  I have the wrong one up there.  I

15  apologize.  It's 282.  We'll come back.  We'll come back

16  to that.

17        All right.  So you are saying from time to time the

18  coordinators would put in time for you?

19  A.   Yes.

20  Q.   And the circumstances of when they put time in for

21  you, what was that?  Was that when you failed to put in

22  your time yourself?

23  A.   Yes.

24  Q.   All right.  So at the point in time the coordinators

25  were putting time in for you, it's because you have not
```

*02:01:24* (line 5)
*02:01:40* (line 10)
*02:02:09* (line 15)
*02:03:09* (line 20)
*02:03:18* (line 25)

1    met the requirements of submitting your time yourself.

2    And so there is somebody who is having to make the

3    difference for you and put it in so you can get paid?

4    **A.**    Correct.

02:03:29  5    **Q.**    All right.  And when they put the time in, they were

6    trying to make sure that your payroll was met, correct?

7    **A.**    Correct.

8    **Q.**    And these are not your supervisors.  They were not

9    people telling you how much time that you were supposed to

02:03:40  10    put in, correct?

11    **A.**    That's correct.

12    **Q.**    They were doing you a favor so that your time sheets

13    would at least go through and trigger getting you paid?

14    **A.**    Correct.

02:03:48  15    **Q.**    All right.  In connection with your work for Boxer

16    Property, do you remember there is the Boxer bible and the

17    standards that you said you always followed?

18    **A.**    Yes.

19    **Q.**    All right.  Did you read that?

02:04:06  20    **A.**    What is that?

21    **Q.**    Did you read the Boxer bible and try to follow it?

22    **A.**    I tried my best, yes.

23    **Q.**    All parts of it?

24    **A.**    I tried my best.

02:04:15  25          MS. VALDERRAMA:  All right.  Could we get

*Laura Wells, CRR, RDR*

Cross-Examination of Sherry Shelby    Day 1

```
 1  Exhibit 13.
 2         MS. GALINDO:  Defendant's?
 3         MS. VALDERRAMA:  Defendant's.
 4  BY MS. VALDERRAMA:
 5  Q.  All right.  Will you take a look at Exhibit 13 in
 6  front of you?
 7  A.  I am.
 8         MS. VALDERRAMA:  (addressing Ms. Galindo)  Roll
 9  it down.  I need 13-1, please.  At the top, please.
10  BY MS. VALDERRAMA:
11  Q.  All right.  Do you see --
12         MS. WILLS:  May I just say, Your Honor, I want to
13  be clear.  We didn't cover the Boxer bible with this
14  witness.  This is cross.  Is she doing her full
15  examination of this witness?  Because we didn't get into
16  the Boxer bible.
17         THE COURT:  It goes to credibility though.  She
18  is entitled to do it.
19         MS. WILLS:  Okay.
20  BY MS. VALDERRAMA:
21  Q.  All right.  So with respect to the Boxer bible, do you
22  see where it says "1.5.12.4 dishonesty"?
23  A.  Yes, ma'am.
24  Q.  Do you see under the first bullet point it considers
25  dishonesty to be falsifying time sheets or other company
```

02:04:37
02:04:40
02:05:06
02:05:13
02:05:25

*Laura Wells, CRR, RDR*

1   records?

2   **A.**   Theft of company, tenant, or another employee.

3   **Q.**   The second bullet point, please.

4   **A.**   Falsifying time sheets or other company records.

5   **Q.**   Is that correct?

6   **A.**   I see that, yes.

7         MS. VALDERRAMA:   (addressing Ms. Galindo)   All

8   right.   Can you hold that up.   Up.

9   BY MS. VALDERRAMA:

10  **Q.**   All right.   If you take a look at the time and

11  attendance policies and it talks about time and attendance

12  tracking, which is 1.5.13.2, that says, "Attendance is

13  recorded daily by each employee and verified by his or her

14  manager.   Attendance records are company records.

15  Exercise care in accurately recording the hours worked,

16  overtime hours, and absences."

17        Do you see that?

18  **A.**   I do see that.

19  **Q.**   And then if you move down to the next bullet point, go

20  down to the one that says lunchtime.   It says lunchtime is

21  one hour unless otherwise indicated by a supervisor.   Do

22  you see that?

23  **A.**   I do.

24  **Q.**   And then if you go down to the last bullet point, it

25  talks about exempt salaried employees.   Do you see that?

*Laura Wells, CRR, RDR*

02:06:45

02:06:58

02:07:10

02:07:29

02:07:38

1   **A.**   I do.

2   **Q.**   It says exempt salaried employees are required to log

3   their total daily hours worked or not worked, whether paid

4   time off or unpaid, and verify same each pay period.

5   Business trips, vacation, PTO days must be recorded on the

6   online time card within the note section.

7         Do you see that?

8   **A.**   I do see that.

9   **Q.**   And that specific directive for exempt or salaried

10  employees was that you log your total daily hours worked

11  or not worked, correct?

12  **A.**   I do see that, yes.

13  **Q.**   So that was a directive of the Boxer bible that you

14  say is so important in being followed at Boxer, correct?

15  **A.**   I do see that, yes.

16  **Q.**   All right.  All right.  I need you to go to --

17        MS. VALDERRAMA:  (addressing Ms. Galindo)  Roll

18  it down, please.

19  BY MS. VALDERRAMA:

20  **Q.**   Do you see 1.5.13.5?

21  **A.**   Yes.

22  **Q.**   It says "working from home."

23  **A.**   Yes, I see that.

24  **Q.**   It says, "Working from home is not permitted without

25  the explicit written approval of the president, CFO, COO,

*Laura Wells, CRR, RDR*

1  or vice president and is strongly discouraged.  In most

2  cases, the underlying reason for requesting working from

3  home warrants taking the day off.  Approval will be

4  provided only under very limited circumstances.  Notifying

02:07:57   5  your supervisor or any of the approval authorities above

6  that you or another employee is working from home today is

7  not sufficient.  You must obtain actual explicit approval.

8  Otherwise, this time will be treated as a day off and PTO

9  will be charged."

02:08:13   10       Did you ever get any approvals to work from home?

11  **A.**   Well, I think the directive that we were required to

12  answer our phones 24 hours a day was pretty much an open

13  book to say you are working from home.  And the fact that

14  our supervisors knew that we were working from home and

02:08:32   15  had no problem with that, they knew that we did our

16  Craigslist ads.  They knew that we took phone calls.  I

17  would think that that would be considered approval.

18  Whether it was verbal or whether it was written, they were

19  aware.

02:08:46   20  **Q.**   All right.  So you are saying that you didn't get any

21  written approval from any of these individuals, but you

22  believe that the requirement, as a leasing representative,

23  that you have your phone, your Boxer-issued phone on your

24  person that that was sufficient for you to work from home?

02:09:03   25  **A.**   I'm saying that's directing me to work.  Otherwise, I

1    would have turned that phone off and left it on my desk --

2    **Q.**  In the working from home --

3    **A.**  -- because that was not permissible.

4    **Q.**  All right.  So you believe that this working from home

02:09:17    5    provision that says you shouldn't work from home, it

6    doesn't apply to you because you had a Boxer-issued phone

7    and were asked to answer calls that may have come in in

8    this evening?

9    **A.**  Yes.  I was required to work from home.  So if I was

02:09:30    10    required to work from home, then why would I have any

11    reason to think that anything else I would do would not be

12    permissible when I am working from home.

13    **Q.**  So the long and short of it is you didn't get any

14    approval.  You just based it on the fact that you had your

02:09:42    15    telephone on you?

16    **A.**  I didn't have to get approval.  It was a policy.  I

17    was required to do it.

18    **Q.**  There is nothing in the policy that says you are

19    supposed to do Craigslist from home, is there?

02:09:49    20    **A.**  When our director stands up in a meeting and says, If

21    people don't answer their calls they are going to be

22    fired, I would think that that would override anything in

23    this book.

24    **Q.**  I see.  So you are saying that the statement that you

02:10:01    25    are supposed to answer your phone calls means that you are

1    supposed to do Craigslist work at home?

2    **A.**   I would say so, yes.  Because the only way that we

3    could get to the point that they wanted us to be was to do

4    those from home.  And they knew we were doing them from

5    home.  As a matter of fact, I got a bonus one month

6    because I had done so many that it flared up my carpal

7    tunnel and I had to wear two casts on my hands for about

8    three weeks because I couldn't feel my fingers.

9         And my supervisor at the time, Jerry Watson, went to

10   the rest of the team and actually said, Look at this.

11   Long at these ads that she is posting from home.  She

12   needs a bonus.

13        So it was acknowledged amongst the actual regional

14   supervisors that we were doing that and for sure for

15   myself -- and I know for everyone else -- they would all

16   talk about it in the meetings amongst our supervisors that

17   they would never do hardly anything.

18        If they were watching TV, they were posting Craigslist

19   ads.  It was important.  It was very important.  And we

20   were directed to work from home.  It doesn't matter what

21   that says right there because when your supervisor tells

22   you you are going to do something under duress, are you

23   not going to do it, irregardless of what is in that book?

24   You are being instructed to do something, and you are not

25   going to have your job if you don't.

1    **Q.**  All right.  So my understanding is that when your --

2    that you understood that you were going to work from home

3    because you knew that you had the opportunity for a bonus

4    if you put in more Craigslist ads.  Is that what you are

02:11:36   5    saying?

6    **A.**  We did get a bonus, but it was required.  We had

7    quotas.

8    **Q.**  Your quota was 100 Craigslist ads per month.  Is that

9    accurate?

02:11:45   10   **A.**  Yes.  That is accurate.

11   **Q.**  I want to step back for a moment.  You have said that

12   you worked from 8:00 until 8:00 every day.

13   **A.**  Approximately, is what I said.

14   **Q.**  Well, sometimes you say you may have worked later.

02:11:58   15   **A.**  I could have, but I said approximately.  So that may

16   have meant I may have left at 7:30 one day and I may have

17   worked to 8:30 on another.  But an approximate day would

18   have been 8:00 to 8:00.

19   **Q.**  I want to make sure I am understanding your testimony.

02:12:12   20   You understand you are under oath?

21   **A.**  I do understand.

22   **Q.**  All right.  And it's your testimony that you

23   specifically recollect that you, Sherry Shelby, worked

24   from 8:00 a.m. until 8:00 p.m. every day and then went

02:12:26   25   home and worked for two hours more?

1  **A.**  Approximately, yes.

2  **Q.**  When you say approximately, are you saying that there

3  may have been days that you didn't work at all like that?

4  **A.**  Let's clarify something on the two hours a day.  What

02:12:36  5  I had said in the initial -- in the initial deposition, I

6  believe, was that the additional ten hours a week was over

7  the seven-day week.  So not necessarily specifically two

8  hours every day.  It could have been spread over a

9  seven-day period.

02:12:51  10  **Q.**  Ms. Shelby, I don't mean to interrupt you, but I would

11  like an answer to that actual question.

12        THE COURT:  You have got to let her finish.  She

13  has taken an oath to tell the whole truth.

14        MS. VALDERRAMA:  All right.

02:13:00  15        THE COURT:  You can go ahead and answer.

16  **A.**  What I was trying to tell you was it may not have been

17  specifically two hours a night, but it was approximately

18  ten hours over a seven-day period because we did do work

19  every day.

02:13:12  20        Now, that could have been Craigslist ads.  It might

21  have been checking e-mails.  It might have been taking

22  calls.  It could have been a number of all those things at

23  one time.  So that ten hours would have been spread out.

24        It may have been one particular week that I worked

02:13:23  25  four hours on a Saturday and maybe I only did -- you know,

Cross-Examination of Shelby Shelby                    Day 1

1    because I did go in on a Saturday, maybe I only did six

2    hours during the week.  So there were times when that

3    could have fluctuated.

4        But, yes, ma'am.  On an average, that is what I

02:13:39    5    worked, approximately; and I didn't punch a time clock.

6    That was not available.  We did not have a time clock.  If

7    we would have had a time clock, we could have punched that

8    time clock and we could have given a more accurate

9    reflection based on -- because, obviously, these time

02:13:56   10    reports are not accurate.  When you look at any of them,

11    they are not accurate.

12    BY MS. VALDERRAMA:

13    **Q.**   You are testifying to your specific memory that these

14    are the facts that you worked that many hours every day of

02:14:05   15    every week that you were employed by Boxer Property

16    Management Corporation?

17    **A.**   Repeat that.

18    **Q.**   That you worked 30 hours of overtime or more every

19    week that you were employed by Boxer Property Management

02:14:21   20    Corporation, as you have asked for payment from the Court?

21    **A.**   I think specifically what I said was that I worked

22    approximately 70 hours a week was my testimony.

23    **Q.**   Answer my question then.  My question is:  Are you

24    claiming you worked 30 hours of overtime, which is the

02:14:37   25    claim that you are here for, at least 30 hours of overtime

 1    every week that you were employed by Boxer Property

 2    Management Corporation?  Is that --

 3    **A.**  Approximately, yes.

 4    **Q.**  And that's your -- you are testifying from your own

 5    memory that those are the facts of what you worked?

 6    **A.**  Unless I had a doctor appointment or unless I had a

 7    PTO day or vacation time.  I will clarify that, yes.

 8    **Q.**  Oh, so there are workweeks where you didn't work

 9    30 hours of overtime?

10    **A.**  Well, if you were on vacation you couldn't work

11    overtime.  You are on vacation.

12    **Q.**  Oh, I see.  So which of those weeks that were just

13    posted up there were weeks that you were on vacation and

14    that you are not claiming to have been working 30 hours of

15    overtime that week?

16    **A.**  Well, you can see what a PTO day is.  It's on there.

17    **Q.**  Do you know which weeks?

18    **A.**  No.  I couldn't.

19    **Q.**  Have you ever looked at the records of your

20    employment?

21    **A.**  What records?

22    **Q.**  The time sheet records of your employment to try to

23    discern how many hours you worked?

24    **A.**  I've glanced through them.  Yes.

25    **Q.**  Have you done any kind of a calculation?

*Laura Wells, CRR, RDR*

Cross-Examination of Shelby Shelby                        Day 1

```
        1   A.   Based on knowing what time I got there and what time I
        2   left?  Those were my calculations.  That's how I based it.
        3   Q.   Do you have any records that show that you worked from
        4   8:00 to 8:00 every day and then worked for approximately
02:15:59 5   two hours after that?
        6   A.   The only records that I can show were my exemplary
        7   employment records and, also, my production speaks for
        8   itself.  There is no way that I could have done my job
        9   without working those kind of hours and be able to be as
02:16:17 10  productive of an employee as I was.
       11   Q.   Okay.  So let's -- rather than talk about your
       12   productivity and your general capability as you see
       13   yourself as a leasing rep, let's talk about documents.
       14        The question was:  Do you have any documents that can
02:16:33 15  show that you worked from 8:00 in the morning until 8:00
       16   at night every day at Boxer Property and then two hours
       17   after that so that you are entitled to at least 30 hours
       18   of overtime for every week that you were employed by Boxer
       19   Property?
02:16:48 20  A.   The only documents that I would think would be what
       21   you are looking for are going to be where you can see some
       22   of my e-mails being later in the evening, 7:30 and on.
       23   Whereas after I would have finished e-mails, that's when I
       24   would have processed paperwork and done things like that.
02:17:05 25  So, yes, there are documents that will show that I was in
```

1    my office sending e-mails and things like that.

2    **Q.**   And have you reviewed and collected those showing that

3    you were at the office sending e-mails at 8:00 in the

4    evening?

02:17:17   5    **A.**   I believe that my attorney has submitted those.

6    **Q.**   All right.  I'm going to ask you.  Are you saying that

7    you sent e-mails from the office at 8:00 in the evening on

8    every day that you worked for Boxer Property?

9    **A.**   I'm not saying every day I sent an e-mail at that

02:17:34   10   time.  I'm saying there are some records.  The question

11   was did I have any documents.  Any documents was the

12   question.

13   **Q.**   Right.

14   **A.**   The question was not every day did I have documents.

02:17:42   15   So, no, I'm not going to say that every day.  But as a

16   rule of thumb, you can see a general flow of the type of

17   work schedule that I kept by looking at those documents

18   and knowing that that was not -- if I sent an e-mail, I

19   didn't get up and just walk out the door after that.  I

02:17:59   20   still had work.

21       I would complete my Salesforce tasks.  I would

22   complete my e-mails.  And then the last thing I would do

23   would be to process my paperwork and clean up my office so

24   that it would be clean and refreshed for the next day.

02:18:12   25   **Q.**   I thought you cleaned up your office on Saturdays.

Cross-Examination of Shelby Shelby    Day 1

1  **A.**  Sometimes I did, yes.  Yes.

2  **Q.**  So going back to the question, the only paperwork that

3  you have that would show you worked are the documents that

4  belong to Boxer Property Management Corporation?

02:18:23  5  **A.**  That would be correct.

6  **Q.**  All right.  You have no other documents that might

7  tend to show you worked that amount?

8  **A.**  No, ma'am.

9  **Q.**  And you are relying solely on what you perceive to be

02:18:32  10  your stellar employment as an employee?

11  **A.**  No.  I'm not saying solely.  My supervisor was aware

12  that I was there.  So I can't say that I'm relying solely

13  on that.

14  **Q.**  All right.  Did you see the video that we showed today

02:18:48  15  when you went over to Paycom?

16  **A.**  Do you mean did I see it today?

17  **Q.**  No, ma'am.  When you were there, did you see the

18  video?

19  **A.**  You know, I don't recall seeing that.  They just had

02:18:57  20  started -- they had hired the gentleman, and I don't

21  remember his name, that is doing the training modules not

22  long before I left there.  And that was all in the process

23  of working on that.  I'm not saying I did or I didn't.  I

24  do not recall seeing that.  I actually don't really recall

02:19:13  25  not working off of ADP.  So I think if that came in, it

*Laura Wells, CRR, RDR*

1    must have came in at the very end of my employment.

2    **Q.**   I'm sorry.  You say you don't remember the change from

3    ADP to Paycom?

4    **A.**   That's what I'm telling you.  I think that must have

02:19:30    5    been at the very end of my employment because I don't

6    recall that.

7              MS. VALDERRAMA:  (addressing Ms. Galindo)  Can

8    you get Exhibit 3.  Go to -- I'm sorry.  Exhibit 2, 2-21.

9    BY MS. VALDERRAMA:

02:20:11    10    **Q.**   All right.  Do you see that September 12, 2013, is the

11    first time it's changed to the Paycom system?

12    **A.**   What is that?  December what?

13    **Q.**   That September 12 of 2015 is the first pay period.

14    **A.**   Okay.

02:20:24    15    **Q.**   Right?

16    **A.**   So, yeah.  That was towards the end or -- let's see.

17    Yeah.  That was toward the end of my employment.

18    **Q.**   Your employment ended in February of the following

19    year, correct?

02:20:33    20    **A.**   Yes.  About five months later.  Toward the end.  About

21    five and a half.

22    **Q.**   All right.  And during those five months you are

23    saying that you don't believe you saw the training that

24    all the employees at Boxer Property received for purposes

02:20:47    25    of knowing how to use this system?

02:20:54

02:21:08

02:21:31

02:21:47

02:22:01

1   **A.**   I'm not telling you -- I don't recall.  I'm telling

2   you I don't recall.

3   **Q.**   You don't remember getting any sort of exemption, do

4   you?

5   **A.**   Exemption from?

6   **Q.**   From taking the training for the new system.

7   **A.**   I don't know that it was required, and I don't know

8   that I received it.  I don't remember.  That's all I'm

9   telling you.  I'm not denying that I did or I didn't.  I

10  don't recall.

11  **Q.**   All right.  Going back to the issue of the work that

12  you say that you did, You identified some specific tasks

13  that you say were performed by you.  Before we actually

14  get into that work and talk about how much -- what your

15  responsibilities were in that, I want to go back and

16  clarify some of the testimony that you gave.

17       You testified that you believe that Andrew Segal owned

18  some Boxer Property building?

19  **A.**   You want me to clarify why I testified to that?

20  **Q.**   No.  I want to know whether you are testifying do you

21  know whether Andrew Segal owned a Boxer Property building?

22  **A.**   I am telling you that in that testimony that I was

23  told he did own some of the buildings.

24  **Q.**   And who told you he owned some of the buildings?

25  **A.**   Managers, regionals, yes.

*Laura Wells, CRR, RDR*

1   Q.   Are these Andrew Segal himself?

2   A.   No.

3   Q.   All right.  So from some scuttlebutt that's floating

4   around from managers who work for Boxer Property

02:22:16   5   Management Corporation, you are going to testify in court

6   that you believe it's a fact that Andrew Segal owned these

7   buildings?

8   A.   Well, I wouldn't refer to my regionals as scuttlebutt;

9   but I would say that they had a direct connection to know

02:22:31   10   what exactly was -- and I can elaborate as to why, if you

11   want me to do that.

12   Q.   No.  I'm asking whether you have any personal

13   knowledge that those buildings were actually owned by

14   Andrew Segal?

02:22:43   15   A.   I was told that Andrew Segal owned the 1120 NASA

16   Parkway building.

17   Q.   All right.  When you were deposed, do you remember me

18   talking to you about the ownership of the NASA Parkway

19   building?

02:22:55   20   A.   Uh-huh.

21   Q.   Do you remember testifying that you did not know who

22   owned that building?

23   A.   Let me tell you.  I'm going to elaborate, if you'll

24   let me elaborate.

02:23:02   25   Q.   Did you testify in your deposition under oath that you

1  did not know who owned that building?

2  **A.**  I did.

3  **Q.**  All right.

4  **A.**  I'll elaborate.

02:23:08  5        THE WITNESS:  Judge, can I elaborate on that?

6  BY MS. VALDERRAMA:

7  **Q.**  You haven't been employed at Boxer Property Management

8  Corporation since your deposition, have you?

9  **A.**  No.

02:23:15  10  **Q.**  All right.  Now, you have told the judge many times

11  that you had to carry your phone with you and that you had

12  to answer calls as a result of carrying your phone with

13  you.  Do you recall that?

14  **A.**  I do.

02:23:42  15  **Q.**  And do you remember how many calls you had to answer

16  each day?

17  **A.**  I do not.

18  **Q.**  Do you have any recollection of how many calls per day

19  you had to answer?

02:23:50  20  **A.**  Whatever was required.  When it rang, I had to answer

21  it and I could not tell you the number of calls because I

22  did not write them down and I did not keep track of them.

23  **Q.**  And so you can't say on any particular day that you

24  worked for Boxer Property Management Corporation that you

02:24:06  25  took any after-hour call; is that correct?

1    **A.**    I'm not sure I understand that question.

2    **Q.**    While you worked for Boxer Property Management

3    Corporation and you say that you were working there and

4    one of the activities that you said was work for which you

02:24:21    5    were asking to be paid was answering the Boxer Property

6    phone, correct?

7    **A.**    That's correct.

8    **Q.**    You have no records showing how often or frequently

9    you had to answer that phone?

02:24:34    10    **A.**    I personally do not; that is correct.

11    **Q.**    All right.  And you have no recollection because, as

12    you told me in your deposition, it would be speculation,

13    correct?

14    **A.**    That is correct.

02:24:47    15    **Q.**    Now, talking about the Craigslist items, you said that

16    100 per month were required, correct?

17    **A.**    A minimum of 100 per month, correct.

18    **Q.**    A minimum that's what is expected by management,

19    right?

02:25:02    20    **A.**    That is correct.

21    **Q.**    Anything over and above that was you trying to do

22    marketing activities in the form of Craigslist that would

23    get you a bonus, right?

24    **A.**    No.  They pushed us to get more.  They pushed us to

02:25:15    25    get more.

*Laura Wells, CRR, RDR*

1   **Q.** You said the minimum was 100?

2   **A.** Correct.

3   **Q.** So if you did 100, you were fine?

4   **A.** If you did 100, you would definitely be frowned upon.

02:25:25  5   **Q.** Wasn't that the minimum you had to do?

6   **A.** That was the minimum. You would have been frowned on

7   if you did 100 per month.

8   **Q.** All right. Nobody gave you a directive to go home and

9   do Craigslist?

02:25:37  10  **A.** I can't say that they said, Sherry, go home tonight

11  and do Craigslist; but in order to meet the requirements

12  and to produce the productivity, because it was a

13  marketing activity that draws business to the building.

14  So in order to do our job --

02:25:53  15  **Q.** Let's talk a little bit about Craigslist then.

16  **A.** Okay.

17  **Q.** You would agree that an employer, a property

18  management company, they wouldn't want you engaged in an

19  activity that's not actually going to be helpful to sales,

02:26:06  20  right?

21          MS. WILLS: I'm going to object, Your Honor.

22  This is vague and ambiguous.

23          THE COURT: Yeah. Why don't you rephrase that.

24          MS. VALDERRAMA: All right. Sure.

02:26:15  25  BY MS. VALDERRAMA:

*Laura Wells, CRR, RDR*

1  Q.   Ms. Shelby, you indicated that you were doing

2  Craigslist from home, which would be sometime after 8:30

3  in the evening.  So it would be, like, 8:30 till 10:30 at

4  night?

02:26:28  5  A.   Possibly.

6  Q.   All right.  Did you attend meetings where you were

7  instructed that the Craigslist tool was useful to the

8  extent that it kept, during the day, the Boxer Properties

9  in front of those people who might be coming in to

02:26:46  10  potentially lease?

11  A.   Would you say that again?

12  Q.   Did you receive instructions that the proper way to

13  enter Craigslist was during the day, not all in one bunch,

14  spread out morning and afternoon so that those people on

02:27:02  15  Craigslist who would be interested in finding a property

16  would have during the workday the opportunity to see what

17  you had posted?

18  A.   We would post throughout the day as well as in the

19  evening.  So it wasn't that -- yeah, they didn't want you

02:27:17  20  to just sit down and post all of your ads all at one time.

21  For instance, they didn't want an agent to sit down in one

22  day and post 500 ads and not post anything else throughout

23  the month.

24  Q.   Ms. Shelby, the way that Craigslist works is when you

02:27:32  25  posted it, it is sort of at the top and then it sort of

*Laura Wells, CRR, RDR*

1  gets covered up by other ads and then it's not fresh.

2  **A.**   That's right.

3  **Q.**   So it's not there in front of the viewing public,

4  correct?

02:27:41  5  **A.**   Well, it's there.  Yes, they can see it.

6  **Q.**   Well, they have to look for it.  It's not the first

7  thing that shows up on Craigslist, right?

8  **A.**   Well, that's typically what people do.  When they do a

9  search, they pull it up.  They are going to search, you

02:27:55  10  know, what ads are there.  They are not going to look at

11  the first ad and only look at that ad.  They are going to

12  look.

13  **Q.**   Ms. Shelby, I don't -- I didn't ask you how people

14  look at it.  I asked you how, on Craigslist when you post

02:28:08  15  something, it sits on that platform and you agreed

16  initially that the most recent posts are at the top of the

17  platform, correct?

18  **A.**   That is correct, yes.

19  **Q.**   All right.  And you were instructed by Boxer Property

02:28:20  20  that the way to post to Craigslist is to post them a

21  little bit each day, in the morning and in the afternoon,

22  during the workday so that they would constantly refresh

23  so that people who are interested in leasing a Boxer

24  Property could see when they looked on Craigslist the

02:28:40  25  Boxer Property locations that were available, correct?

**A.**   I don't believe I said that.  So I'm confused by that
comment.

      Yes.  They did want us to space out the ads.  But
there are business owners that don't look at things like
that during the day because they don't have time.  So that
would be applicable going into the evenings because lots
of times that's when a business owner has the quiet time
to actually sit down and take a look and start reviewing
and shopping for a new office because they are so busy
during the day.

      And that's not all.  Everybody is different.  Some
business owners have that time during the day or have that
flexibility.  But many times, even on weekends, that's
when the business owners would stop and take a look.

      So it's not just that a business owner is only looking
during the day.  It's important to have those new ads at
the top where people can see them, as you say, because
they did want us to do that to have them frequently
posted.  So they didn't want you to do them all at one
time for the entire month.  But it's also important that
you had that in the evenings as well so that those folks
that were signing on in the evenings could take a look as
well.

**Q.**   All right.  The instructions though, not your view as
to what is best, the instructions from Boxer Property were

1    to put them in in the morning and the afternoon during the

2    day, correct?

3    **A.**   I can't say that we had specific instructions.  I can

4    say that maybe that is what we did and maybe we tried to,

5    like I said, spread it out.  But I can't say that that was

6    a specific instruction.  They knew that we were doing

7    Craigslist ads in the evenings, and it was a common thing

8    that was discussed in the meetings.

9    **Q.**   At the time that they instructed you to do them during

10   the morning and the afternoon was to spread them out,

11   correct?

12   **A.**   I can't say that they instructed it, you know, so I'm

13   not sure what exactly you are implying by that or what you

14   want me -- what answer you are looking for, what you want

15   me to say.  I'm telling you that we posted them.

16   Sometimes I would post them at 10:00.  I might post them

17   at 2:00.  I might post them at 4:00 and then again go home

18   and still be posting at 8:00 or 10:00.

19       So it wasn't just that they wanted us to only post

20   during the day.  They wanted us to continue posting.  It

21   was important that those evening folks that were looking,

22   just as those daytime folks, for that reasoning of what

23   you just said, because if the ad is up here, maybe they

24   will see it first.  It was important for evening people to

25   see them as well.

*Laura Wells, CRR, RDR*

1    So that's why we did them.  That's why we did them in

2    the evenings, also.  It wasn't something that we just did

3    at one time.

4        As I mentioned, as you post, you can only post so many

02:31:14    5    because it times you out if you post too quickly.  So we

6    would try to post periodically at different times.

7    **Q.**  The process for Craigslist, you said you don't have

8    any records showing that you posted to Craigslist in the

9    afternoon -- I'm sorry, in the after-hours and in the

02:31:34    10    evening; is that correct?

11    **A.**  I don't have anything to show.

12    **Q.**  All right.

13    **A.**  I don't have access to it.

14    **Q.**  Now, when you post to Craigslist, what happens?  How

02:31:42    15    do you know that your post has been successful?

16    **A.**  Well, you can just -- I think what I did at the time

17    was I would just go back, and it would show that it was --

18    it was on line.  You know, it would show active.  So you

19    could go in, and you could pull it up, your posted ads,

02:32:03    20    and it would show you what was active and what was

21    expired.

22    **Q.**  All right.  But at the time that you actually

23    successfully posted, you also would receive an e-mail from

24    the account that would be shot back to Boxer Property

02:32:17    25    saying, "Congratulations.  Your post went through" or

1    words to that effect, correct?

2    **A.**   I don't believe that my Craigslist ad was -- at that

3    time was set up on a Boxer Property e-mail.  I'm not sure

4    of that.

02:32:28   5    **Q.**   Why would your Boxer Property Craigslist ads not be on

6    a Boxer Property e-mail?

7    **A.**   Well, initially, when I started working at Boxer

8    Property, the Craigslist wasn't a big -- it wasn't a big

9    proponent in the marketing.  It was something that they

02:32:46   10   were just starting to experiment with, and it wasn't

11   required.  So, initially, I personally set up my own

12   Craigslist at my own Craigslist account.

13        Whereas, some of the other employees, after they

14   started marketing, started handling that and that was part

02:33:03   15   of, kind of, their second setup package.  They would set

16   their Craigslist account.  They would get them set up on

17   ADP and do all those initial things you would do when

18   someone was hired.  So I can't say that.  I believe

19   initially it was set up on a different e-mail account.  It

02:33:18   20   wasn't set up on the Boxer account.

21   **Q.**   All right.  So that e-mail account would have been

22   your personal e-mail account, correct?

23   **A.**   It would have been an e-mail account, yeah; but I

24   don't -- I don't recall what I would have set it up under.

02:33:28   25   **Q.**   But it would have been your personal e-mail account?

1  **A.**   Yes.  Yes.

2  **Q.**   So if you, from 8:00 till 10:30 every night, had

3  posted to Craigslist, there would have been a receipt sent

4  to your personal e-mail account, correct?

02:33:43   5  **A.**   That's possible.  I don't recall.

6  **Q.**   Well, you said you set it up with your own e-mail

7  account, correct?

8  **A.**   Yes.  Yes.

9  **Q.**   If the receipt went out, it would have gone back to

02:33:52  10  the e-mail that you set up your own personal account with,

11  correct?

12  **A.**   I don't know that it would have.  I don't recall that.

13  I don't know.  I don't remember that.  You are asking me

14  to answer something that I don't remember, and I'm not

02:34:02  15  going to lie to you and tell you that I do.

16        MS. VALDERRAMA:  (addressing Ms. Galindo)  Could

17  we take a look at Exhibit 7, please.

18  BY MS. VALDERRAMA:

19  **Q.**   All right.  This is 7-1.  It's the first in a group of

02:34:17  20  e-mails that were attached to the exhibit list.  I believe

21  there are about 1,200 e-mails.

22        Can you identify for the Court what that e-mail is,

23  Ms. Shelby?

24  **A.**   That one is Sherry.Shelby@BoxerProperty.com.

02:34:35  25  **Q.**   What is it?

1    **A.**   I'm sorry?

2    **Q.**   What is that e-mail?

3    **A.**   Oh, it looks like it comes from Craigslist.

4    **Q.**   It's a receipt of a posting of a Craigslist by you,

02:34:43    5    correct?

6    **A.**   Yes.  And I don't remember seeing that.  I honestly

7    don't remember that.

8    **Q.**   All right.  And this one happens to be posted at

9    3:51:04 p.m. correct?

02:34:53    10    **A.**   That's correct.

11    **Q.**   You know all the e-mails were produced during this

12    litigation --

13           MS. WILLS:  I'm going to object, Your Honor.

14           THE WITNESS:  I have not seen it.

02:34:58    15           MS. WILLS:  I'm going to object, first of all,

16    that that assumes facts not in evidence, and we would

17    disagree with that.  We don't believe that all the e-mails

18    were produced to us.  We would take issue with that

19    representation.

02:35:10    20           MS. VALDERRAMA:  I'm sorry, Your Honor.  This is

21    my cross-examination.  For her to say that the answer to a

22    question about whether e-mail were received is that for

23    the first time ever she is saying Boxer Property didn't

24    produce it, that's offensive.

02:35:24    25           MS. WILLS:  Well, Your Honor, I believe that my

1   objection was that the question assumes facts that are not

2   in evidence.  Counsel made the statement that all of these

3   e-mails were produced in this case.  That's assuming facts

4   not in evidence.

02:35:38   5           THE COURT:  I don't think this witness --

6           MS. WILLS:  We take issue with it.

7           THE COURT:  I don't think this witness knows what

8   was produced in discovery.  The witnesses seldom do.

9   Let's ask another question.

02:35:47  10   BY MS. VALDERRAMA:

11   Q.    Would you agree that Sherry.Shelby@BoxerProperty.com

12   is your e-mail?

13   A.    It was a Boxer Property e-mail.

14   Q.    A Boxer Property e-mail.  Would you agree that at

02:36:01  15   least as of June 30, 2015, your receipts for postings at

16   Craigslist were coming back to that particular e-mail at

17   Boxer Property?

18   A.    Yes.  It looks like at that time it was.

19   Q.    Have you done any analysis or review of those e-mails

02:36:14  20   to determine whether there are any receipts that came out

21   during the time frame that you are talking about where you

22   have testified to the Court that you sat at home and

23   posted between 8:00 and 10:00 in the evening?

24   A.    No.  I have not done an analysis.

02:36:28  25   Q.    Are you aware of any e-mails showing that you posted

*Laura Wells, CRR, RDR*

1  from home between 8:00 and 10:00 in the evening?

2  **A.**  I have not seen these e-mails.

3  **Q.**  Have you seen any e-mail from Craigslist --

4  **A.**  No, ma'am.

02:36:38  5  **Q.**  -- being returned to your BoxerProperty.com box that

6  says that you posted at any time after 8:00 in the

7  evening, as you are testifying in court today that you

8  did?

9  **A.**  I don't recall ever seeing an e-mail from Craigslist.

02:36:55  10  So I would have to answer no to that question.

11  **Q.**  All right.

12  **A.**  I'm wondering if it could have been going to spam or

13  something.  I don't know.

14  **Q.**  Now, when your lawyer was talking to you about the

02:37:16  15  kind of things that you do as a leasing agent, one of the

16  things that was talked about was how you have brochures

17  that you try to have available; is that correct?

18  **A.**  That is correct.

19  **Q.**  All right.  And I just want to make sure I understand

02:37:29  20  what the use of the term "brochure" was because your -- I

21  thought on the one hand your lawyer was referring to the

22  slick, colored, Boxer Property handouts that you put into

23  a folder; but I thought I heard you testify that when you

24  were talking about a brochure for the prospect you meant

02:37:50  25  the folder and the things you put in it?

*Laura Wells, CRR, RDR*

```
 1   A.   No.
 2   Q.   What is a brochure?
 3   A.   Okay.  So you could -- you could consider two
 4   different things a brochure.  The what you are calling
 5   slick, maybe seeming like a flyer, that could be a
 6   brochure.  I would refer to that.  Wait a minute.  Let me
 7   finish.  That could be a brochure.
 8        But also, Boxer did have tri-fold brochures about how
 9   to lease office space and things like that.  So sometimes
10   we would also stick those in the folder.
11        So the actual folder itself would not have been
12   referred to as the brochure.  It would have been the
13   leasing folder, and then we would have put brochures
14   inside of it.
15   Q.   You don't --
16   A.   Both of those things could have been considered a
17   brochure.
18   Q.   Now, you didn't actually prepare the brochures, did
19   you?
20   A.   No, we did not.  The marketing department --
21   Q.   That was --
22   A.   -- did them from --
23   Q.   That was Boxer corporate office.  They were the ones
24   who put together those color slick brochures; is that
25   correct?
```

*Laura Wells, CRR, RDR*

Cross-Examination of Shelby Shelby    Day 1

1  **A.**   That's correct.

2  **Q.**   In fact, you didn't have a color printer in your

3  office?

4  **A.**   I think we did have a color printer, but we didn't

02:38:59  5  print them in the office.

6  **Q.**   So you didn't create them there.  You just stuck them

7  in the folder?

8  **A.**   That is correct.

9  **Q.**   How much time did you say it took you during the day

02:39:08  10  to stick those ten items into the folder?

11  **A.**   Into one folder?

12  **Q.**   Isn't that what you said you did?

13  **A.**   What do you mean, "did I say I did"?

14  **Q.**   You said you put together a brochure for prospects,

02:39:23  15  correct?

16  **A.**   We put together folders for the prospects with

17  brochures in them.

18  **Q.**   All right.  And the amount of time that you said --

19  you had to have ten of those folders available, I believe

02:39:32  20  is what you testified; is that correct?

21  **A.**   Yes.  At all times, yes.

22  **Q.**   You said this was a big part of your time during the

23  day?

24  **A.**   Well, I don't recall saying it was a big part of my

02:39:42  25  time.  I recall saying that it was a part of our job

Cross-Examination of Shelby Shelby                Day 1

```
 1   duties.
 2   Q.   Okay.  But you explained to the Court that that was
 3   one of the things that kept you very busy during the day?
 4   A.   That's one of the things that we do.  I don't think
 5   that I said that's one of the things that kept me very
 6   busy.  I think that you are implying things.
 7   Q.   All right.  So with respect to the folder, is this the
 8   -- what I'm holding, is this the kind of thing you would
 9   put the brochures in and then hand out to the prospect?
10   A.   That is the folder, correct.
11   Q.   All right.  And so it was -- the time that it took to
12   put the sample lease and the property description and your
13   card into that folder, you had to have ten of these,
14   right?
15   A.   Uh-huh.
16   Q.   Yes?
17   A.   At a minimum, yes.
18   Q.   Okay.  A minimum?
19   A.   A minimum of ten.
20   Q.   A minimum of 10.  So anything you did above the ten
21   minimum would have been extra and did not need to be
22   complete that day, correct?
23   A.   That's correct.
24   Q.   All right.  So whatever time it took for you to do
25   that is the time that was spent each day on that
```

02:39:57
02:40:09
02:40:23
02:40:27
02:40:39

Cross-Examination of Shelly Shelby Day 1

02:40:52

02:41:06

02:41:20

02:41:36

02:41:45

1 particular task that your lawyer had you describe to the

2 judge?

3 **A.** Yes. We would print the floor plans, if we were

4 putting floor plans in it. We would print the leases. We

5 would take the time to attach the card on the insert there

6 in the little holes and whatever other documents, the map,

7 and the brochures, and the building flyers I guess is what

8 you would call them.

9 **Q.** How much time did you say that took you every day?

10 **A.** We probably spent about 30 minutes every afternoon

11 working on those.

12 **Q.** Putting together ten of these, putting --

13 **A.** Not necessarily just ten. We were required to have a

14 minimum of ten. You have got to keep in mind we had a lot

15 of traffic in the buildings I was in coming in and out.

16 We may have done more or, excuse me, I may have done more.

17 **Q.** All right.

18 **A.** We're talking about I have got to print this stuff. I

19 have got to fold everything. I have got to attach the

20 cards. I have got to put everything in. Yeah, about

21 30 minutes.

22 **Q.** Now, my understanding is you said you are a top

23 producer for the company?

24 **A.** I was a top producer. Yes, I was.

25 **Q.** And you said that as a top producer, if you had

02:41:59

 1  inventory, you made that clear, you might sign between 10
 2  and 20 leases per month, correct?
 3  **A.**   Yes.  And that's including renewals and expansions.
 4  **Q.**   Okay.  So renewals were the leases that were signed
 5  because Boxer Property initiated an e-mail to the tenant
 6  that said, hey, your lease is going to be up in 90 days.
 7  Make sure you go stop by and sign a new lease?
 8  **A.**   Toward the end of my tenure, Boxer did start sending
 9  the e-mails; but prior to that, we actually would send

02:42:19

10  them ourselves or we actually did take a notice to the
11  suite and put it under the door if they weren't there.
12  Later on, they started trying to streamline it.
13  **Q.**   All right.  And that would be 10 to 20 per month,
14  including all of those different kinds of leases, correct?

02:42:34

15  **A.**   Correct.  On an average, yes.
16  **Q.**   All right.  And you also said that secret shoppers
17  would sometimes come by and sort of test you on whether
18  you were conforming to the standards that Boxer Property
19  held important, correct?

02:42:49

20  **A.**   Yes, ma'am.
21  **Q.**   And what would be a good example of how much time you
22  would spend on a tour and what was required of you on a
23  tour?
24  **A.**   Well, I would say, as far as the timing with -- unless

02:43:03

25  -- let me rephrase this because they are always in a

1    hurry.  That's one way you could kind of know when you

2    were being shopped because they really weren't that

3    interested in seeing very many suites.

4         So, typically, if you went on a tour with someone that

02:43:18    5    was shopping you, it was going to be a much shorter period

6    of time because a lot of times they would only want to

7    look at one, maybe two suites, and then get right back and

8    be done with it.

9         Whereas when you are dealing with an actual real

02:43:32    10    prospect that wants to actually lease space, they are more

11    engaged with you, and they really start building that

12    rapport.  They want to get to know you.  Sometimes they

13    will just come back with you, sit in your office, talk

14    with you more about the company.  It was much different.

02:43:45    15         That's why I typically always knew when I was being

16    shopped because it was really evident that the person

17    wasn't engaged in leasing an office, and you could tell

18    that they weren't engaged.

19    **Q.**   All right.  And so the reason you are telling us that

02:43:59    20    is because you are trying to explain the secret shopper

21    video that takes less time than you say you would spend

22    while you were doing a tour?

23    **A.**   Yes.

24    **Q.**   All right.  Now, I heard you also say you book about

02:44:15    25    an hour for a tour?

*Laura Wells, CRR, RDR*

02:44:30

02:44:46

02:44:58

02:45:12

02:45:29

1  **A.**  Yes.  Typically 30 minutes to an hour, depending on --

2  sometimes if a tenant just called and said, I just need a

3  one-room office and I need something today; do you have

4  something, well, then I probably would schedule a

5  30-minute appointment because I knew I wasn't going to be

6  showing in multiple buildings.

7      Or if someone called and said, I need a two-room

8  office and I knew I only had one two-room office, there

9  was no reason for me to schedule a whole hour for that

10  appointment because I only had one office I could show

11  them.

12      So those things always fluctuated because it really

13  depended on the availability and the client and what they

14  were looking for and how quickly they needed something.

15  There were a lot of things that applied to that.

16  **Q.**  I'm sorry.  That applied to?

17  **A.**  Applied to how long it was going to take and how long

18  you would need to spend.  There were times when

19  appointments went way over an hour, because, especially if

20  that person decided to actually sign the lease, and you

21  get people that are Chatty Cathy sometimes and there is a

22  lot of talk and you are building your rapport.

23      And that was one of the big things with Boxer they

24  wanted you to do.  They wanted you to be extremely

25  personable and engage with your clients so that they

*Laura Wells, CRR, RDR*

1    almost felt like they were coming home and they wanted to

2    be there.  That was one of the reasons I did have great

3    retention is because I did have good rapport with all the

4    tenants in the building.

02:45:42    5    **Q.**   That's part of your differentiation from your peers?

6    That's what made you the top producer?

7    **A.**   Well, I can't say that being personable made me

8    different.  I think everybody that worked for Boxer was

9    personable.  We had some very talented and wonderful

02:45:57    10   salespeople.  So I can't say that that necessarily made me

11   different.

12       I think that maybe my -- I don't know.  Maybe my sales

13   experience made me different.  I don't know.  Maybe my

14   personality made me different.  There is a lot of things

02:46:11    15   that could apply to someone being different.  So I can't

16   say that.

17   **Q.**   So one of the things that was -- you said that you do

18   when you are working for Boxer and that you say is

19   time-consuming is that you say that you review leases,

02:46:28    20   correct?

21   **A.**   That is correct.

22   **Q.**   The reality is Boxer has a rather short lease compared

23   to the industry, right?

24   **A.**   Well, yeah.  In some cases, uh-huh.

02:46:39    25   **Q.**   Isn't that pretty much the standard that they have

1  developed a shorter lease and that's one of the things
2  that really, you believe, sets them apart?
3  **A.**   Well, this is what they believe sets them apart.
4  However, if you compare their lease to, like, a standard
02:46:56  5  Texas Real Estate Commission commercial lease, it's really
6  not that much different.
7       Because once Boxer adds in all their addendums and
8  exhibits and all the other stuff, it really comes out to
9  be more in the range of probably 12 to 20 pages.  That's
02:47:13  10  an estimate because I don't know exactly.
11       But I can tell you that it's not the three to four
12  pages they like to tell people on the phone and they train
13  you to tell people on the phone in the training sales
14  meetings.
02:47:25  15            MS. VALDERRAMA:  (addressing Ms. Galindo)  Could
16  we get a look at Exhibit 11.  It's the video.
17            THE COURT:  What?
18            MS. VALDERRAMA:  It's the video.  It is the
19  secret shopper video.
02:47:38  20  BY MS. VALDERRAMA:
21  **Q.**   Do you remember being secret shopped?
22  **A.**   I was secret shopped numerous times in five and a half
23  years.
24  **Q.**   So this is an example of what you are talking about
02:47:47  25  when you are talking about the secret shopper and how they

Cross-Examination of Sherry Shelby    Day 1

1    would interact with you.

2    **A.**   Uh-huh.

3    **Q.**   So if we want to see what Sherry Shelby does, this is

4    an example of what Sherry Shelby does, correct?

02:47:55    5    **A.**   Yeah.

6    **Q.**   Is there sound on that?

7         (Defendant's Exhibit 11, a video, played.)

8    BY MS. VALDERRAMA:

9    **Q.**   All right.  So looking at your office, what would you

02:57:52    10    have to stay late for to have cleaned that office that

11    would take you two hours?

12    **A.**   Well, I knew I had an appointment coming.  So I would

13    have already straightened up my desk.  Come the end of the

14    day, that doesn't mean that I didn't drop those files

02:58:06    15    underneath my desk and hide them.

16         So come the end of the day, I had to pull all that

17    stuff back out and stack the files and file them.  That

18    was real common because you weren't supposed to have

19    anything on your desk.  And we knew if we got shopped like

02:58:17    20    that, if we had anything on our desk, that was going to be

21    an automatic -- we were going to lose serious points for

22    that.

23    **Q.**   So are you telling the Court you actually had stashed

24    trash under your desk?  That's what really is going on

02:58:28    25    here?

**A.** No. That's not what I'm saying is really going on.
What is really going on is a whole different story. We
could probably elaborate more on that.

        What I am telling you is that if I had some stuff on
my desk and I had to put it somewhere because I had a --
some prospect coming in, I would have maybe stuck it under
my desk or I would have put it in a drawer or I would have
put it somewhere to get it out of the way because it
wasn't supposed to be there when I had a prospect come
into the office.

        And I don't think there is anything wrong with putting
something away and bringing it back out.

**Q.** All right. And in this instance, this woman surprised
you, correct?

**A.** Well, she was early, yes.

**Q.** Yeah?

**A.** I did have an appointment. The gentleman that was
there was a regional supervisor that had come in to see
the property manager, and she wasn't in the office. So he
had popped back to talk to me about how things were going
here on the property. So that -- he disrupted me in
getting ready for my appointment.

**Q.** Okay. But even in that disrupted state, when she came
in, your desk was clean and it met all the Boxer standards
we're talking about, correct?

Cross-Examination of Shelby Shelby Day 1

**A.**   Yes.

**Q.**   And you did that all day regularly, because if your supervisor came in or somebody popped in, you wanted to make sure that you met the standards throughout the day?

02:59:35

**A.**   I will tell you in a heartbeat that there were times that, no, I wasn't meeting the standard on the desk because I was inundated and covered up with work and I may have a stack of files and I may reach over and slide the giant drawers that we had and stick stuff in there if

02:59:52

somebody came in and I didn't want them to see it so I could pull it back out later.  Yes, ma'am.  That's exactly what I'm telling you, and I'm sure every other agent probably had the same experience.

**Q.**   But not on this day in this video that was a surprise?

03:00:05

**A.**   What do you mean on this day?

**Q.**   On this day, we saw you go in.  You didn't push anything off your desk.  Everything was clean and orderly --

**A.**   Did you see the supervisor that was in there?  When I

03:00:16

heard him coming in, if I had anything out, I would have put it away because he was a supervisor for the company. So the fact that I had a supervisor in my office already, my office would have already been prepared.

**Q.**   So are you saying that unless you have a supervisor

03:00:30

there, you don't obey the Boxer standards?

**A.** What I'm saying is that there were times that you
weren't able to not have something on top of your desk.
As you well know, I'm sure your desk don't look like that
desk right there if you went in your office.

03:00:44          THE COURT: Okay. Let's look for a place we can
take our afternoon break.

                  MS. VALDERRAMA: We can take a break now, Judge.

                  THE COURT: 15 minutes.

     (Recess from 3:00 p.m. to 3:20 p.m.)

03:20:59          THE COURT: Okay. If you want to retake your
seat.

                  THE WITNESS: Yes, sir.

                  THE COURT: And we'll go ahead and proceed with
cross.

03:21:46 BY MS. VALDERRAMA:

**Q.** All right. Ms. Shelby, we were looking at a secret
shopper video and looking at how you handle the office.
I'm just going to quickly go back into the secret shopper
video so we can see a little bit of what happens when you
03:22:02 take the individual to the location.

     (Defendant's Exhibit 11, a video, was played.)

BY MS. VALDERRAMA:

**Q.** So is this video a perfect example of what you do when
you are doing a tour?

03:25:06 **A.** Yes, ma'am.

                              *Laura Wells, CRR, RDR*

1   **Q.**   Is this representative of what happens when you are on

2   a tour?

3   **A.**   On an appointment, yes, ma'am.

4   **Q.**   Right.  And the appointment requires that there be

03:25:14   5   somebody who it is convenient for them to be on that tour

6   also?

7   **A.**   Repeat?

8   **Q.**   You have to have a prospect?  You have to have a

9   potential client that you are going to be showing on the

03:25:22   10   tour, correct?

11   **A.**   I don't think I understand your question.

12   **Q.**   When you are showing somebody on a tour, you are

13   taking a prospect for a lease on the tour, right?

14   **A.**   I'm taking them for a lease on the tour?  I still

03:25:35   15   don't understand your question.  I'm sorry.

16   **Q.**   The purpose of the tour -- and you call it the tour,

17   taking them on a -- going around the potential lease

18   locations, the suites, to show them what it is that you

19   are wanting to rent to them, correct?

03:25:50   20   **A.**   I call it an appointment but, yes, that is.  I think

21   we are talking about the same thing.

22   **Q.**   All right.  So whether you call it an appointment or a

23   tour, you have to have somebody who is ready, willing, and

24   able to go with you, correct?

03:26:04   25   **A.**   Well, yes.

1    **Q.**   All right.  And so that means that times for the tours

2    have to be convenient and workable for the clientele out

3    there that Boxer is trying to serve, correct?

4    **A.**   Yes.

03:26:16    5    **Q.**   So that means that later in the evening is not a time

6    when people would typically set up a tour, correct?

7    **A.**   That's not necessarily the case.  Business owners are

8    very busy sometimes.  So they vary.  Some business owners

9    may need to come before a typical, you know, office might

03:26:35    10   open and some may ask you to stay after typical office

11   hours.  And when I say typical, I mean the 8:30 to 5:30 of

12   what is on the front door.  And then, therefore, they

13   request also for some tours on Saturdays.

14   **Q.**   And it was your responsibility to put those tours into

03:26:55    15   Salesforce, correct?

16   **A.**   That is correct.  Well, no.  No.  Not necessarily.  We

17   had, as you know, the prospect calls come into

18   coordinating.  So if they get you on the phone or they

19   don't get you on the phone, then they are going to enter

03:27:08    20   that information in for you, as well as another agent may

21   very well do that for you as well.

22   **Q.**   All right.  But if you are going to go on a tour,

23   somebody has to have entered it into the system, correct?

24   **A.**   Unless it's a walk-in.

03:27:23    25   **Q.**   All right.

1    **A.**   Which happened quite regularly.

2    **Q.**   But going back to the list, those that have come in

3    through the corporate system, those get put onto the list

4    of tours because somebody else has actually done the work

03:27:35    5    of taking down the information of who the tour is going to

6    be for, correct?

7    **A.**   Correct.  I would say that's accurate.

8    **Q.**   Okay.  And then it's up to you to put in the tours

9    that come in to you through your phone, correct?

03:27:46    10   **A.**   Yes.

11   **Q.**   All right.  And then you say there are walk-ins,

12   correct?

13   **A.**   That is correct.

14   **Q.**   All right.  For those walk-ins, it's your

03:27:53    15   responsibility, if you want to show that you have had a

16   tour, to put those tours into Salesforce?

17   **A.**   That is correct.

18   **Q.**   All right.  And you said that you typically did put

19   them in.  That it would be very rare if you didn't.  It

03:28:06    20   would only be if you forgot, correct?

21   **A.**   That is correct.  It did happen.  It did happen that I

22   forgot.  As a matter of fact, I recall specifically a shop

23   that I forgot to enter the information into the system,

24   and I actually lost significant points on my shop for

03:28:23    25   that.

03:28:35

03:28:46

03:28:58

03:29:20

03:29:29

1  **Q.**  So you are paying attention to the points, and you are

2  paying attention to your performance.  So you want to make

3  sure you put the tours into Salesforce because it's

4  something that you get merit judged on, correct?

5  **A.**  That's correct.

6  **Q.**  All right.

7  **A.**  We are so busy all the time that there were times that

8  you would get busy and forget to put something in.  Yes,

9  ma'am.  That did happen.

10  **Q.**  All right.  And can you tell the Court -- quantify how

11  often you failed to put into Salesforce those important

12  tours?

13  **A.**  Surely I wouldn't be able to tell you that after I

14  have been gone for three years.

15  **Q.**  It would be just pure speculation?

16  **A.**  Yeah.  It would be speculation.

17  **Q.**  All right.  So we have talked about the Craigslist

18  postings.  We have talked about the leases.  And we have

19  talked about the process of tours.  We have talked about

20  telephone calls.

21      Do you remember how many telephone calls you received

22  after 5:30?

23  **A.**  I think you asked me that earlier, and I told you I

24  did not.

25  **Q.**  It would be pure speculation on that as well?

03:29:41

03:29:53

03:30:07

03:30:17

03:30:28

1   **A.**   That's correct.

2   **Q.**   All right.  So you can't recall the telephone calls.

3   And the e-mails afterwards, you said that those are all

4   collected here as exhibits from -- that were presented by

5   your lawyer?

6   **A.**   I can't say all.  I think you said you contributed,

7   what, how many documents?  You must --

8   **Q.**   Well, have you had a chance to review the documents in

9   the case?

10  **A.**   I have reviewed the e-mails and -- that she has in

11  these exhibit books.

12  **Q.**   Okay.  So let's do this.  Let's just go through and

13  look at a couple of the exhibits that are in the exhibit

14  books.  Before we do that, I want to make sure that we

15  also understand again how it is that you are reaching the

16  30-plus hours of overtime per week.

17       Is it my understanding that you work through lunch

18  every day?

19  **A.**   Yes.

20  **Q.**   And you left --

21  **A.**   That would be typically, yes.  That's typically.

22  **Q.**   Okay.  So it would not be normal for you to go to

23  lunch?

24  **A.**   That's correct.  It would be a rare situation.

25  **Q.**   Okay.  And you would, obviously, be staying until 8:00

Cross-Examination of Sherry Shelby Day 1

1   every night?

2   **A.**   Typically and approximately, yes.

3   **Q.**   And then going home and spending two hours putting in

4   the Craigslist information?

03:30:43   5   **A.**   No.  That's not what I said.  What I said was that I

6   typically spend about another ten hours throughout a

7   seven-day week working from home, not specifically.  I

8   think I actually went back and clarified that earlier for

9   you.

03:30:59   10   **Q.**   So you would do that on weekends, though?  You would

11   put in Craigslist?

12   **A.**   Sometimes, yeah.

13   **Q.**   If you had a tour on a weekend you, of course, would

14   log that, correct, because you wouldn't be hurried?

03:31:08   15   **A.**   If I didn't forget to put it in.

16   **Q.**   Are you testifying you would forget to put a tour in

17   on the weekend?

18   **A.**   That could happen.  Yeah, that could happen.

19   **Q.**   I'm asking you.  Did you forget to put in a tour on

03:31:17   20   the weekend?

21   **A.**   I'm telling you that could happen.

22   **Q.**   Do you recall tours that you forgot to put in on the

23   weekend?

24   **A.**   Yeah, I do.

03:31:24   25   **Q.**   And so if you can recall now, four years after the

Cross-Examination of Shelby Shelby Day 1

1  fact, that you forgot to put them in, why didn't you put

2  them in at the time?

3  **A.**   What do you mean?

4  **Q.**   Why didn't you log the tours that you said you did on

03:31:36    5  a Saturday?  Why didn't you log them into Salesforce?

6  **A.**   Well, like I said, maybe I forgot to put it in the

7  system.  So if it wasn't a productive tour, that would

8  have been more likely.  The person wasn't interested and,

9  you know, I was ready to get out of there.  It was a

03:31:54   10  Saturday and, you know, I didn't want to spend 12 hours at

11  the office on Saturday.

12  **Q.**   Let me make sure I understand.  So you would have a

13  tour.  You would spend the time doing what we have just

14  seen you do with a secret shopper.  You are testifying you

03:32:07   15  would have a tour on a Saturday but you would be so

16  anxious to get out of there, even though you were a high

17  performer, that you wouldn't log it into the Salesforce

18  system?

19  **A.**   I'm saying it could happen.  Yes, ma'am.  And it has

03:32:18   20  happened.  So, yes, ma'am.  As a matter of fact, you could

21  probably find that in my shop records.

22  **Q.**   Now, to the extent --

23        MS. VALDERRAMA:  (addressing Ms. Galindo)  Well,

24  let's look at -- let's go ahead and look at Exhibit 45,

03:32:31   25  Plaintiffs' Exhibit Number 45.  You can take down the

1   video.  Thanks.

2   BY MS. VALDERRAMA:

3   **Q.**  All right.  And these were the Sherry Shelby

4   Salesforce tours that your lawyer put in front of you when

03:32:52   5   you testified about it earlier.  Do you recall that?

6   **A.**  I do.

7   **Q.**  And if you --

8        MS. VALDERRAMA:  (addressing Ms. Galindo)  Can I

9   see the whole thing on there.

03:33:07   10   BY MS. VALDERRAMA:

11   **Q.**  All right.  Do you have it?

12   **A.**  45?

13   **Q.**  Yes, ma'am.  Exhibit 45, Plaintiffs' Exhibit

14   Number 45.

03:33:15   15   **A.**  Yes.

16   **Q.**  All right.  Now, you said the column you filled in is

17   the fifth column?

18   **A.**  Is there any way you could make it just a little bit

19   larger?

03:33:32   20   **Q.**  Sure.  Sure.  We'll make it bigger.

21   **A.**  Thank you.

22   **Q.**  The fifth column is what you filled in, right there

23   where it says "SS/signed/first EXP appointment"?

24   **A.**  Not necessarily all the time.  If someone else is

03:33:51   25   setting something up for you, then they would have put my

1  initials in there.  That doesn't necessarily indicate that

2  I did that.

3  **Q.**  Okay.

4  **A.**  What it indicates is it was assigned to me.  Say if

03:34:02  5  another agent were to do this and upload something for me,

6  he would put "SS/renewal appointment" or "SS/first

7  appointment" because, if he didn't do that, it wouldn't

8  pull up under my task for the day.

9  **Q.**  All right.  So these tasks that are listed here as

03:34:17  10  things on Exhibit 45, the Sherry Shelby Salesforce tours,

11  not everything in there is something that you did?

12  **A.**  Correct.

13  **Q.**  All right.  And there are other things that should

14  have been on there but that you forgot to put on there?

03:34:29  15  **A.**  That's happened, yes.

16  **Q.**  But we have no way of knowing what those are today,

17  correct?

18  **A.**  Well, we do have at least one shop that would indicate

19  that that did happen on the shop.  So we have some ways.

03:34:40  20  But I don't know that you have all the ways.  There is

21  record of that that Boxer would have.

22  **Q.**  You can think of one tour that should be on here

23  that's not?

24  **A.**  And the reason why that would -- the reason why that

03:34:50  25  would resonate in my mind is because I did lose points on

1    a shop.

2         Now, if I forgot to put something in that it wasn't a

3    shop, then I probably would have never even realized it

4    because I would have never been addressed about it.  So

03:35:04    5    that's all I'm telling you.

6    **Q.**  All right.

7    **A.**  The reason why that one resonates with me is because

8    it was actually in writing and, you know, my supervisor

9    said, hey, you didn't do this.  So it was brought to my

03:35:16    10   attention.  But if I forgot to do something, that would

11   mean I would have forgotten it and probably wouldn't have

12   remembered if it wasn't significant or someone that was an

13   ongoing person that I would have been working with.  So --

14   **Q.**  All right.  So with respect to the wider field here

03:35:33    15   that's right next to the one that you said you sometimes

16   are the one who is responsible for but sometimes it's

17   somebody else who is actually doing that piece of work,

18   when would you be the one who fills in the field that the

19   hand is above right now?  It says "null SS-signed."

03:35:52    20   **A.**  Yeah.  I have no idea what that is.

21   **Q.**  All right.  If you go down to where it says, "SS

22   toured 300 and 630.  They like 630 the best and want to

23   move forward with a five-year term," is that a line you

24   would have input?

03:36:09    25   **A.**  Yeah, likely.

*Laura Wells, CRR, RDR*

1   **Q.**   Okay.  So if we see lines like that, we can conclude

2   that this would have been a tour that you were involved

3   with and not something that corporate did?

4   **A.**   Not necessarily because someone actually putting that

03:36:20   5   prospect in the system could have made a note in there.

6   So it would just depend on what it said.  Yes.  Sometimes.

7   Yes.  Most likely most of the time it would have been, but

8   not necessarily all of the time.  So it would depend on

9   what it said.

03:36:37   10   **Q.**   So are you saying the only person that could really

11   tell whether you made an entry or not by reading this

12   would be you?

13   **A.**   Well, no.  I mean, it would indicate.  I mean, I would

14   know because I would know that maybe it wasn't a note that

03:36:49   15   I made.  For instance, maybe someone that made the

16   appointment wanted to make a note.

17   **Q.**   Okay.  I'm really sorry.  I don't mean to interrupt.

18   But the question is, I'm trying to determine --

19          MS. WILLS:  Your Honor, I would object to her

03:37:00   20   interrupting the witness.  She is not letting her complete

21   her answer.

22          THE COURT:  Yeah.  We need to let witnesses

23   answer the question.  I think you all may have had a

24   miscommunication.  Try your question one more time.

03:37:11   25          MS. VALDERRAMA:  All right.  Thank you, Judge.

Cross-Examination of Sherry Shelby - Day 1

BY MS. VALDERRAMA:

Q.   I'm trying to understand, Ms. Shelby, how you know
when you look at the list of entries that have "null" at
the top followed by "SS signed" how you determined whether
that was an entry or an activity that Sherry Shelby, the
person sitting here, was actually involved with or whether
it was somebody else's work?

A.   Well, I would have to read it and see what it was.  So
if it said that, you know, I had an appointment, for
instance -- you know, let's look at one of them.  First --

Q.   That's fine.

        THE COURT:  Let her finish.  Let her finish.

A.   For instance, if you looked down at -- let's look down
at the, it looks like, the fifth entry from the top.

BY MS. VALDERRAMA:

Q.   Okay.  Thank you.

A.   It says "first appointment."  It says, "SS-toured 300
and 630."  Those are suites, 300 and 630.  "They liked 630
the best and wanted to move forward with a five-year
term."

        Well, I can read that and say it looks like I did a
tour with these guys.  Maybe someone set up an appointment
for me.  Sometimes people would put notes in there about
the appointment or maybe what their expectations were.  So
it could be that someone else would put information in

 1   there.

 2       If, for instance, you scroll down a little further

 3   down, let's see, one, two -- keep going. Keep going. For

 4   instance, when you get down -- keep going a little

 5   further. Keep going a little further. That one right

 6   there where it says, "SS expansion of EXP appointment.

 7   Discuss possible terms and TI." I don't know who did

 8   that. You know, that's just notes in there.

 9   **Q.** That activity was not necessarily your activity?

10   **A.** I don't know, you know.

11   **Q.** And it would be speculation to determine whether that

12   activity was yours or not?

13   **A.** Well, there were other people that worked in the

14   building. So if I was off on a vacation or if I was out

15   sick or in the hospital or something like that, there

16   could have been someone else fulfilling my position. So

17   that is correct.

18   **Q.** All right. Thank you. All right. So we were talking

19   about -- we were talking about the tours, though, on this

20   Exhibit 45. Your lawyer pointed to one at the very

21   bottom.

22       (addressing Ms. Galindo) Can you roll that down. Of

23   this first page, I believe, or maybe it's the second page.

24       There was a 6:00. Do you see there that there is a

25   6:00 entry?

*Laura Wells, CRR, RDR*

Cross-Examination of Shellzy Shelby      Day 1

1    **A.**  Uh-huh.

2    **Q.**  You are confident that that 6:00 entry was yours?

3    **A.**  Yes.  Because I remember Quinton.  That's such an

4    unusual name.  I only had one client named Quinton.  And I

03:39:56    5    can specifically tell you I remember even the kind of

6    business he had and stuff.  So I recall him.  He was quite

7    a character.

8    **Q.**  All right.  And in this instance you put in a tour

9    that was after hours?

03:40:12    10    **A.**  That is correct.

11    **Q.**  All right.  All right.  So I wanted to -- we have

12    talked about the tours, which this record 45 would capture

13    to the extent that you described it.  We talked about the

14    leases.  We have seen how you do a tour.  We have seen the

03:40:30    15    folder that you have to keep at least ten of in your

16    office.  And we have seen the cleanliness that's required

17    that you talked about for the Boxer standards.  We have

18    also seen the receipts from the Craigslist.

19          Was there anything else you said you do during a

03:40:48    20    regular day that would fill up those 14 hours?

21    **A.**  Well --

22          MS. WILLS:  I'm going to object, Your Honor.

23    This is cumulative.  I believe the witness has covered all

24    this.  It's been asked and answered.  I don't understand

03:40:59    25    why we are -- we spent all morning going through all the

1    stuff she did.  If there is a specific question that

2    counsel wants to ask her about something she testified

3    about.  Now she is being, like, oh, let's go over

4    everything you did all over again.

03:41:13    5         MS. VALDERRAMA:  I didn't ask that, Judge.  I

6    asked her to tell me, after we have gone through five

7    different things, if there is anything else that I have

8    missed.  I think I'm entitled to do that as the defendant

9    when we are trying to figure out what the claim is as to

03:41:27    10   what was done.

11         THE COURT:  Let's get an answer to that, and then

12   let's move on.

13   **A.**   Okay.  Do you want to repeat your question?

14   BY MS. VALDERRAMA:

03:41:35    15   **Q.**   Is there anything else that you can recall that you

16   spent your days doing, other than the things that we have

17   discussed, which included the tours, the Craigslist, the

18   leasing documentation, the telephone calls, and then

19   potentially some e-mail?

03:41:53    20   **A.**   Okay.

21         MS. WILLS:  I'm going to object, Your Honor, to

22   the extent are we saying in addition to the things she

23   testified about all day or just what counsel asked her

24   about right now.  I'm a bit confused.  Are we talking

03:42:05    25   about all day?  That was my initial objection to the

```
 1   extent that it's been asked and answered.
 2           MS. VALDERRAMA:  This is cross-examination.  I'm
 3   trying to figure out what she is claiming she did, and I
 4   think we are entitled to have it in one place so we can
 5   make sure we have --
 6           THE COURT:  Are you trying to get the components
 7   of her day?  Is that what you are trying to do?
 8           MS. VALDERRAMA:  Yeah.  I'm trying to get the
 9   components of the day that she did during this extended
10   time frame for the company.
11           THE COURT:  I think we already have had a lot of
12   testimony on that.
13           MS. VALDERRAMA:  All right.
14   BY MS. VALDERRAMA:
15   Q.  Let's talk then about you said you have these e-mails
16   that were collected.  One of the things I think you
17   testified was that you -- it was very important if you
18   were at work that you respond to e-mails, correct?
19   A.  Yes.
20   Q.  And the importance was that your supervisor didn't let
21   you fail to respond to e-mails because that would look
22   like you weren't doing your job.  Is that what was going
23   on?
24   A.  I'm not really sure what you are saying.
25   Q.  All right.  What was -- what was your obligation in
```

1    connection with responding to e-mail?

2    **A.**   Doing my job.

3    **Q.**   But what was your responsibility in terms of timing?

4    I think you told -- you testified to your lawyer that the

03:43:16   5   Boxer way was so difficult because you had to immediately

6    respond to e-mails from, for example, your supervisor?

7    **A.**   Well, as soon as possible, absolutely.

8    **Q.**   All right.  And certainly before the end of the day?

9    **A.**   If possible.  I mean, you know, stay late, try to

03:43:34   10   complete my e-mails.  I can't say that just because I

11   stayed late I was able to complete my e-mails.  You were

12   never, ever complete with your work.  I mean, you tried to

13   do as much of it as you could, but we worked so hard.  You

14   have no idea the constant interruptions throughout the

03:43:52   15   day.

16       You want to talk about, you know, what we did all day

17   long.  Let me tell you something.  There were days that I

18   couldn't even go to the bathroom, and that's the truth.

19   So if you want to know, I can sit here and I could keep

03:44:04   20   going more and more and more and more because, if you saw,

21   that interruption -- how many times did I get interrupted?

22   I was trying to tour my client.  How many times did I get

23   interrupted during that tour?  How many times?  Several

24   times.  That was constant throughout the day.

03:44:21   25       So not only were you dealing with your work, but you

1    also had to deal with tenants that would come into the

2    office.  Because if a property manager wasn't there, we

3    would try to help them the best we could.  We couldn't do

4    the property management job, but we couldn't turn our back

03:44:35   5    to that tenant and just say, "I'm sorry.  She is just not

6    here" because that's not good customer service and that's

7    not the image that Boxer wanted to project.

8        In order to retain your clients, every single one of

9    them that walks through that door has to feel like they

03:44:49   10    are important, and that's a fact.  So if you are thinking

11    that during the day we had lull time and we didn't have

12    anything to do, that never happened.  We worked hard, and

13    we worked long hours every day.

14   **Q.**  All right.  If you would, would you take a look at

03:45:05   15    Plaintiffs' Exhibit Number 80.

16        All right.  That looks like it is an e-mail at the end

17    of the day -- actually, it's the beginning of the

18    following day.  It's 8:09:19 a.m.   Do you see that?

19   **A.**  Actually, I see -- can you scroll down some more?

03:45:35   20    Okay.  It looks like I received an e-mail at 8:19 p.m.,

21    and then Jerry e-mailed me -- or Jerry e-mailed me at

22    8:18.  Is that Tuesday?

23   **Q.**  Ms. Shelby, if you look at that --

24   **A.**  6:43 p.m. and 8:18 p.m.  It's hard to see.

03:45:54   25            MS. WILLS:  Your Honor, she is not giving the

Cross-Examination of Shelby Shelby    Day 1

1    witness an opportunity to even read the e-mail.  I would

2    request that the witness be allowed to see the full

3    e-mail.

4            THE COURT:  Go ahead and finish your answer.

03:46:04  5    **A.**   Can you ask the question again, please?

6    BY MS. VALDERRAMA:

7    **Q.**   Could you take a look at Exhibit Number 80, please?

8    **A.**   Yes, ma'am.

9            MS. WILLS:  I would tell the witness Exhibit 80

03:46:13  10   is in your notebooks, since you are not being shown the

11   whole thing on the screen, and none of us are getting to

12   see the whole thing.

13   **A.**   Yes.  Okay.  Let's see.  It looks like it starts from

14   January 25th.

03:46:41  15   BY MS. VALDERRAMA:

16   **Q.**   When you are finished reading it, just let me know.

17   **A.**   Okay.  26, 27.  Okay.  It appears as though Kristine

18   Dinh --

19   **Q.**   I don't need you to go through the e-mail.  I need you

03:47:00  20   to read it.  When you finish reading it, please let me

21   know.

22   **A.**   Okay.  Your question?

23   **Q.**   All right.  If you go to the middle of the page where

24   it says from Jerry Watson, it is sent Tuesday, January 26

03:47:19  25   at 6:43 p.m.  It's to you.  Do you see that?

*Laura Wells, CRR, RDR*

1   **A.**   That's correct.

2   **Q.**   All right.  And he says, "Hi, Sherry" and he gives you

3   some information about a report, correct?

4   **A.**   That's correct.

5   **Q.**   All right.  The response to that or the reply to that

6   comes from you the following morning at 1-27 -- on 1-27,

7   correct?

8   **A.**   Yes.

9   **Q.**   So you did not reply to him after he sent it to you at

10   6:43 p.m.?

11   **A.**   No.  It wasn't an urgent situation.  So I did not

12   reply.

13   **Q.**   Okay.  So although you testified that you always had

14   to respond to e-mail the same evening, that's not

15   necessarily accurate?

16   **A.**   I don't think that's what I testified, actually.  I

17   didn't say I always had to reply the same evening.  That's

18   not what I said.

19   **Q.**   All right.  Let's go to Plaintiffs' Exhibit Number 84.

20   Do you see that?

21   **A.**   Which one is this?

22   **Q.**   Exhibit Number 84.

23   **A.**   Okay.  The question?

24   **Q.**   All right.  That appears to be an e-mail communication

25   between you and someone named Charlotte McLean, who runs

1    an insurance agency, right?

2    **A.**    Yes.  She is a tenant.

3    **Q.**    Okay.  And she doesn't do business with Boxer, right?

4    **A.**    Yes, she does.

03:49:04    5    **Q.**    She is a tenant.  She doesn't provide our insurance,

6    correct?

7    **A.**    I don't know that she does or not.  I don't know who

8    does Boxer's insurance.

9    **Q.**    If you go to the bottom of the page, there is an

03:49:15    10    e-mail from you to her at 11:45 a.m.  Do you see that?

11    **A.**    Yes, I do.

12    **Q.**    And it says, "re business cards"?

13    **A.**    Yes.

14    **Q.**    Actually, that's from her to you.  Below that is one

03:49:28    15    from you to her on January 29 at 11:35 a.m.   Do you see

16    that?

17    **A.**    That is correct.

18    **Q.**    You say, "Good morning, Charlotte.  I'm about to head

19    to lunch, but I need some of your cards," correct?

03:49:39    20    **A.**    Yes, I do.

21    **Q.**    So that was a day when you were heading to lunch?

22    **A.**    Yeah.   I probably went and picked something up at

23    McDonald's or Jimmy John's or somewhere like that.

24    **Q.**    All right.  And then if you'll turn to Plaintiffs'

03:49:52    25    Exhibit Number 92.  Let me know when you have had a chance

1    to read it.

2    **A.**   Uh-huh.  I have read it.

3    **Q.**   That's an e-mail from you to Jerry Watson, your

4    supervisor, correct?

03:50:17    5    **A.**   That's correct.

6    **Q.**   And you are notifying him at 6:50:51 p.m. that you

7    stayed late, correct?

8    **A.**   Correct.

9    **Q.**   All right.  And so you are telling him you stayed late

03:50:27    10   because you are trying to make up some of tomorrow's time,

11   correct?

12   **A.**   Yes.

13   **Q.**   All right.  If you'll turn to Plaintiffs' Exhibit

14   Number 95.  Let me know when you have had a chance to

03:50:59    15   finish reading it.  I see you are going to another

16   exhibit.  Are you finished reading the one we're working

17   on?

18   **A.**   I thought it was the same thing.

19   **Q.**   It is Exhibit 95.  Have you finished reading it?

03:51:22    20   **A.**   Does it have a number on it?  Okay.  This is 93 at the

21   bottom.  I'm confused.  There are two documents under

22   Exhibit 95.  So I'm not sure which one you want me to look

23   at.

24   **Q.**   All right.  This is your -- if you look at the one

03:51:43    25   that's from Travis Lemley -- to Travis Lemley from Travis

1    Lemley at 5:27:35 p.m.  Do you see that one?

2    **A.**   5:27, yes.

3    **Q.**   It says "conversation with Travis Lemley"?

4    **A.**   Yes.

03:51:58    5    **Q.**   All right.  Have you had a chance to read that?

6    **A.**   I see that.

7    **Q.**   Again, this is Plaintiffs' Exhibit Number 95.  That

8    e-mail, is it -- or it captures a Lync conversation,

9    correct?

03:52:27    10    **A.**   Yes.

11    **Q.**   That's what you were talking about was the sort of

12    instant messenger program?

13    **A.**   Yes.

14    **Q.**   All right.  That particular e-mail that is in here,

03:52:38    15    5:27:35 p.m. is before the close of business, correct?

16    **A.**   Yes.

17    **Q.**   All right.  And down below do you see where it says

18    Sherry Shelby and there is a time next to it?

19    **A.**   Yes.

03:52:48    20    **Q.**   That's at 5:26 p.m.?

21    **A.**   Yes.

22    **Q.**   You are responding to Mr. Lemley and you are saying,

23    "Oh, yeah.  K.  See you tomorrow.  I'm out for the day,"

24    correct?

03:52:58    25    **A.**   Yes.

*Laura Wells, CRR, RDR*

Cross-Examination of Shelby Shelby

1    **Q.**   All right.  And that's at 5:26 p.m.?

2    **A.**   That doesn't mean that -- if you are implying that I

3    left, that doesn't mean that I left the building.

4    **Q.**   That's what the document says, right?

03:53:10   5   **A.**   What that says is I'm out for the day.  That means I'm

6    not going to help him with anything else today.  So maybe

7    I have got my own stuff to do in the office and I can't

8    help him today.

9    **Q.**   All right.  If you'll take a look at Exhibit

03:53:25   10   Number 99.  This is Plaintiffs' Exhibit Number 99.  It has

11   two sides to it.

12   **A.**   I was trying to figure out -- okay.

13   **Q.**   All right.  If you look at the bottom of the page

14   that's Bates labeled BPMC-027104, do you see that

03:54:38   15   Mr. Lemley has a 4:42 p.m. message to you?

16   **A.**   Where?  At the --

17   **Q.**   Exhibit 99, Plaintiffs' Exhibit Number 99, it has

18   multiple pages.  If you look on the screen, you can see

19   which page we're looking at.

03:54:58   20   **A.**   Are you talking about where it says I had to step in

21   the break room for a quick bite because I had no lunch

22   today until a few minutes ago and was seeing stars?

23   **Q.**   Right.  Mr. Lemley says -- at 4:42 p.m. he says he was

24   not able to have lunch that day, correct?

03:55:12   25   **A.**   That's what he said, yes.

*Laura Wells, CRR, RDR*

|  | 1 | **Q.**  And your response is on the following page, "LOL.  I |
|  | 2 | totally understand.  Have been there a few times." |
|  | 3 | **A.**  Uh-huh. |
|  | 4 | **Q.**  Is that your response? |
| 03:55:23 | 5 | **A.**  Yeah. |
|  | 6 | **Q.**  All right.  If you will turn to Plaintiffs' Exhibit |
|  | 7 | Number 105.  This is another one of the Lync |
|  | 8 | conversations, but it's between you and someone named |
|  | 9 | Hemang Kareliya? |
| 03:55:54 | 10 | **A.**  Yes.  I see it. |
|  | 11 | **Q.**  Let me know when you have finished reading it. |
|  | 12 | **A.**  I'm reading it.  Okay. |
|  | 13 | **Q.**  Do you see in the middle of the page Hemang Kareliya |
|  | 14 | is trying to do something to your system remotely, |
| 03:56:18 | 15 | correct? |
|  | 16 | **A.**  Yes.  And we had had some issues with that.  He had |
|  | 17 | tried several times for several hours and was not able to |
|  | 18 | complete it. |
|  | 19 | **Q.**  If you go to the middle of the page where it says |
| 03:56:25 | 20 | Sherry Shelly, 4:56 p.m., correct? |
|  | 21 | **A.**  Yes. |
|  | 22 | **Q.**  You say, "I will be here until 5:30, but I'm working |
|  | 23 | on something important." |
|  | 24 | **A.**  Yes. |
| 03:56:33 | 25 | **Q.**  So you are telling him that you can't stop what you |

Cross-Examination of Shelby Shelby        Day 1

```
 1  are doing and you'll be there until 5:30, correct?
 2  A.   Yes.
 3  Q.   Was that accurate?  Were you telling the truth?
 4  A.   What do you mean?  That I was working on something?
 5  Q.   That you were going to be there until 5:30.
 6  A.   See, I don't know because -- what day was that?  That
 7  was back in 2014.  So I couldn't tell you.  But most
 8  likely, whatever I was working on I could pretty much
 9  guarantee you that I wouldn't have been able to leave at
10  5:30.  If it was something important, it probably would
11  have taken a while.
12       And I just didn't want to mess with him because he was
13  trying to sign in to my computer from India, and I had to
14  work on documents.  And after I got done with that, I
15  wasn't going to sit there and wait for him to do a back-up
16  on my computer for three hours and just have to sit there
17  and twiddle my thumbs.
18  Q.   Okay.  Are you -- I'm sorry.  I didn't mean to
19  interrupt.
20  A.   Go ahead.
21  Q.   If you go down to the bottom of the page, you see the
22  last entry from Hemang Kareliya is at 5:34 p.m.  Actually,
23  at 5:34 p.m. you tell him, it's all yours, correct?
24  A.   Yes.
25  Q.   He responds, "Okay.  I will connect remotely.  You can
```

03:56:43
03:56:58
03:57:10
03:57:18
03:57:33

1    log off your computer," correct?

2    **A.**    Yes.

3    **Q.**    And you say, Sherry Shelby, 5:35 p.m., "Okay."

4    **A.**    I let him get in.  That would have given me time to go

03:57:45    5    ahead and do what I needed to do in my office with the

6    paperwork and whatever else.

7    **Q.**    All right.  Now turn to Plaintiffs' Exhibit

8    Number 106.  So that is to Travis John Lemley from Travis

9    John Lemley, and it's a conversation -- it's a Lync

03:58:12    10    conversation with you, and it's closed out at 4:41:08 p.m.

11    Do you see that?

12    **A.**    Uh-huh.

13    **Q.**    Is that a yes?

14    **A.**    Yes, I see it.

03:58:19    15    **Q.**    Then we go down and see where Travis John Lemley is

16    saying something about usually leaving at 4:00 and he

17    could check and see.

18    **A.**    He is talking about the maintenance man.

19    **Q.**    Right.  But he goes to you at 4:39 p.m., and you say,

03:58:32    20    "K.  I'm leaving sharp today"?

21    **A.**    Yeah.  I may have had to leave early that day.

22    **Q.**    Okay.  And also, another one of the plaintiffs'

23    exhibits, this is Plaintiffs' Exhibit Number 120, do you

24    see at the end of that conversation, which is with Kristen

03:59:28    25    Davis, you say to her, "Have a great weekend."

*Laura Wells, CRR, RDR*

Cross-Examination of Shelby Shelby    Day 1

```
         1        She says, "Okay.  See you Monday.  You, too."

         2        You sign off with her and say, "Have a great weekend."

         3   A.   What is your point?

         4   Q.   Is that what you tell her?

03:59:39 5   A.   Yeah.

         6   Q.   All right.  And Kristen Davis is the -- she is the

         7   manager at the same location?

         8   A.   She was, yes.

         9   Q.   All right.  All right.  If you'll turn to Exhibit

04:00:03 10  Number 128, Plaintiffs' Exhibit Number 128.  Let me know

        11   when you have had a chance to read that.

        12   A.   I have got to go to a new book.  Hang on a second.

        13   128?

        14   Q.   Yes, ma'am.

04:00:23 15  A.   Are you talking about the e-mail at 6:37 p.m.?

        16   Q.   Yes, ma'am.  It's at 6:37:23 p.m. from you to Peterson

        17   Homebuilders?

        18   A.   Right.

        19   Q.   In the body of that e-mail you are talking about

04:00:51 20  checking in with them to see if they are ready to renew

        21   their lease.  And it says you'll be going on a two-week

        22   vacation and would like to get everyone's leases taken

        23   care of prior to.  Do you see that?

        24   A.   Yes.

04:01:02 25  Q.   So that means there are at least two weeks where you
```

1    are not going to be earning overtime, correct?

2    **A.**   I would say so.  I'm not there.

3    **Q.**   All right.  If you take a look at Exhibit 129.

4             THE COURT:  How much vacation did you take on the

04:01:16  5    average year?

6             THE WITNESS:  I think we got three weeks.

7             THE COURT:  And you took it?

8             THE WITNESS:  Don't quote me on that, Judge, but,

9    yes.  Well, one year I did give some back.  I didn't use

04:01:28  10   it all.  When I left that last year, I didn't -- I left

11   with pretty much most all of it.  I hadn't used it, that

12   last part, I think maybe two or three days that I was out

13   sick.  But I lost a lot of vacation time.

14            THE COURT:  Okay.

04:01:48  15   BY MS. VALDERRAMA:

16   **Q.**   Regardless, when you looked at the claim that's being

17   made from the Court, you didn't deduct for any weeks that

18   you were out for vacation, did you?

19   **A.**   No.

04:01:57  20   **Q.**   All right.  Let's take a look at Plaintiffs' Exhibit

21   Number 129.  This is a conversation with Lauren Reis or

22   Rice (phonetic)?

23   **A.**   What exhibit?  I'm sorry.

24   **Q.**   It's Plaintiffs' Exhibit 129.  I think you spoke about

04:02:17  25   it with your attorney already.

| | |
|---|---|
| | 1 |

**A.**   Yes.

**Q.**   All right.  And this is the one where Ms. Reis is telling you that she filled in the time cards, correct?

**A.**   That is correct.

04:02:29   **Q.**   And that's at 4:54 p.m. on the Friday that the time cards are due; is that correct?

**A.**   That's correct.

**Q.**   Does that refresh your recollection that you had not filled them in and that you did not reach out to her until
04:02:42   5:54 p.m. to ask her to fill them in?

**A.**   I don't see where I asked her to do that.  Actually, unless I'm missing something here, I messaged her to tell her I was unable to access the system, which was quite a common problem that I had for some reason with my computer
04:03:06   and ADP.  They didn't like each other.

**Q.**   All right.  When you reached out to her, it was at 4:54 p.m. on the Friday when your time records were due?

**A.**   That's correct.

**Q.**   All right.  And that's the same time that I read to
04:03:19   you as the time that you reached out to her, correct?

**A.**   I don't know.  It actually looks like she maybe inquired with me because the beginning -- this doesn't look complete, the one on the left, because it's Sherry Shelby at 4:54 p.m.  I say, "Sorry.  I can't get into
04:03:40   ADP."

*Laura Wells, CRR, RDR*

1       So it seems as though I'm replying to something that

2  she may have Q'd me, but there is not anything else on

3  there.  So I don't know.

4  **Q.**  Have you ever --

04:03:50   5  **A.**  That's what it seems like to me, like I'm replying to

6  her.

7  **Q.**  Have you ever failed to put in your time cards

8  completely?

9  **A.**  Yes.

04:04:02  10  **Q.**  All right.  Would you turn to Exhibit 145.  This is

11  Plaintiffs' Exhibit Number 145.

12  **A.**  Yes.  I see it.

13  **Q.**  All right.  And in the middle of that there is a

14  message from you at 6:41 p.m. where you tell someone named

04:04:30  15  Lisa Fouche, "I'll be there after lunch to see what I can

16  do to help out"; is that correct?

17  **A.**  Yes.

18  **Q.**  All right.

19  **A.**  So let me elaborate on that.  She is on the other side

04:04:41  20  of town, and they needed my help over there.  And so I was

21  letting her know that after her lunchtime I would be there

22  because I was going to drive over there and I would be

23  there.  So I don't know what you are implying there.

24  **Q.**  If you'll turn to Exhibit 199.  This is actually

04:05:02  25  Plaintiffs' Exhibit Number 199.  Let me know when you have

           1    finished with it.

           2    **A.**    Okay.

           3    **Q.**    All right.  At 4:52:41 p.m., you are sending an e-mail

           4    from yourself to yourself, correct?

04:05:53   5    **A.**    No.  That's not correct.  What is happening here is

           6    that Boxer has an internal system, as I mentioned earlier,

           7    and what is happening here is that I apparently went in

           8    and created -- or someone did.  I don't know.  It doesn't

           9    -- I can't say that it was me because it says from CME,

04:06:18  10    which is the contact management system that Boxer has

          11    created, their own software, proprietary software.

          12         So someone created this case in CME and e-mailed it to

          13    Jerry Watson, Ernest Garza, myself, and a couple of other

          14    people.  Anyone that's associated, assigned to that

04:06:37  15    property in the system when a case gets created for that

          16    building for whatever it is, a maintenance issue, a

          17    leasing issue, automatically gets an e-mail.

          18         So, no, I can't say that I sent that e-mail.

          19    **Q.**    Okay.  With respect to that e-mail it was in there --

04:06:53  20    it was selected by the plaintiffs as a plaintiffs'

          21    exhibit.  If you'll turn to the next page, Exhibit 199,

          22    it's the very last page of Exhibit 199.  That appears to

          23    be a document -- an e-mail sent from you to yourself at

          24    your Boxer Property e-mail, correct?

04:07:13  25    **A.**    Did you say the last page?  I'm sorry.

1  **Q.**  The last page of Exhibit 199.

2  **A.**  Yes.

3  **Q.**  All right.  And what is there, you are sending from

4  Sherry's iPhone -- that would be your personal iPhone?

04:07:41  5  **A.**  Yes.

6  **Q.**  And you are sending it to your Boxer Property e-mail,

7  correct?

8  **A.**  That could have been a mistake because both of my

9  e-mails --

04:07:48  10  **Q.**  If you'll just answer the question.  Is that --

11          THE COURT:  Let her finish.  Let her finish.

12          MS. WILLS:  She keeps cutting her off.  It's very

13  rude, actually.

14          THE COURT:  Go ahead and finish your answer.

04:07:59  15  **A.**  My personal e-mail is SherryShelby@aol.com.  My Boxer

16  e-mail was Sherry.Shelby@BoxerProperty.com.  Sometimes

17  when I would go to send an e-mail from my phone, it would

18  auto-populate.  This could have very well been an accident

19  that I was trying to send something.

04:08:16  20      This e-mail is from my daughter, Stephanie Brown.  She

21  was trying to sell her house.  She engaged with Elaine

22  Marak, who is a residential real estate agent in our area;

23  and Elaine sent her these documents to list her home.

24      She had sent that to me to look at for her.  So I was

04:08:35  25  trying to send that to myself where I could take a look at

1    it for her.

2        So it's very likely that that is an accident because I

3    would have wanted to be able to see it on a big screen if

4    she sent it to me on my phone because she was wanting to

04:08:49   5    sell her house.  Since I'm a licensed agent, she asked me

6    to look at it.

7    BY MS. VALDERRAMA:

8    **Q.**  I'm sorry.  Was it an accident to -- did you want to

9    see it on a big screen?  So you were trying --

04:08:59   10   **A.**  What I'm telling you is --

11   **Q.**  Let me finish the question so that I don't interrupt

12   you again.

13   **A.**  Uh-huh.

14   **Q.**  You said that you think it was an accident, but you

04:09:07   15   wanted to see it on a big screen.  So are you saying you

16   wanted to see it on a big screen at Boxer Property or are

17   you saying you wanted to see it on a big screen somewhere

18   else that was not your phone and was not Boxer Property?

19   **A.**  Well, what I'll say is considering it looks like it

04:09:22   20   was at 4:52 and, as you noted in some of the other

21   e-mails, I would e-mail things even from Boxer to my

22   personal e-mail so that when I got home I could look at

23   it.  So that would have been what I was trying to do here.

24   I would have wanted to send that to my regular e-mail.

04:09:37   25   And it looks like she had sent it to me -- let's see.

*Laura Wells, CRR, RDR*

1   Elaine Marak.  I don't know.  I don't know what happened

2   with that.  I don't know.  That's what it is.  She wanted

3   me to look at those documents.

4   **Q.**  It looks like your daughter Stephanie Brown sent it to

04:09:58   5   you via her iPhone at 3:58:10 p.m. and that before the end

6   of the work day you sent it from your e-mail, which would

7   be aol.com to Sherry.Shelby@BoxerProperty.com, correct?

8   **A.**  It looks like that, yeah.

9   **Q.**  All right.  And that would be before the end of the

04:10:18   10   workday?

11   **A.**  Okay.

12   **Q.**  Correct?

13   **A.**  Correct.

14   **Q.**  And it would be for some kind of personal business,

04:10:25   15   right?

16   **A.**  Yes.

17   **Q.**  All right.  But this is plaintiffs' exhibit, correct?

18   **A.**  That's correct.

19   **Q.**  All right.  All right.  Would you take a look at

04:11:04   20   Plaintiffs' Exhibit Number 232.  Let me know when you have

21   finished reading it.

22   **A.**  Okay.

23   **Q.**  All right.  So that was an e-mail that was sent from

24   Sherry Shelby, which looks -- the last time that was your

04:11:54   25   personal AOL account, to Sherry Shelby at Boxer Property

*Laura Wells, CRR, RDR*

1   and there is no content.  Do you know what the purpose of

2   that e-mail is, why that would be considered work?

3   **A.**   I don't know.  Maybe I meant to attach something and I

4   didn't attach it.

04:12:10  5   **Q.**   Well, looking at that, that doesn't seem to serve any

6   purpose to send a blank e-mail to yourself?

7   **A.**   I probably meant to attach a document to it and I just

8   forgot to attach it.  That happens.  I have sent e-mails

9   to tenants and forgot to attach documents.

04:12:25  10   **Q.**   That's Plaintiffs' Exhibit Number 232, correct?

11   **A.**   Otherwise, there would be no reason to send a blank

12   e-mail.

13   **Q.**   All right.  Would you take a look at exhibit --

14   Plaintiffs' Exhibit Number 285.

04:13:25  15   **A.**   Are you wanting me to look at the one that was from

16   7:20 p.m. or 7:21?

17   **Q.**   7:21 p.m.  It's the one that your attorney discussed

18   with you.

19   **A.**   I have the one from 7:30 a.m.  It's actually

04:13:58  20   multiples.  They are the same exhibit.

21   **Q.**   All right.  If you would take a look at the one at

22   7:21 p.m., 12-4-2015.

23   **A.**   Okay.

24   **Q.**   All right.  You told your lawyer that you sent that

04:14:20  25   e-mail to yourself because you needed to review the

1    document, correct?  You needed to review the lease?

2    **A.**   Uh-huh.

3    **Q.**   Is that yes?

4    **A.**   Yes.

04:14:29    5    **Q.**   All right.  So when the document was actually sent, it

6    was sent after all parties had signed the envelope and the

7    lease.  So the lease is finished.  There is no review that

8    you could do that would be contributing to the content of

9    the lease, correct?

04:14:44    10   **A.**   No.  Not correct.

11   **Q.**   Are you saying you were going to change the terms of

12   the lease after the tenant signed it?

13   **A.**   No.  I'm saying for some reason I needed to send it to

14   myself to review it to make sure that everything was

04:14:57    15   signed properly and that everything went through.  There

16   was a reason why I would have wanted to review that.  It

17   served no other purpose for me to send it to look at it on

18   my own e-mail.

19   **Q.**   Can you take a look at the last page of that exhibit,

04:15:12    20   7:22:18 p.m.  You are saying, "I'm just now leaving and

21   didn't take a break.  I'm exhausted."  You are telling

22   that to your supervisor Mr. Watson, right?

23   **A.**   Yes.  That's correct.

24   **Q.**   You are telling him this extraordinary thing that has

04:15:28    25   caused you not to be able to leave until 7:22 p.m. and not

*Laura Wells, CRR, RDR*

1    to be able to take a break, correct?

2    **A.**   No.  You are putting words in my mouth.

3    **Q.**   Why else?

4    **A.**   That's not what I am telling you.  I will tell you

04:15:40   5    what I am telling him.  He asked me for something

6    apparently.  I'm letting him know, okay, that I didn't

7    even get to take one break, meaning I didn't even get a

8    five-minute sandwich to eat that day.  So I am letting him

9    know that at that point I am completely exhausted.  I am

04:15:57   10   done, and I'm going home.

11       Now, that was at 7:22.  That doesn't mean that I

12   walked out the door at 7:22.  I just let him know that I'm

13   done.  I'm fixing to leave, and I'll address this on

14   Monday.  Because apparently whatever it was wasn't

04:16:14   15   something that I wanted to get into on a Friday at almost

16   7:30 p.m.

17   **Q.**   All right.  And those e-mails that we went through,

18   those were plaintiffs' exhibits that were produced to show

19   the time that you worked after hours, correct?

04:16:31   20   **A.**   That is correct.

21   **Q.**   All right.  And again, I just want to confirm that you

22   didn't go to lunch regularly, right?  You didn't get to

23   take lunch, and that's how you get to 14 hours per day,

24   plus four hours on the weekend?

04:16:45   25   **A.**   We had a lot of working lunches, yes.

Cross-Examination of Shelley Shelby Day 1

1    **Q.**  All right.

2    **A.**  And there were rare occasions when we did get to go

3    out to lunch, but it was a rare occasion.

4    **Q.**  Oh.  Did you get to go to lunch or not?

04:16:58    5    **A.**  Well, we had working lunches where we ate and worked

6    in the office and ate.  So I guess if you consider that

7    going to lunch, we had a sandwich or something or a

8    hamburger and worked.  And on a rare occasion, especially

9    if it was like a Boxer sales lunch or something where they

04:17:21    10    had our sales meetings, they would feed us lunch at the

11    sales meeting.

12            MS. VALDERRAMA:  May I approach the witness,

13    Judge?

14            THE COURT:  Yes, you may.

04:17:44    15            MS. WILLS:  I'm sorry.  What exhibit is this?

16            MS. VALDERRAMA:  116.

17            MS. WILLS:  One what?

18            MS. VALDERRAMA:  116.  It's a new exhibit.

19            MS. WILLS:  Is it in the exhibit notebook?

04:17:55    20            MS. VALDERRAMA:  No.  It's rebuttal.

21            MS. WILLS:  Your Honor, this is a document that

22    was never marked as an exhibit.

23            THE COURT:  Are you unfamiliar with it?

24            MS. WILLS:  I'm completely unfamiliar with it.

04:18:06    25    It was not included in any of the exhibits that defendant

1    submitted in their four boxes of exhibits for the trial of

2    this case.

3           MS. VALDERRAMA:  Judge, it's not our job to have

4    to show where the plaintiff is not being truthful.  The

04:18:20  5    plaintiff has said she never got to go to lunch.  We are

6    entitled to wait until she testifies at that point and

7    then put her credibility at issue with the Court.  This is

8    a rebuttal exhibit.  She is either testifying truthfully

9    about getting to go to lunch or she is not.  Truthfulness

04:18:36  10   is a big piece of this case.

11          MS. WILLS:  It is a big piece of this case, and

12   nothing in this e-mail is any different from anything

13   else.

14          THE COURT:  I don't know what the agreement was

04:18:46  15  between you.  Did you agree to produce all documents,

16   including impeachment documents?

17          MS. VALDERRAMA:  We did not agree to produce

18   impeachment documents.  We did not.  We reserved the right

19   to have rebuttal and impeachment documents.

04:19:00  20          MS. WILLS:  We'll withdraw.  She can ask her

21   about this exhibit because it's -- okey-dokey.

22          THE COURT:  Okay.

23   BY MS. VALDERRAMA:

24   **Q.**  Would you take a look at Exhibit 116, which is in

04:19:17  25  front of you?

1    **A.**   Yes.

2    **Q.**   Is that an e-mail from you to Jerry Watson at

3    9:04 a.m. on September 10 of 2015?

4    **A.**   It is.

04:19:26    5    **Q.**   And the heading is "earlier lunch today," correct?

6    **A.**   That is correct.

7    **Q.**   You tell him that today is grandparents' day at your

8    grandson's school, and you are going to take lunch today a

9    little earlier than normal, at 10:45?

04:19:40    10    **A.**   By normal I mean in the Boxer management book, the

11    Boxer bible, it says that lunch hours when taken are

12    supposed to be between 11:00 and 1:00.  And it was -- like

13    I told you -- I want to correct you.  You said that I said

14    I never went to lunch.  I did not say that.  I said on

04:19:57    15    rare occasions I did.  And when it involved grandparents

16    day, I'm a wonderful grandmother and I love my

17    grandchildren.  They are the most important thing to me.

18    And I did want to participate in my grandson's

19    grandparents' lunch.

04:20:09    20    **Q.**   This basically says it's an earlier lunch.  It doesn't

21    say that you are not taking lunch otherwise?

22    **A.**   Earlier than customary for Boxer.

23    **Q.**   All right.

24              MS. VALDERRAMA:  Approach, Judge?

04:20:53    25              THE COURT:  Yes, you may.

*Laura Wells, CRR, RDR*

BY MS. VALDERRAMA:

**Q.**   Exhibit 118.  I have one in the order.  All right.  On

11-24-2015 at 1:59 p.m. you are telling Jerry, your

manager that you are taking a late lunch.  You say, "I'm

04:21:35   just now headed to lunch," correct?

**A.**   That's correct.

**Q.**   All right.

**A.**   That doesn't mean that I didn't go get a sandwich and

come right back and eat it in my office.  If we were going

04:21:46   to be out of the office during the normal 11:00 to 1:00,

which is the time period that Boxer allotted for people to

go to lunch, we had to notify the supervisor.  So --

        MS. VALDERRAMA:  May I approach, Judge?

        THE COURT:  Yes, you may.

04:22:43        MS. VALDERRAMA:  Thank you.

BY MS. VALDERRAMA:

**Q.**   All right.  Would you take a look at Exhibit 119?

**A.**   I have.

**Q.**   All right.  That's an e-mail to Jerry Watson, your

04:23:41   supervisor, copying Kimberly Yantz, who is, I assume,

another leasing agent.  Is she another leasing agent?

**A.**   Yes.

**Q.**   It's sent from you at 9:13:26 a.m.  In that e-mail you

say, "Jerry, after I get Ann's lease to her, I will be

04:24:04   leaving for an earlier extended lunch to see my

1    granddaughter's Christmas program.  Kimberly has agreed to

2    cover the extra hour while I'm not available.  I'll be

3    unavailable from 10:30 to 12:30."  That's Exhibit 119.

4         Is that accurate you took an extended lunch that day?

04:24:24  5    **A.**   I did.  For my granddaughter's program.

6              MS. VALDERRAMA:  May I approach, Judge?

7              THE COURT:  Yes, you may.

8    BY MS. VALDERRAMA:

9    **Q.**   All right.  Exhibit 120, that's an e-mail on

04:25:48  10   January 18 of 2016 from you to your supervisor Jerry

11   Watson.  Do you see that?

12   **A.**   I do.

13   **Q.**   And you are telling him again that you are going to

14   take a late lunch, correct?

04:25:57  15   **A.**   That's correct.

16   **Q.**   And you say, "Jerry, my PM -- " who would that be?

17   **A.**   That would have probably been -- because I would have

18   been -- that would have been at 1322 Space Park.  So that

19   would have been Kelly Farrell.

04:26:12  20   **Q.**   All right.  "My PM is out today.  I have been dealing

21   with tenant issues this morning.  I'm just now getting to

22   head to lunch.  I'll be back at 1:45 for my 2:00 p.m.

23   appointment."  Do you see that?

24   **A.**   I do.

04:26:25  25   **Q.**   It shows that you are leaving at 12:42 and will be

1    back at 1:45.  That is an hour lunch?

2    **A.**    That is correct.

3              MS. VALDERRAMA:  May I approach?

4              THE COURT:  You may.

04:27:14    5    BY MS. VALDERRAMA:

6    **Q.**    Would you take a look at Exhibit 121, which is an

7    e-mail from you to Jerry Watson, your supervisor, on

8    January 8th, 2016, at 2:09 p.m.?

9    **A.**    I see it.

04:27:28   10    **Q.**    It says, "Late lunch today.  Jerry, late lunch.  Was

11   on a tour.  I'll be back at 3:15," correct?

12   **A.**    Correct.

13   **Q.**    So it shows you leaving at 2:09 p.m. and it shows you

14   won't be back until more than an hour later, correct?

04:27:41   15   **A.**    That's correct.

16   **Q.**    All right.

17             MS. VALDERRAMA:  May I approach?

18             THE COURT:  Yes, you may approach.

19             MS. VALDERRAMA:  Thank you, Judge.

04:29:13   20   BY MS. VALDERRAMA:

21   **Q.**    This is 122.  Would you take a look at what the court

22   reporter has -- I'm sorry -- what is marked as

23   Exhibit 122, Defendant's Exhibit Number 122.  Just let me

24   know when you finish, Ms. Shelby.

04:33:52   25   **A.**    Okay.

Cross-Examination of Sherry Shelby          Day 1

1   **Q.**  All right.  So if you go to the very beginning of this

2   e-mail exchange, it appears that there is an issue with a

3   tenant named Ann Thomas, correct?

4   **A.**  Yes.

04:34:06  5   **Q.**  All right.  And Ann Thomas, going back until

6   apparently around November 19 of 2015, which is the

7   second-to-last page of the exhibit, is asking you -- she

8   is asking you for a lease, and you say, "My apologies," at

9   4:34 p.m., "I'll have it over to you tomorrow."

04:34:35  10      Do you see that?

11   **A.**  I do.

12   **Q.**  All right.  And then apparently, just for some reason,

13   she follows up with you on December 7 because she doesn't

14   have it yet.  Do you see that?

04:34:45  15   **A.**  December 7th?

16   **Q.**  Yes.  It's the e-mail above.

17   **A.**  Are you starting from the bottom page or the top page?

18   **Q.**  I'm starting from the back because that's the

19   beginning of the discussion.  Let's start at the

04:34:59  20   beginning.

21   **A.**  Okay.  Yes.  I see that.

22   **Q.**  All right.  And then it's followed up with an e-mail

23   from Ms. Thomas to you on Wednesday, December 9, at

24   6:49 p.m.  It's from her to you.  You didn't send it.  She

04:35:28  25   sent it to you.  And she also sent it to Lynn Dockall, who

1  is one of the -- one of her colleagues, and she sent it to

2  Leasing@BoxerRetail.com.  So she sent it to where it would

3  draw the attention of somebody else, correct?

4  **A.**  Uh-huh.  Yes.  I'm sorry.

04:35:51  5  **Q.**  It, in fact, did draw the attention of Alex Kakhnovets

6  on December 9 at 6:00 p.m.  He e-mails Jerry Watson and

7  says, "Follow up personally and let's discuss tomorrow,"

8  correct?

9  **A.**  Yes.

04:36:02  10  **Q.**  And you are not on that particular e-mail chain

11  because that's something that is as a result of it having

12  been sent to Leasing@BoxerRetail.com?

13  **A.**  Correct.

14  **Q.**  So then if you move up, Jerry Watson then tells Alex

04:36:18  15  Kakhnovets on Wednesday at 8:49 -- now, Alex is the senior

16  manager, and Jerry is your immediate supervisor.  He says,

17  "I'll call the tenant in the morning and schedule some

18  time with you," correct?

19  **A.**  Yes.

04:36:31  20  **Q.**  And you are not on that e-mail either?

21  **A.**  No.

22  **Q.**  All right.  Then on the next page, Jerry Watson sends

23  to you on December 10th the entire e-mail chain so you can

24  see what has been happening with this particular tenant,

04:36:48  25  correct?

04:37:07

04:37:27

04:37:35

04:37:47

04:38:05

1    He says, "Hi, Sherry.  I spoke with Ann.  And as you

2  know, her delay in getting renewal documents started long

3  before our relocation project on 12-3-15.  Let's make sure

4  we handle her with kid gloves to turn her around.  I

5  suggest hand-delivering her the renewal docs.  If she is"

6  -- I need to go back -- "If she is having internet issues,

7  let's do a paper lease.  Let me know if we have any other

8  issues that could surface between now and December 18 of

9  2015 and please e-mail me after you have spoken to Ann

10  today."  That's what he sends you, correct?

11  **A.**   Yes.

12  **Q.**   All right.  And 12-18-2015, that's the day you are

13  leaving on a two-week vacation, correct?

14  **A.**   I don't know.  Was it?

15  **Q.**   Do you know what is going on on 12-18-2015?  Do you

16  remember?

17  **A.**   I was -- are you asking me if I was going on vacation

18  or are you asking me if I remember?

19  **Q.**   Do you remember what is significant about the date of

20  December 18 of 2015?

21  **A.**   I typically did take time off around Christmas.  So,

22  yeah, I could see where I might be going on vacation, yes.

23  **Q.**   All right.  And so you then e-mail Ann and you say,

24  "My apologies.  I'll have this over to you tomorrow, on

25  November" -- I'm sorry.  What did I do with it?  Okay.  It

1   looks like there is some duplicate here.

2       Then you say, "Sherry" -- Jerry sends it to you and

3   then you, Sherry, you respond to him.  You respond --

4   there is communication with you and Ann on -- I'm sorry.

04:39:09   5   You forward something at that point in time on December 10

6   to Jerry Watson that has all of those attachments.

7       Do you see that?  December 10.  And you copy Alex

8   Kakhnovets.

9   **A.**   I'm not sure.  Let me see.  I'm trying to figure out

04:39:33   10   where you are at here.  You said it had attachments?

11   **Q.**   Look at -- look at the first page of Exhibit 122.

12   **A.**   Okay.  Yes.  I see where I e-mailed Jerry and copied

13   Alex on it.

14   **Q.**   And in that e-mail you are telling Jerry that at 9:50

04:40:01   15   a.m. you e-mailed her a copy of the lease, as well as sent

16   her the lease in DocuSign and left her a message.  That's

17   because Jerry told you to tell him when you had responded

18   to her, correct?

19   **A.**   That's correct.

04:40:13   20   **Q.**   All right.  And then you go on and you say in the

21   middle of the day -- I'm sorry.  In the middle of the

22   exhibit, "Jerry, I explained to you that I had several

23   time-sensitive issues going on last week that I needed to

24   get to and you said that the 1322/2400 relo project took

04:40:40   25   precedence to everything."

1    You asked for help several times over the past month

2    and just finally received some help with calls yesterday.

3        In the paragraph immediately preceding that, you talk

4    about how you covered Kimberly a couple of times in

5    addition to numerous tours, renewals, and general building

6    activity and then went on Thanksgiving holiday from the

7    25th through the 30th."  Then you said, "The day after we

8    got back from vacation you said 'Let's go now relo.'  And

9    ever since then I have been working till 7:00 to 8:00 p.m.

10   most nights trying to get this done for you."

11       So it says that ever since at some point in time where

12   you got this new project, you are all of a sudden having

13   to work between 7:00 and 8:00 p.m., correct?

14   **A.**   No.  I wouldn't say every -- that that was the only

15   time; but at that time, that's when I focused on that

16   project for him.  So it doesn't mean that I wasn't there

17   working any other time.  It just means that during this

18   period of time, that was my primary focus every evening

19   was trying to get what he was needing done for this relo.

20   **Q.**   But the paragraph you send him says that ever since

21   then, ever since that date, you have been working to 7:00

22   or 8:00 p.m. at night?

23   **A.**   On that project, yeah.  That's exactly what I told

24   him.  I let him know that I had focused in on that project

25   and that ever since he had notified me of it that I had

Cross-Examination of Shelby Day 2

04:42:26

 1  been working on it.  That's what I was telling him.  And I
 2  think I even go on to say, you know, haven't even had time
 3  to go to the bathroom and I rarely go to lunch, which was
 4  my testimony earlier.  I'm not just sitting around wasting
 5  my time.  I rarely go to lunch and I can barely get in the
 6  restroom once, maybe twice a day.

 7      So I was letting him know how busy I was.  I was
 8  actually pleading for help.  I was actually begging them
 9  to get me some help because I was so inundated that I
04:42:44
10  couldn't get my work done, and it was starting to consume
11  me, as a result of an unhappy tenant in this particular
12  case.

13  Q.  You are explaining to your boss why it is that it was
14  all right for you not to keep up with that particular
04:42:59
15  tenant, correct?  Didn't he say earlier that it started
16  with -- the problem long before the relo?

17  A.  I don't know that he said long before.  I think he
18  said it started before.  That doesn't mean that she didn't
19  ask for a renewal.  This lady didn't know what she wanted
04:43:12
20  to do.  She wanted to expand.  She wanted some possible
21  construction.  Then she didn't want it renewed.  Then she
22  wanted to move out.  And so I had worked with her for some
23  time.

24      When she finally came and said, I need the lease, it
04:43:26
25  could have been -- and I don't know.  It could have been a

*Laura Wells, CRR, RDR*

04:43:41

1    day or two days or three days.  It may have started

2    before.  I don't know how many days before.

3         At the time when the relo project picked up, he made

4    that my number one priority.  I couldn't be in two places

5    at one time making everybody happy.  So unfortunately, in

6    this particular case, Ann got put on the back burner and

7    we had internet issues and there were compounding issues

8    with this particular deal that weren't normal.

9         So I was letting him know that I'm focusing in on this

04:43:58

10   relo project.  This is what I'm spending my time on.  I'm

11   not just sitting here and not taking care of my customer.

12   **Q.**   The Exhibit 119, you were able to take a two-hour

13   lunch break from 10:30 to 12:30?

14   **A.**   That's for my granddaughter?

04:44:14

15   **Q.**   Correct.

16   **A.**   Is that the one?

17   **Q.**   Correct.

18   **A.**   Yes.

19   **Q.**   That was the day before you were able to take a

04:44:19

20   two-hour lunch.

21   **A.**   I can't say I was gone two hours, but I wanted to

22   allot that time just in case.  But typically, when I go to

23   a school lunch, because I go to those special occasions

24   now, and typically they take about 45 minutes to an hour.

04:44:31

25   **Q.**   So even though it says here with you telling Jerry, I

    1  will be unavailable from 10:30 to 12:30, your testimony in

    2  court --

    3  **A.**  I did tell him that.

    4  **Q.**  -- your testimony in court here today is that you

04:44:42  5  didn't actually spend that amount of time?

    6  **A.**  I'm not saying that I did or I didn't.  I'm telling

    7  you that their lunchtime is only about 45 minutes.  So,

    8  you know, I'm not saying that I took the full two hours,

    9  but I was letting him know that it was a possibility

04:44:57  10  because I don't know.

    11          MS. VALDERRAMA:  May I approach the witness?

    12          THE COURT:  You may.

    13  BY MS. VALDERRAMA:

    14  **Q.**  Would you take a look at what has been marked as

04:45:24  15  Exhibit 123, Defendant's Exhibit Number 123.

    16  **A.**  Okay.

    17  **Q.**  All right.  So that's on February 5.  You are going to

    18  dinner with Kristen Davis, correct?

    19  **A.**  Yes.

04:45:48  20  **Q.**  It looks like you guys are going to meet up at the

    21  Saltgrass Steakhouse?

    22  **A.**  Yes.

    23  **Q.**  You are going to be there between 5:45 and 6:00 p.m.,

    24  right?

04:45:57  25  **A.**  Yes.

                              *Laura Wells, CRR, RDR*

1    **Q.**  You are going to skip out early to beat the traffic?

2    **A.**  Well, that didn't happen.  I can tell you that.

3    Because I remember this.  This was not long before I left

4    from working for Boxer.  And I wasn't able to get out

04:46:08    5    because I was down at 1322 Space Park, and we had to push

6    this back.  Just so you know.

7    **Q.**  Even though it says here you are going to skip out

8    five minutes early in black and white, as you sit here

9    today --

04:46:22    10    **A.**  Well, maybe we were going to try to do that, yes.

11    **Q.**  Let me ask you a question.

12    **A.**  It was on a Friday, wasn't it?  Yeah.

13          THE COURT:  I think, well, isn't it Ms. Davis who

14    says she is --

04:46:36    15          MS. WILLS:  Right.  It's not you saying.

16          THE COURT:  Ms. Davis is skipping out five

17    minutes early?

18    BY MS. VALDERRAMA:

19    **Q.**  Did you say you are going to get there.  Sounds good.

04:46:42    20    You are going to be there at 5:45.

21    **A.**  That was my intention, but that did not happen.

22    **Q.**  So even though you have an e-mail saying you are

23    meeting your friend at 5:45 --

24    **A.**  I am meeting the property manager, yes.

04:46:51    25    **Q.**  She wasn't your property manager in February, correct?

*Laura Wells, CRR, RDR*

1    **A.**   Well, she was the property manager I worked with for

2    three years.  Yes.

3    **Q.**   In February she was no longer your property manager?

4    **A.**   That's correct.

04:47:00    5    **Q.**   You were meeting your friend, correct?

6    **A.**   Okay.  You can call it a friend if you want.  That's

7    fine.

8    **Q.**   All right.  Are you testifying that this is not --

9    **A.**   I would call her a business associate.  I thought

04:47:12    10    maybe she was a friend, but I would call her a business

11    associate because we do not communicate.  We are not

12    friends at this -- we have not spoken, other than one

13    lunch after I left Boxer.

14    **Q.**   All right.  You did have a lunch after you left Boxer.

04:47:26    15    So at this time, you will concede she was a friend?

16    **A.**   I would say she is a business acquaintance, yeah.  Did

17    she ever come to my house?  No.  Have I ever been to her

18    house?  No.  So --

19             MS. VALDERRAMA:  May I approach, Your Honor?

04:47:55    20             THE COURT:  Yes, you may.

21    BY MS. VALDERRAMA:

22    **Q.**   This is 117.  Would you take a look at Defendant's

23    Exhibit Number 117, please?

24    **A.**   Yes.

04:48:32    25    **Q.**   Do you see that?

 1   **A.**   Yes.

 2   **Q.**   That's an e-mail on September 28, 2015, sent at

 3   2:57 p.m. from you to Jerry Watson where you are telling

 4   him you are leaving at 4:30, correct?

04:48:43    5   **A.**   That's correct?

 6   **Q.**   All right.  You say you didn't get a break at all and

 7   you have to attend to something before the end of business

 8   today.  That would be 5:30, correct?

 9   **A.**   Correct.

04:48:52   10   **Q.**   And then you get Kimberly to cover you from 4:30 to

11   5:30?

12   **A.**   That's correct.

13   **Q.**   All consistent with a normal Boxer day, correct?

14   **A.**   What do you mean consistent?

04:49:02   15   **Q.**   The end of the day is 5:30.  The end of business is

16   5:30.  If you are leaving early, you are supposed to let

17   your supervisor know.

18   **A.**   That was the standard office hours, yes.

19   **Q.**   Okay.  And you said you were leaving before the end of

04:49:16   20   business today?

21   **A.**   Yes.  I was -- I asked for coverage, that I had

22   something I had to attend from 4:30 to 5:30.  I didn't say

23   I wasn't coming back or that I was going to be complete

24   with work.

04:49:29   25   **Q.**   I see.  Are you testifying that even though you said

1    you were leaving at 4:30, you really meant you were coming

2    back?

3    **A.**   I don't know.  I'm saying I don't know.  I don't even

4    know -- to be honest, I don't remember even what I had to

04:49:40  5    handle that particular day.  But there was, obviously,

6    something I had to do.

7              MS. VALDERRAMA:  May I approach, Judge?

8              THE COURT:  Yes, you may.

9              MS. VALDERRAMA:  Thank you.

04:50:23  10   BY MS. VALDERRAMA:

11   **Q.**   (Tendering document.)

12   **A.**   Okay.

13   **Q.**   All right.  This is an e-mail from you to Jerry

14   Watson.  You are talking about notifying him that you are

04:50:58  15   actually going to be there that following Saturday,

16   correct?

17   **A.**   Yes.

18   **Q.**   And you are telling him that you are going to come in

19   tomorrow to try to catch up a little?

04:51:05  20   **A.**   Yes.

21   **Q.**   All right.  And you are notifying Mr. Watson because

22   you don't usually come in on Saturday, correct?

23   **A.**   Well, sometimes I would let him know that I was coming

24   in.  This looks like it could have had something to do

04:51:19  25   with the Ann thing, based on the dates, because I was so

Cross-Examination of Sherry Shelby        Day 1

1    covered up.  And I had that extra project on me with those

2    extra buildings.

3         So I wasn't able to just dedicate my extra time to my

4    particular assignment, my normal assignment.  So I was

04:51:33   5    getting behind.  And I was letting him know, because he

6    wasn't happy with me on that issue.  But he was inundating

7    me with work, and I could not get my head above water.

8         So normally, whereas I would have stayed in my office

9    on my personal assignment to get caught up, I wasn't able

04:51:54  10    to do that because I was working on that relo project.

11   **Q.**  And it's the relo project that was causing you to stay

12   as late as 7:00 or 8:00 p.m. during that time frame that

13   began on December 3 where you wrote the e-mail on

14   December 11th, correct?

04:52:12  15   **A.**  When you say causing, there was always a reason.  So,

16   no, it was -- it was what I was working on at that time,

17   but I can't say it's the only thing that was causing me to

18   have to put in extra work time.  There were lots of things

19   that caused that.  This just happened to be one of them

04:52:34  20   that was over the top.

21   **Q.**  Now, in the e-mail -- well, at the same time that you

22   were being employed by Boxer Property Management

23   Corporation as one of their leasing agents and, as you

24   said, a top producer for them, you had another business

04:53:18  25   going on the side, correct?

Cross-Examination of Sherry Shelby    Day 1

1   **A.**   I wouldn't know if I would call it another business

2   but I was a licensed real estate agent and I did have a

3   few sales, a few residential sales that I completed.

4   **Q.**   When you say a few residential sales, let's talk about

04:53:35   5   the time frame of 2015.  What was the volume of dollars

6   you did in sales in 2015 with that business that you had

7   on the side?

8   **A.**   Personally, I don't know right offhand.  You would

9   have to show me what you have got there because I don't

04:53:49   10   remember.

11          THE COURT:  Was it more than a half million or

12   less than a half million?

13          MS. VALDERRAMA:  It was a half million, more than

14   a half million.

04:53:56   15          THE COURT:  I was asking her.  Do you recall if

16   it was more than a million or less than a million?

17          THE WITNESS:  I don't know, Judge, honestly.

18   BY MS. VALDERRAMA:

19   **Q.**   In 2015 you sold almost $500,000 in properties; is

04:55:34   20   that correct?

21   **A.**   It was under.  It was under.

22          THE COURT:  If these numbers are correct, it's

23   more than $500,000.

24   BY MS. VALDERRAMA:

04:55:40   25   **Q.**   It was more than $500,000.

04:55:55

04:56:15

04:56:29

04:56:42

04:56:59

1   **A.**   Was it?  I think it's under, isn't it?

2   **Q.**   If you take the 7-23-15, the 10-4-15, the 11-2-15, and

3   the 11-17-15, it exceeds half a million.

4   **A.**   Okay.  I don't have a calculator.

5   **Q.**   So that means that during the period of July, October,

6   and November, at least, of 2015 where you sold -- that was

7   the time frame when you sold those properties, it was

8   actually a three-month time frame in 2015, that was the

9   same time frame that you indicated you were working at

10  Boxer Property until -- from 8:00 a.m. in the morning

11  until 8:00 p.m. at night and then working ten more hours;

12  is that correct?

13  **A.**   That's correct.

14  **Q.**   So you are saying you didn't spend time in this -- how

15  are you able to handle your real estate business on the

16  side?

17  **A.**   Well, when you list a property, okay, it doesn't

18  require a lot of attention.  So, typically, you are going

19  to meet with your client on a Saturday or a Sunday,

20  because that's when most people are off work, and snap a

21  few pictures and it takes you about ten minutes to put it

22  in the MLS system.

23      You send them their contract via DocuSign.  That takes

24  you about ten minutes to type that.

25      Once you put it in MLS, buyers' agents are the ones

*Laura Wells, CRR, RDR*

1   that typically show the properties, and you don't really

2   have to do anything until they send you a contract.

3       And then you forward that to your client.  If they

4   accept it, they sign it.  If they don't, they reject it.

04:57:15   5       It doesn't require a lot of time.  It's different than

6   when you are representing a buyer.

7   **Q.**  All right.  So you are saying that the paperwork was

8   easier and it was just -- it didn't take any time at all

9   for you to sell these four properties to the tune of over

04:57:28   10  a half a million dollars?

11  **A.**  Not much time at all, actually.

12  **Q.**  All right.  You were a Texas Real Estate Commission

13  broker -- I'm sorry, not a broker -- a licensed agent?

14  **A.**  Yes, I am.

04:57:44   15  **Q.**  You had to keep up with certain CLE responsibilities?

16  **A.**  CLE?

17  **Q.**  I'm sorry.  Continuing education responsibilities.

18  **A.**  I did.

19  **Q.**  All right.  And how would you do those, perform those

04:57:56   20  responsibilities?

21  **A.**  Continuing education?

22  **Q.**  Yes, ma'am,

23  **A.**  Usually on line.

24  **Q.**  You would go on line and complete this?

04:58:03   25  **A.**  Yeah.  Yeah.

1    **Q.**   All right.  And when you went on line, what would be

2    the date of the -- that would be shown for when you

3    completed it?

4    **A.**   I don't know.  What do you mean the date?  Whatever

5    date --

6    **Q.**   Well, how would you know when you had completed it?

7    **A.**   Well, whatever it would -- I don't understand what you

8    are asking me.

9    **Q.**   All right.  So when you completed your on-line CLE,

10   would that then somehow show up as the date by which you

11   had certified to do those hours?

12   **A.**   I don't know that I would say that that was the case.

13   What do you mean?  I mean, when you completed your

14   continuing education and you completed whatever module

15   they had for you, whether it was some kind of test or

16   something, typically it would print out, like, a

17   certificate and then that would have the date; but it

18   didn't indicate necessarily that that was the date you

19   completed the hours because you had however much time to

20   complete the hours.

21        When you are doing it on line, you work at your own

22   pace.  You don't have to sit down and do it all at one

23   time.  It's not like going to a class and you are there

24   eight hours and then you leave.

25        So if you got on to an on-line system, you could work

04:59:31

1  on it for ten minutes and you could save your work and you

2  could come back.  You just can't take the test.

3      It doesn't require -- on-line systems doesn't require

4  if it's -- I forget the number of hours you need for

5  continuing education.  Is it 15 or 30?  But whatever it

6  is, you don't actually have to spend 15 hours in the

7  system.  You just can't take your test until you have had

8  it signed up for 15 hours.

04:59:50

9      So, for example, if today I signed up at 9:00 a.m. in

10  an on-line class, I wouldn't have to spend 15 hours in

11  that system.  I just can't take the test until 15 hours

12  have passed.  And that's how the real estate commission --

13  at that time, that's how they regulated things.

14  **Q.**  I'm sorry.  Just so I understand, if it says that you

05:00:08

15  are supposed to be qualified for 30 hours of education,

16  you don't actually have to study for 30 hours.  You just

17  have to log on, and then 30 hours later take the test?

18  **A.**  You have to pass the module, and then you will get it,

19  yeah.

05:00:22

20  **Q.**  You don't actually have to do the work.  Is that what

21  your testimony is?

22  **A.**  I'm saying that some people read faster than others,

23  and it doesn't require that you have to be in the system.

24  So it's not like a timed system is what I'm telling you.

05:00:35

25      So, in other words, when it signs on it doesn't --

Cross-Examination of Shelby Shelby                                  Day 2

1    it's not making you stay signed on.  You just can't take

2    the test until you have actually purchased and signed on

3    the initial time.

4         That's not my regulation.  The state regulates the

05:00:49  5    educators.  Not me.  So I just went through the system the

6    way that they required it.

7              MS. VALDERRAMA:  May I approach?

8              THE COURT:  Yes.

9    **A.**   And also, Boxer allowed us to do that because they

05:01:01  10   required us to have a real estate license and Boxer

11   allowed us to do that on their time.  So --

12   BY MS. VALDERRAMA:

13   **Q.**   You actually had a real estate license of your own on

14   the side and a business of your own on the side and you

05:01:24  15   needed to keep that license up for that business, correct?

16   **A.**   Actually, when I came to work for Boxer, they told me

17   that they wanted me to have a real estate license.  And I

18   let them know then that I wouldn't come to work for them

19   if I had to put that license in their name and that that

05:01:43  20   was because if I had a past customer or an acquaintance

21   that needed help with a real estate transaction, that I

22   wanted to be able to do that.  And they agreed to that.

23   What is this disciplinary action?

24   **Q.**   Would you take a look at Exhibit 126.  That's a

05:02:01  25   certificate of license history from Texas Real Estate

*Laura Wells, CRR, RDR*

1    Commission.  Do you see that?

2    **A.**    Okay.  Yes.

3    **Q.**    It says there on May 12 of 2015, May 7 of 2015 --

4              MS. WILLS:  Your Honor, we're going to object to

05:02:13   5    this document.  It was never even produced.  They are

6    just -- this was never even produced.  They are literally

7    just pulling things out now, a document that was never

8    even produced in discovery.

9              MS. VALDERRAMA:  Judge, it is --

05:02:26   10             MS. WILLS:  And what impeachment is it?  What is

11   the purpose of this document, other than a document that

12   they didn't produce in discovery?

13             MS. VALDERRAMA:  It's a public record, Judge.

14             THE COURT:  Normally impeachment does not need to

05:02:39   15   be produced ahead of time.

16             MS. WILLS:  But this is not an impeachment

17   document, Your Honor.

18             THE COURT:  Well, I'm not sure where we are going

19   with this, but it looks like the courses that she took.

05:02:56   20             MS. VALDERRAMA:  That's correct, Judge.  The

21   courses were taken in 2015 during the time that she was

22   working for Boxer and when she described the work that she

23   was doing for Boxer after hours.

24             MS. WILLS:  She also testified that Boxer

05:03:08   25   required her to have a real estate license and she took

1  courses and supported that license.  I don't understand

2  how this is impeachment evidence.

3       THE WITNESS:  Boxer paid for this.  Boxer paid

4  for this class.  They reimbursed us for our continuing

05:03:22  5  education, and they also reimbursed us for our licensing

6  renewals.

7       MS. WILLS:  It's just -- it's improper, Your

8  Honor.  They didn't produce this during discovery, and

9  it's not impeachment evidence.

05:03:33  10       THE COURT:  I don't think they have to produce it

11  during discovery and I --

12       MS. WILLS:  So that means, Your Honor, we can

13  just start bringing in all kind of documents?

14       THE COURT:  For impeachment.  For impeachment.

05:03:43  15       MS. WILLS:  This is not impeachment, though, Your

16  Honor.

17       THE COURT:  Well, I don't know where we are going

18  with it.

19       MS. VALDERRAMA:  All right, Judge.  I'll just

05:03:47  20  withdraw the exhibit.  She has -- we have --

21       THE COURT:  You are going to withdraw the

22  exhibit.  Okay.

23       MS. VALDERRAMA:  Withdraw the exhibit.  She has

24  testified already to the fact she had to do -- perform

05:03:58  25  these hours and that she performed the hours with

1    actually --

2        THE COURT:  Well, just to make sure we don't

3    leave an ambiguity on the record, there is no disciplinary

4    action reflected here.  It's just saying that as of

05:04:14    5    April 2nd of this year the following disciplinary action

6    is shown.  And then it doesn't show any disciplinary

7    action, right?

8        MS. VALDERRAMA:  No.  But it goes on to identify

9    the time that was spent certifying for courses, and I

05:04:35    10    think that Ms. Shelby has already explained that she

11    didn't actually do the hours.  She just logged in, let

12    them happen, and then took the test.  That is all you

13    need.

14        THE WITNESS:  That's not what I said.

05:04:48    15        MS. WILLS:  I agree.  Your Honor, in order to

16    clear up the record, nothing in this record shows any

17    disciplinary action.  I think that was the point Your

18    Honor wanted to make.  Although, the exhibit is being

19    withdrawn anyway.

05:04:59    20        THE COURT:  Okay.  How close are you to being

21    done?

22        MS. VALDERRAMA:  Well, we have to talk about the

23    other plaintiffs, Judge.

24        THE COURT:  I am getting worried about -- we

05:05:18    25    allotted this week for the case.  I'm not confident we're

*Laura Wells, CRR, RDR*

Cross-Examination of Shelly Shelby                    Day 1

05:05:33

1  going to get it done this week.  This is just one witness

2  today.  How many witnesses are we going to have?

3       MS. VALDERRAMA:  I don't think my witnesses are

4  going to take quite so long.  The problem is, Judge, that

5  the evidence of work is what is so nebulous and the

6  Court -- we need to be able to present to the Court the

7  absence of evidence of work.  My witnesses are not going

8  to take that long, but that's part of the issue that we

9  have.

05:05:57

10      THE COURT:  Okay.  We're going to break for the

11 day.  We'll start at 9:00 tomorrow.

12      MS. VALDERRAMA:  Thank you, Judge.

13   (Proceedings concluded at 5:05 p.m. and continued on

14 Day 2.)

15 *Date: June 10, 2019*

16                  ***COURT REPORTER'S CERTIFICATE***

17   *I, Laura Wells, certify that the foregoing is a*

18 *correct transcript from the record of proceedings in the*

19 *above-entitled matter.*

20

21                  *_____/s/ Laura Wells_____*

22                  *Laura Wells, CRR, RMR*

23

24

25

*Laura Wells, CRR, RDR*